## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| THE ELITE RODEO ASSOCIATON d/b/a ELITE RODEO ATHLETES, TREVOR BRAZILE, BOBBY MOTE, AND RYAN MOTES, individually and on behalf of a class of similarly situated individuals, | § § § § § § | |
| Plaintiffs, | § § | CASE NO. |
| v. | § § § | PLAINTIFFS' ORIGINAL COMPLAINT – CLASS ACTION |
| PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC. | § § § § § § | DEMAND FOR A JURY |
| Defendant. | § | |

T. Ray Guy
Texas Bar No. 08648500
ray.guy@weil.com
Olivia Zimmerman Miller
Texas Bar No. 24074724
olivia.miller@weil.com
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201-6950
Telephone:     (214) 746-7700
Facsimile:     (214) 746-7777

OF COUNSEL:
James W. Quinn (*pro hac vice to be submitted*)
James.quinn@weil.com
Eric S. Hochstadt (*pro hac vice to be submitted*)
eric.hochstadt@weil.com
John R. Gerba (*pro hac vice to be submitted*)
john.gerba@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:     (212) 310-8000
Facsimile:     (212) 310-8007

**ATTORNEYS FOR PLAINTIFFS**
**THE ELITE RODEO ASSOCIATION**
**d/b/ELITE RODEO ATHLETES, TREVOR**
**BRAZILE, BOBBY MOTE, AND RYAN**
**MOTES, individually and on behalf of a class**
**of similarly situated individuals**

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs, by their undersigned attorneys, for their Complaint herein allege as follows:

## INTRODUCTION

1.    This class action is brought to stop—on a temporary and a permanent basis—blatant federal antitrust violations by Defendant Professional Rodeo Cowboys Association ("PRCA") so that *free competition* exists in the sport of rodeo in the United States for the 2016 season and beyond.

2.    A number of the ***top rodeo athletes*** in the world—including representative Plaintiffs Trevor Brazile, Bobby Mote, Ryan Motes, and other class members—have invested time, money, and effort to create Plaintiff The Elite Rodeo Association ("ERA") to ***elevate*** and ***grow*** the sport of professional rodeo ***for the benefit of everyone in the rodeo industry***.   ERA is a new organization committed to bringing ***the best*** full-time rodeo athletes (both cowboys and cowgirls) together to compete in an annual series of rodeos—with the first season commencing next year and culminating in November 2016 with the World Championship Rodeo at the American Airlines Center in Dallas, Texas.   ERA's multiple-event rodeos are intended to feature ten (10) to twelve (12) of the best current professional rodeo athletes in each of rodeo's traditional events, with a qualifying system for future professional rodeo athletes to compete for eligibility.   Fox Sports has agreed to broadcast the entire ERA Tour nationally on Fox Sports 1 and Fox Sports 2.

3.    Defendant PRCA has a ***long-standing monopoly*** in the rodeo industry. PRCA is the self-described "largest and oldest rodeo-sanctioning body in the world;" the "recognized leader in professional rodeo;" "the premier sanctioning body on the planet;" and

1

"the gold standard."    PRCA holds over six hundred (600) multiple-event rodeos a year, which it describes as the "cream of the crop" of rodeo events.    While the best professional rodeo athletes who devote themselves full-time to rodeo have been long-time, loyal, dues-paying PRCA members and have participated in hundreds of PRCA events, PRCA is threatening to kick them out simply because they want to have some basic control over their professional careers and lives in a responsible way that will improve the sport of rodeo for everyone.

4.    For decades now, PRCA-sanctioned rodeos have been the only game in town for a professional rodeo athlete.    Under the current system, the sport of rodeo is not set up for the most part in any organized way that showcases elite professional rodeo athletes competing against each other on a scheduled basis and in a way that makes it easy for fans to follow and sponsors to promote.    Right now, professional rodeo athletes typically compete against any PRCA member—regardless of whether those members rodeo on a part-time basis, as a hobby, or for the first-time.    Also, there are no dedicated time slots based on rankings or otherwise, so fans buy a ticket not knowing if they will see even one of the best professional rodeo athletes in the sport or not.    The best rodeo athletes who have the largest fan followings and are the biggest draws can compete at non-peak hours, as early as 7 a.m.    It is not uncommon that a competition-winning performance is given to an empty arena early in the morning, while peak time performances that have no bearing on the outcome of the rodeo are made in front of a full arena.    All of this hurts fan interest, as well as television and sponsorship opportunities, as they all want to see or sponsor truly the best events.    Put simply, ***no other professional sport is organized like this***.

5.    Indeed, ERA and the representative Plaintiffs are trying to help rodeo take the same ***natural evolution that other sports experienced decades ago***.    For example, elite

2

professional golfers chose to set up their own PGA Tour—separate from the thousands of golf club professionals affiliated with the PGA of America—and compete directly against each other. Yet, this does not negatively impact other golf associations, like the United States Golf Association ("USGA"), which sanctions numerous tournaments every single year for part-time and amateur golfers.    In fact, just the opposite is true.    The PGA Tour's growth in popularity, prize money, and television coverage has benefited the entire sport of golf, including the USGA whose membership has grown as well.

6.      Even worse, as currently set up by PRCA as the leading sanctioning body, the representative Plaintiffs and other professional rodeo athletes in ERA are forced to take **substantial personal risk**—financially and physically—to try to make a living in the sport of rodeo.   With no guarantee of any success, rodeo athletes have to gamble on themselves by typically going in the hole for much of the PRCA regular season so they have a shot to make some money by year-end at the finale event in Las Vegas, Nevada at the National Finals Rodeo. Professional rodeo athletes have to pay to compete in every PRCA-sanctioned rodeo; many of them have to pay for the animals they ride; they have to pay double the expenses of life on the road and keeping up a home; and they have to pay for private medical insurance coverage. Purse sizes for PRCA-sanctioned rodeos are random as the purse depends on the amount of contestants and sponsorship dollars, none of which is known in advance by athletes.

7.      Because the PRCA rankings for the National Rodeo Finals are based on points won at PRCA-sanctioned events during the regular season and points are awarded on a "1 point; $1 dollar" basis, there is a race to rack up as many points as possible in any PRCA-sanctioned rodeo.   So the best athlete in a given rodeo discipline can win ten (10) events and still be ranked lower than an athlete who came in the middle of the pack or worse in fifty (50)

events simply because of the volume of events competed in.    That uncertainty results in professional rodeo athletes having to be on the road away from their families crisscrossing the country for the majority of the year to compete in as many rodeos as possible to ensure a spot in the National Finals Rodeo is not lost out to someone else based simply on the number of rodeos participated in.    These risks are ***shortening current athletes' careers*** and will make it ***hard to attract top athletes in the future***.

8.    ERA and its limited schedule of events are not attempting to supplant PRCA and the six hundred (600) rodeos it sanctions every year.    The ERA Tour will have a regular season schedule building up to a world championship with a clear end-of-year winner in each rodeo event.    That way fans can easily follow and get behind the ERA Tour in a way that will allow the sport to grow from a fan, television, and sponsorship standpoint.    In ERA, the best professional rodeo athletes will also own and control the tour—not the sanctioning body and its chosen sponsors.    By contrast, the PRCA-sanctioned Champions Challenge is not and cannot be the ERA Tour for a number of reasons, including because PRCA-sanctioned rodeos culminate in the National Finals Rodeo, which is totally separate from, and after, the Champions Challenge takes place.    Also, the Champions Challenge does not result in a clear "Champion" because it is team-based and even the "best" athlete from the Champions Challenge may not even compete in the National Finals Rodeo because other athletes are higher in the PRCA world rankings from having won more prize money in other non-Champions Challenge PRCA-sanctioned rodeos during the year.

9.    Before founding ERA, the representative Plaintiffs and other top rodeo athletes attempted over the course of a couple of years to negotiate in good-faith with PRCA to bring about many of the same changes in rodeo that they have now focused on through ERA.

PRCA consistently rebuffed these attempts.   In the face of PRCA's utter refusal to meet them

even half-way on basic ways to improve the sport for the betterment of all, these committed

professional rodeo athletes and class members had nowhere left to turn other than creating ERA.

      10.    The Professional Bull Riders ("PBR") offer an example of precisely the

type of positive impact ERA can have on multiple-event rodeo.   PBR broke away from PRCA

in the early 1990s when twenty (20) of the biggest names in bull riding decided to create their

own organization that would focus exclusively on the best professional bull riders.   At that time,

PRCA was operating under an antitrust injunction that prevented them from taking the very type

of anticompetitive actions they are now employing against ERA.   Over twenty years after the

founding of PBR, there can be no doubt that bull riding is far better off as a sport for everyone

involved by any measure—*i.e.*, number of live televised performances, events, contestants,

fans—and ***PBR co-exists with PRCA today***.   In fact, PBR was so successful that it spurred

competition from PRCA who was incentivized to create its own "Xtreme Bulls" tour that PRCA

sanctions and owns, and which mimics PBR's successful format.   And, unlike what PRCA is

trying to do with ERA athletes, PRCA does not prevent PBR bull riders from participating in the

Xtreme Bulls tour.   ERA seeks to co-exist with PRCA and achieve many of the same goals for

multiple-event rodeo that PBR has accomplished for bull riding—but ***free of anticompetitive***

***interference from PRCA***.

      11.    ERA's intent has always been, and still remains, to co-exist with PRCA in a

mutually beneficial manner that enhances multiple-event rodeo in the same way PBR co-exists

and improved the sport of bull riding.   ERA does not require its rodeo athletes to commit

exclusively to ERA competitions.   Indeed, many ERA athletes fully intend to continue

competing in PRCA rodeos, particularly those rodeos with which they have strong ties or have

positive prior experiences.   That is why ERA scheduled its own ERA World Championship event so as not to conflict with PRCA's National Finals Rodeo.   Also, there are more than enough top professional rodeo athletes for some to participate in the ERA Tour and others to participate in the PRCA-sanctioned Champions Challenge.   After all, the National Final Rodeo includes more professional rodeo athletes than will participate in the ERA Tour.   That is why ERA's vision truly is of a rising tide raising all ships.

12.   PRCA, however, does not share this vision; instead, it mistakenly perceives ERA as a direct ***threat to its monopoly***.   And, like other monopolists have tried to do in response to innovation from an upstart, PRCA is attempting to shut down or harm ERA before it can get off the ground and begin its inaugural 2016 rodeo season.   In direct response to the creation and promotion of ERA, PRCA implemented new bylaws—while bypassing its regular practice of publishing proposed changes for membership reaction and comment—that boycott professional rodeo athletes who are involved with ERA.   These bylaws are clearly anti-competitive on their face.

13.   Specifically, PRCA has barred from its membership and participation in any PRCA-sanctioned rodeo any ERA owner, officer, board member, employee, or other person with a financial interest of any kind in ERA.   PRCA's message is clear: if you want to compete in PRCA-sanctioned rodeos, it's the PRCA way or the highway.   The PRCA bylaw is intended to force members to make a Hobson's choice, *i.e.*, to participate in any PRCA-sanctioned rodeo, a rodeo athlete must do so exclusively and stop participating in any ERA rodeo.   PRCA is bullying its own membership into toeing the PRCA line by threatening any member who wants to be involved in ERA with being locked out of PRCA rodeos.   The deadline for 2016 PRCA membership is fast approaching in mid-December 2015, and, without relief from this bylaw,

class members will not be able to apply for membership and compete in PRCA-sanctioned rodeos starting in January 2016—a result that hurts the sport of rodeo for everyone.

14.     PRCA, however, was not satisfied with simply expelling professional rodeo athletes who have the audacity to compete in ERA rodeos.   PRCA also implemented a blackout bylaw under which **all** rodeo organizing committees and contracting parties who produce any PRCA-sanctioned rodeo **must agree** not to be involved in any "Competing Rodeo Events" during, seventy-two (72) hours before, or seventy-two (72) hours after, **any** PRCA-sanctioned event.   This message is also clear: if a rodeo committee, facility, or vendor wants to do business with PRCA-sanctioned rodeos, they need to steer far clear of any ERA events.   PRCA is even taking its **bullying** beyond the bylaws and using its monopoly power to blacklist ERA with numerous other players in the rodeo industry.   Indeed, rodeo committees, stock providers, and vendors have said they want to do business with ERA—who is offering better economic terms to those offered by the PRCA to sanction rodeos—and be a part of the 2016 ERA Tour, but now need to wait.   Upon information and belief, this anticompetitive **chilling effect** is due to PRCA's illegal bylaws, as well as PRCA's efforts to scare off any other entities involved in the sport of rodeo who dare to work with ERA.

15.     These new anticompetitive bylaws are about PRCA's desire to and insistence on controlling the stars of rodeo.   PRCA has refused to give professional rodeo athletes any meaningful say in how PRCA-sanctioned rodeos are run.   Now that those star athletes have formed their own organization where they can control their impact on the future of the sport, PRCA is engaging in illegal and anticompetitive actions to stamp down ERA.   PRCA wants to continue to dominate the sport of rodeo, control its stars, and dictate who else is allowed to be involved and on what terms.

16.    There can be no doubt that these new PRCA anticompetitive bylaws are aimed directly at ERA.    For example, PRCA passed the new bylaws *only one week* after a number of the top rodeo athletes announced their intent to focus their 2016 "tour" schedules on ERA events.    Further, PRCA's own Senior Public Relations Coordinator, Jim Bainbridge, admitted in an interview to Fence Post News on October 3, 2015 that the new bylaws were implemented *in response* to this announcement.    In addition, PRCA's Commissioner, Karl Stressman, stressed in an interview that the intent of the rule was to *force* rodeo athletes to make choices.    He also made clear in the October 23, 2015 edition of ProRodeo Sports News that these new bylaws were implemented to make the professional rodeo athletes continue to serve their "master"—the PRCA.

17.    This is not the first time that PRCA has employed anticompetitive measures in order to try to snuff out competition.    PRCA has been a *bad actor* and an *antitrust recidivist* for decades.    For example, in the early 1990s, PRCA passed a bylaw with a similar anticompetitive impact.    That bylaw prohibited any rodeo athletes who competed in any non-PRCA-sanctioned event in a given year from participating in that year's National Finals Rodeo —the biggest event of the PRCA schedule.    The United States District Court for the District of Colorado enjoined PRCA from enforcing the rule, stating that PRCA is "an organization that has a *history of anti-competitive conduct*."    *Medlin v. PRCA*¸ No. 91-N-2082, 1991 U.S. Dist. LEXIS 20847, at **5–9 (D. Colo. Dec. 13, 1991).    Shortly thereafter, PRCA settled the matter and agreed to an injunction prohibiting them from enforcing this anticompetitive bylaw, among other prohibitions, for ten years.    *See Medlin v. PRCA*, No. 91-CV-2082, 1992 U.S. Dist. LEXIS 7653 (D. Colo. Mar. 31, 1992).

18.     PRCA has dusted off its playbook and is up to its same old anticompetitive tactics.    When faced with what it perceives as a competitive threat, PRCA uses its monopoly power and illegal agreements to eliminate competition and unlawfully maintain its monopoly. PRCA's actions, as described herein, constitute an unlawful group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.    These actions also constitute an unlawful exercise of PRCA's monopoly power under Section 2 of the Sherman Act, 15 U.S.C. § 2.

19.     There are no legitimate, pro-competitive, reasons for PRCA's new bylaws. No other sport threatens to kick out its top athletes and voluntarily chooses to lose revenue from those athletes in the form of membership fees and all other forms of revenue from fan and sponsorship interest.    The PRCA's new bylaws only serve to hurt the sport by reducing output as ERA will add events, fans, sponsorships, and television interest to rodeo in the United States now and in the future.

20.     The PRCA's Commissioner has stated that the new bylaws are meant to stop "free-riding" on the PRCA.    ***But rodeo has been built on the backs of cowboys and cowgirls, not the PRCA***.    The representative Plaintiffs and class members comprising ERA are among the most dedicated rodeo contestants.    They ***risk life and limb*** to compete at rodeos full-time and do so for the love of the sport.    These professional athletes endure numerous serious injuries, spend endless weeks on the road away from their families, and devote their entire professional lives to rodeo.    In addition, ERA athletes are also ERA's owners.    They have invested their time, money, and efforts to create ERA and have a stake in it to ensure that it will be a success.    They are not free-riding on anything.    In addition, the bull riders put the lie to PRCA's free-riding claims.    PBR has been in existence for twenty years without the PRCA trying to shut it down as a "free-rider".

21.     The same is true for the other smaller regional rodeo associations that also have co-existed with PRCA for decades.   During this time PRCA has only grown.   And PRCA never took any actions against these other associations despite the PRCA Commissioner's claim that PRCA has supposedly been considering these new bylaws for years.   ERA, the representative Plaintiffs, and class members should be treated no differently.

22.     Unless the PRCA's illegal conduct is stopped, ERA will be substantially hindered before its doors even open, and that will deprive everyone—from professional rodeo athletes, to aspiring professional rodeo athletes, to fans, to sponsors, to stock contractors, to venues—of a vibrant elite rodeo tour that will grow the sport for current and future generations.

## JURISDICTION AND VENUE

23.     These claims arise and are brought under Sections 12 and 16 of the Clayton Act, 15 U.S.C. §§ 22, 26, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2.

24.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

25.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.   PRCA transacts business in the Northern District of Texas and the unlawful activities described herein were or will be carried out in, and will cause substantial impact in, this District.

## THE PARTIES

26.     Plaintiff ERA is a for-profit business organized and existing under the laws of Texas, with an address and its principal place of business at 607 East Blanco, #2178, Boerne, Texas 78006.   ERA brings top professional rodeo contestants together to compete on an annual multi-event rodeo tour, culminating with the World Championship Rodeo to be held at the American Airlines Center in Dallas, Texas.   ERA is owned by the rodeo athletes themselves;

the number of shares each rodeo athlete owns in ERA corresponds to their competitive accomplishments.    The majority of ERA's board is comprised of professional rodeo athletes.

27.    Representative Plaintiff Trevor Brazile is an individual that resides in Decatur, Texas.    He has competed professionally in rodeo for 19 years and is a 21-time World Champion rodeo athlete.    He is a member of the Texas Cowboy Hall of Fame.    He is one of the founders of and a shareholder in ERA, as well as being a member of ERA's board.

28.    Representative Plaintiff Bobby Mote is an individual that resides in Stephenville, Texas.    He has been a professional rodeo athlete for 19 years and holds four world titles.    He is also one of the founders of and a shareholder in ERA, as well as being a member of ERA's board.

29.    Representative Plaintiff Ryan Motes is an individual that resides in Weatherford, Texas.    He has been a professional rodeo athlete for 14 years and is the current co-holder of the world record in team roping, with a time of 3.3 seconds.    He is also one of the founders of and a shareholder in ERA, as well as being a member of ERA's board.

30.    Defendant PRCA is a not-for-profit corporation organized and existing under the laws of Colorado, with an address and principal place of business at 101 Pro Rodeo Drive, Colorado Springs, Colorado 80919.    PRCA has engaged in business in the State of Texas, but does not maintain a regular place of business or designated agent for service of process in Texas.    PRCA may be served with process by serving its registered agent, National Corporate Research, at 12649 West Warren Avenue, Lakewood, Colorado 80228.

31.    PRCA describes itself as "the largest and oldest rodeo-sanctioning body in the world" and the "recognized leader in professional rodeo."    PRCA claims to sanction roughly six hundred (600) multi-event rodeos on an annual basis, which take place in thirty-eight

11

(38) states and in various Canadian provinces, and which in 2014 paid out over $41 million in

total prize money.   PRCA's membership numbers approximately seven thousand (7,000), which

includes nearly five thousand (5,000) rodeo participants of varying skill and accomplishment

levels, with remainder consisting contract personnel (primarily performers and workers) and

other individuals involved in the rodeo business.

32.    Upon information and belief, PRCA has a wholly owned for-profit

subsidiary company called Professional Rodeo Cowboys Association Properties, Inc. ("PRCA

Properties"), which is organized and exists under the laws of Colorado, with an address and its

principal place of business also at 101 Pro Rodeo Drive, Colorado Springs, Colorado 80919, the

same as PRCA.   Upon information and belief, PRCA Properties has no true separate

organizational integrity or existence and is under the direction and control of the PRCA and its

board of directors.   PRCA Properties is the sales, marketing and broadcast division of the

PRCA.

## NATURE OF INTERSTATE TRADE AND COMMERCE

33.    The primary business in which PRCA is engaged is the promotion,

operation, organization, and sanctioning of multi-event rodeos throughout the United States and

Canada.

34.    As noted above, PRCA sanctions rodeos in thirty-eight (38) states.   PRCA

purports to crown "world champions" in various rodeo events, which occur annually at the

conclusion of the PRCA-sanctioned National Finals Rodeo and are based on "total season

earnings at PRCA rodeos across the continent."

35.    PRCA's operation of, and engagement in, the business of multi-event

rodeos involves a substantial volume of interstate trade and commerce, including, *inter alia*, the

following interstate activities:    travel; communications; purchases and movement of equipment; broadcasts and telecasts of rodeos; advertisements; promotions; sales of tickets and concession items; sales of merchandise and apparel; employment of contract personnel and stock contributors; and negotiations for all of the above.

36.    ERA also intends to engage in interstate commerce by holding multi-event rodeos in numerous states and engaging in many of the same activities noted above with respect to PRCA, including televising its events nationally on Fox Sports.

37.    Plaintiffs Brazile, Mote, and Motes, as well as other class members, also intend to engage in interstate commerce by participating in multiple rodeos—sanctioned by both ERA and PRCA—held in a number of states.

38.    The interstate commerce described herein is carried on, in part, into and within the Northern District of Texas and many of the illegal acts set forth in this Complaint have been performed, in whole or in part, or their effects have been felt, or will be felt, in the Northern District of Texas.

## **CLASS ACTION ALLEGATIONS**

39.    Representative Plaintiffs Brazile, Mote, and Motes bring this action against Defendant PRCA under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of all members of the following Class (collectively, the "Class"):

> "All present and future professional rodeo athletes who are or will
> be an officer, board member, employee of ERA or have or will
> have an ownership or financial interest of any form in ERA."

40.    The class is so numerous as to make joinder of all members impracticable. There are currently over eighty (80) professional rodeo athletes committed to ERA.    ERA will

also provide the opportunity for numerous future professional athletes to join ERA and participate in ERA rodeos.

41.   Questions of law and fact common to the class include:

a.   Whether PRCA engaged in an unlawful contract, combination or conspiracy to (i) boycott ERA professional rodeo athletes from PRCA-sanctioned rodeos and (ii) ensure that rodeo committees, vendors, facilities, stock contractors and other providers of necessary rodeo inputs collectively refuse to deal with ERA;

b.   Whether the unlawful contract, combination, or conspiracy violates Section 1 of the Sherman Act;

c.   The duration of the unlawful contract, combination, or conspiracy and the nature and character of the acts performed by PRCA in furtherance thereof;

d.   Whether PRCA has monopoly power in the market for the services of professional rodeo athletes in the United States;

e.   Whether PRCA's behavior constitutes exclusionary conduct in violation of Section 2 of the Sherman Act;

f.   Whether PRCA's conduct will cause injury to Plaintiffs Brazile, Mote, and Motes and other members of the Class; and

g.   Whether Plaintiffs Brazile, Mote, and Motes and other members of the Class are entitled to an injunction to enjoin the PRCA's unlawful conduct;

42.     By engaging in this unlawful conduct, PRCA has acted and/or refused to act on grounds that apply generally to representative Plaintiffs Brazile, Mote, Motes, and all members of the Class.   Temporary and final injunctive relief or corresponding declaratory relief, therefore, is appropriate respecting the Class as a whole

43.     The claims of representative Plaintiffs Brazile, Mote, and Motes are typical of the claims of all members of the Class and these representative Plaintiffs will fairly and adequately protect the interests of the Class.   Representative Plaintiffs Brazile, Mote, and Motes as well as other members of the Class have been injured by the same unlawful and anticompetitive conduct engaged in by the PRCA.   Representative Plaintiffs Brazile, Mote, and Motes' interests are consistent with, and not antagonistic to, those of the other members of the Class.

44.     Representative Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class action and antitrust litigation against sports organizations.

45.     Representative Plaintiffs Brazile, Mote, and Motes will fairly and adequately protect the interests of the Class.

46.     The Class is readily definable.

## BACKGROUND

## PRCA's History of Anti-Competitive Behavior

47.     This case is not the first time that PRCA has engaged in anti-competitive and illegal actions to stifle competition and maintain its monopoly power in the market for professional rodeo athletes.

48.     In the 1980s, PRCA implemented a rule prohibiting PRCA member rodeo athletes from obtaining membership in, or competing in rodeos sanctioned by, non-PRCA

associations.    This rule was challenged in *Stone v. PRCA*, No. 81-Z-1546 (D. Colo. 1985). The *Stone* Court issued a permanent injunction against this anticompetitive rule, which was later amended to a three-year prohibition after the parties settled.

49.    Less than a year after the expiration of the *Stone* injunction, PRCA went right back to its anticompetitive behavior by implementing another onerous rule prohibiting participation in the National Finals Rodeo—the premiere PRCA-sanctioned rodeo event of the year—if a rodeo athlete had participated in any non-PRCA rodeo event within that same year.

50.    Once again, rodeo athletes had to file a lawsuit to get a court to stop PRCA's illegal conduct, this time in the *Medlin* case.    There, the *Medlin* Court held that "[i]t is reasonably likely that the Rule violates §1 of the Sherman Act, 15 U.S.C. §1, in that it appears to be a horizontal conspiracy that cannot withstand scrutiny under a rule of reason analysis.    It appears anti-competitive in both purpose and effect."    *Medlin*, 1991 U.S. Dist. LEXIS 20847, at *2.

51.    After finding that the rule would have been prohibited by the *Stone* injunction if it were still in place and that PRCA was, even at that time, "an organization that has a history of anti-competitive conduct," the *Medlin* Court enjoined PRCA from enforcing its then-latest attempt to stifle competition.    *Medlin*, 1991 U.S. Dist. LEXIS 20847, at *6-10.    Shortly thereafter, pursuant to a settlement with the *Medlin* plaintiffs, PRCA agreed to a ten year injunction.    *See Medlin*, 1992 U.S. Dist. LEXIS 7653, at **1–6.

52.    It was during the time when this antitrust injunction was in place that the top bull riders broke away from PRCA and founded PBR.    PRCA could not employ its usual anticompetitive tactics against the bull riders without risking contempt of the *Medlin* injunction.

16

53.     The *Medlin* injunction is no longer in effect today.    PRCA has returned to business as usual:    squashing competition to preserve its monopoly.

**How PRCA-Sanctioned Rodeos Work**

54.     The rodeo industry is organized around local rodeo committees.    The committees operate the individual regular season rodeos that take place throughout the year nationwide.    Rodeo contestants pay entry fees to compete.    Local rodeo committees also raise additional money which is added to the competitor fees to create the prize money available in an individual rodeo.

55.     Rodeo committees often seek the approval of, and association with, "sanctioning" organizations, such as PRCA.    PRCA is by far the largest sanctioning organization for professional rodeos, sanctioning some six hundred (600) rodeos per year with total prize money of roughly $41 million (the majority of which is raised by local rodeo committees and contestant entry fees).    PRCA negotiates agreements with the local rodeo committees under which the committees pay money to PRCA (commonly 6% of the purse) and agree to follow PRCA's rules in exchange for being a PRCA-sanctioned rodeo.

56.     PRCA-sanctioned rodeos are commonly multiple-event rodeos consisting of the following: bareback riding, saddle bronc riding, bull riding, tie-down roping, team roping, steer wrestling, and barrel racing.    They are often scheduled during larger multi-day events such as stock shows or fairs.

57.     In order to participate in a PRCA-sanctioned rodeo, rodeo athletes must be PRCA members.    Membership runs for a calendar year and must be renewed yearly.    New members are issued permits that only allow them to compete at certain rodeos.    New members can become eligible for full membership after winning $1,000 in prize money.    A full member

can participate in most PRCA-sanctioned rodeos.    The cost of a new member permit is $300, and the cost of a full member card is $500 per year.

58.    Upon information and belief, PRCA has roughly seven thousand (7,000) members, about five thousand (5,000) of which are rodeo athletes.    These members include both full-time rodeo athletes and part-time participants who have other full time jobs outside of being a rodeo competitor.    Accordingly, the skill and notoriety of rodeo athletes at a PRCA-sanctioned rodeo varies widely.

59.    In addition to being PRCA members, rodeo athletes must also pay entry fees for the rodeo events in which they intend to compete.    For a full season, these entry fees can easily exceed $15,000.

**The Founding of ERA**

60.    The American professional sports landscape is commonly organized around competition between elite athletes who have earned the right to compete at every competitive level through their ability and achievements.    In short, it is a merit-based system in which an athlete who wants to compete at the highest level has to demonstrate that they have elite skill and ability.

61.    Rodeos—particularly PRCA-sanctioned rodeos—operate under a completely different paradigm.    Instead of organizing rodeos where rodeo athletes earn the right to compete based on their ability and achievements, PRCA rodeos are overwhelmingly open to any member who can pay the entry fees.

62.    This structure presents a number of obstacles to growing the sport of rodeo. For instance, the top athletes in the sport often compete at off-hours with empty arenas and do not consistently compete head-to-head with the other top competitors in their events.

Television coverage is difficult at best under such conditions because a network cannot focus its

coverage around the top competitors.

63.     Also, under the PRCA's structure, full-time rodeo athletes who compete for

a living and to support their families have to constantly travel across the country to compete in

dozens and dozens of rodeos to accumulate enough points to compete in the National Finals

Rodeo.    These athletes risk grave career threatening injuries that could happen at any time.

The extreme travel also places numerous burdens on their families.

64.     The top rodeo athletes have, for years, attempted to engage PRCA in

discussions to alleviate these issues and help grow the sport.    PRCA, however, rebuffed these

efforts at every turn.    One particular and telling display of PRCA's disregard for these concerns

occurred in connection with a meeting in Waco, Texas.    A number of the top rodeo athletes

were set to meet with PRCA.    Yet, when they showed up for the meeting they learned that the

PRCA Commissioner and Board were skipping the meeting and that PRCA sent only lower level

representatives.    This is episode is emblematic of the PRCA's bad-faith and the way PRCA

dismisses the concerns of its top rodeo athletes.

65.     Having tried for years to work within the structure of PRCA without

success, in 2014 a number of the top rodeo athletes—including Bobby Mote, Ryan Motes, and

Trevor Bazile—founded ERA.    The business structure of ERA diverged from traditional rodeo.

In ERA, rodeo athletes are not just competitors; they are also shareholders in ERA and comprise

the majority of ERA's board.

66.     The idea for ERA was simple:    create a stage for the best rodeo athletes to

compete in a "tour" series of events.    As ERA CEO Tony Garritano explained:    "Professional

rodeo needed an elite tour showcasing the best talent in the world.    We believe that a regular

season format, ending in its own world championship event, will be exciting for rodeo fans to follow.   Fans will benefit by watching the most competitive rodeo action that the sport has to offer."   There was little delay in this idea taking hold.

67.   On August 26, 2015, ERA made two major announcements.   One was that ERA had entered into a five-year agreement with the Dallas Sports Commission and the City of Dallas to bring the ERA World Championship to Dallas.    As Phillip J. Jones, President and CEO of the Dallas Convention and Visitors Bureau, was quoted:    "World championship rodeo is coming home to the state of Texas and the city of Dallas.    Big things happen here in Dallas and we look forward to sharing our great city with rodeo fans from around the world."    Under the deal, the initial ERA World Championship will be held at the American Airlines Center in November 2016.

68.   The other major announcement was that ERA had entered into a multi-year deal with Fox Sports to broadcast the entire ERA season, which will consist of a limited number of regular season events culminating with the 5-day World Championship in Dallas (the "ERA Tour").   Under the deal, Fox Sports will broadcast the ERA Tour nationally on Fox Sports 1 and Fox Sports 2.

69.   Like PRCA-sanctioned rodeos, ERA rodeos will be multiple-event rodeos including the following events: bareback riding, saddle bronc riding, bull riding, tie-down roping, team roping, steer wrestling, and barrel racing.

70.   The ERA Tour's initial event is currently scheduled to take place in March 2016.

71.   Showing their commitment to ERA and the ERA Tour, on September 15, 2015, over seventy (70) of the top rodeo athletes with over 133 world championships between

them, made a group announcement that they would focus on the ERA Tour in 2016.   The announcement, however, also made clear that they would still compete in professional rodeos across the country that are not part of the ERA Tour—including PRCA rodeos.   As four-time World Champion Bareback Rider Kaycee Feild stated:   "As professional rodeo athletes, every year we have to decide what rodeo events we will compete at and what is best for our careers and families.   This group of athletes has decided to concentrate on the ERA in 2016 and we feel the future of professional rodeo, at its highest level, is the ERA Tour."

72.   ERA's goal is to increase the popularity of rodeo overall and advance the opportunities available to rodeo athletes.   As plaintiff Trevor Bazile stated:   "By introducing a unique concept like the ERA, it is our hope to increase the awareness of the sport of rodeo overall.   Enhancing the sport of professional rodeo and helping to build something greater for the further generation rodeo cowboy and cowgirl is the goal of the ERA.   We look forward to working with the entire rodeo industry."

73.   By contrast, PRCA has no interest in working with ERA for the overall betterment of the sport of rodeo.   PRCA sees the ERA Tour as a threat to the PRCA-sanctioned Champions Challenge.   But they are not the same.   For example, the ERA Tour will culminate in a world championship, whereas the world championship for PRCA-sanctioned rodeos culminates in the National Finals Rodeo, which is totally separate from, and takes place after, the Champions Challenge.   So the best athlete in a Champions Challenge rodeo event may not even make it to the National Finals Rodeo and, if he does, he may not be the "best" athlete in that rodeo event at the National Finals Rodeo.

74.   ERA was designed to co-exist with PRCA by providing an outlet exclusively for professional rodeo athletes; ERA was not designed to replace PRCA rodeos.

21

ERA rodeo athletes remain committed to competing in other events, including PRCA rodeos.

And the ERA World Championship does not conflict with the PRCA National Finals Rodeo.

## PRCA Takes Anti-Competitive Actions Against ERA, Plaintiffs Brazile, Mote, and Motes, as well as the Class

75.    Only one week after the September 15, 2015 announcement that the top

rodeo athletes would focus their tour schedules on the ERA Tour, PRCA's board of directors

held an emergency meeting and passed new rules intended to eliminate or reduce perceived

competition from ERA.    In passing these bylaws, the PRCA Board—the majority of which are

not competing rodeo athletes—departed from its regular procedure of publishing proposed

amendments to PRCA members "no less than once per month for one full year . . . until the

legislative meetings of the Board in the calendar year following the year in which the proposal

was first published."

76.    One of these rules—"Conflicting Rodeo Association Interests Bylaws

B.1.2.1.1.-.2" (the "Conflicting Rodeo Association Bylaws")—is aimed directly at reducing

competition in the market for the services of professional rodeo cowboys.    It provides:

> B1.2.1.1    Definition of Conflicting Rodeo Association.
> Conflicting Rodeo Associations are companies, partnerships,
> associations or other entities whose direct or indirect purpose is to
> produce, promote, and/or sanction professional rodeo contests in
> which contestants compete in two or more of the following events:
> bareback riding, saddle bronc riding, bull riding, tie-down roping,
> steer wrestling, and team roping.
>
> B1.2.1.2    Prohibition on Conflicting Rodeo Association
> Interests.    In order to ensure that PRCA members—whose
> popularity and success are the result of participation in PRCA-
> sanctioned rodeos and related PRCA promotional efforts and
> activities (and the associated costly investments the PRCA has
> made in promoting PRCA events and rodeo sports in general)—are
> not pursuing interests in Conflicting Rodeo Associations while
> receiving the benefits of PRCA membership and are putting forth
> their best efforts on behalf of the PRCA, ***any person applying for***
> ***PRCA membership who is an officer, board member, employee***

***or has an ownership or financial interest of any form in a
Conflicting Rodeo Association shall not be issued a membership,
permit or renewal of membership with the PRCA.***

77.     Under this bylaw, PRCA is threatening to kick out existing members and

refusing to admit new members if they are officers, board members, employees, or have any

ownership or financial interest of any form in ERA.    PRCA is attempting to set up a "Hobson's

choice" in which rodeo athletes have to choose between competing in ERA Tour events or any of

the six hundred (600) PRCA-sanctioned rodeos.

78.     Indeed, in an interview on Western Sports Weekly on Rural Radio Sirius

XM in which he was asked by Steve Kenyon to explain the purpose of the Conflicting Rodeo

Association Bylaws, PRCA Commissioner Karl Stressman responded that "people have choices

every day.    People make choices every day."    He has also admitted in the October 23, 2015

edition of ProRodeo Sports News that these new bylaws were put in place to protect the PRCA

and that they were needed because "it is common sense that you can't serve two masters."

79.     The antitrust laws of the United States are the "Magna Carta" of free

competition and, ensure that those choices can be made free from illegal, anticompetitive

conduct, which is something PRCA has had a difficult time grasping for much of its history.

80.     The other new rule—"Competing Rodeo Events Bylaws B15.1.1.1-.2" (the

"Competing Rodeo Bylaws," and together with the Conflicting Rodeo Association Bylaws, the

"New Anticompetitive Bylaws," which are attached hereto as Exhibit A)—provides:

B15.1.1.1        Definition of Competing Rodeo Events. Competing
Rodeo Events are events not sanctioned by the PRCA in which
contestants compete in two or more of the following events:
bareback riding, saddle bronc riding, bull riding, tie-down roping,
steer wrestling, and team roping.

B15.1.1.2        Rodeo Committees. In light of the PRCA's long-
standing and ongoing efforts to create popular and successful
PRCA-sanctioned professional rodeo competitions and promote

rodeo sports in general, including but not limited to creating the National Finals Rodeo event and qualifying points system, soliciting corporate sponsors and television contracts, establishing rodeo rules and regulations, and developing youth and new contestant growth programs—and in order to protect the quality of all PRCA-sanctioned events—*any rodeo committee and/or contracting party involved in producing a PRCA-sanctioned event agrees not to schedule, produce, promote or participate in a Competing Rodeo Event seventy-two hours before, during or seventy-two hours after a PRCA-sanctioned event*.   The PRCA shall have the right to approve specific events that are in conflict with this Bylaw should the PRCA deem any such event to be in the interest of its members and the promotion of professional rodeo sports in general.

81.    Through the Competing Rodeo Bylaws, PRCA is attempting to restrict ERA's ability to hold and/or sanction rodeos by tying up rodeo committees and any contracting parties involved in a PRCA-sanctioned rodeo (which could include arenas, facilities, vendors, merchandisers, and safety personnel, among many others) such that they cannot also have involvement with an ERA event that takes place during, three (3) days before, or three (3) days after a PRCA-sanctioned rodeo.   On its face, this rule has no geographic limit and seemingly applies nationwide.

82.    Since PRCA-sanctioned rodeos commonly last for multiple days, a single PRCA-sanctioned event can trigger a blackout period of a week or more under the Competing Rodeo Bylaws.

83.    ERA has already felt the impact of these anticompetitive bylaws.   ERA has approached multiple rodeo committees and vendors about participating in the ERA Tour, and has offered *better* economic and other terms than those offered by PRCA.   Yet, despite expressing approval of ERA's concept, these entities have declined to get involved with the ERA Tour.   Upon information and belief, this is due to PRCA's improper and anticompetitive behavior.

84.     The New Anticompetitive Bylaws apply to professional rodeo contests in which contestants compete in two or more of the following events: bareback riding, saddle bronc riding, bull riding, tie-down roping, steer wrestling, and team roping.   This further demonstrates that these bylaws are targeted directly at ERA.

85.     Upon information and belief, PRCA has entered into agreements with rodeo committees, rodeo contracting parties, and its own members to enforce the New Anticompetitive Bylaws.

86.     Lest there be any confusion that the New Anticompetitive Bylaws were designed to stifle competition by restricting PRCA members from participating in the ERA Tour, PRCA's Senior Public Relations Coordinator has admitted that these bylaws were passed in direct response to ERA.   In fact, when asked by Leesa Zalesky of Western Ag Reporter, whether the new bylaws would impact any rodeo organization besides ERA, Mr. Bainbridge was quoted as answering with a definitive "no."

87.     Upon information and belief, PRCA implemented the New Anticompetitive Bylaws directly in response to the threat it perceives from ERA.   As a pretext, PRCA Commissioner Karl Stressman has stated that the PRCA Board has been considering these types of bylaws for years.   Yet, after deciding against this type of anticompetitive conduct for years, it took the PRCA Board only one week after the top rodeo athletes committed publicly to ERA to pass the New Anticompetitive Bylaws.

88.     Further putting the lie to PRCA's stated reasons for the new bylaws, PRCA has allowed its members to have far ranging involvement with other rodeo associations for years, including not only participating in rodeos, but serving as officers, having financial interests, and

sitting on those associations' boards.   It was only after the top rodeo athletes formed ERA that PRCA implemented the New Anticompetitive Bylaws.

89.   Moreover, upon information and belief, PRCA implemented the New Anticompetitive Bylaws behind closed doors by Board vote instead of publishing the proposed changes for review and comment from the entire membership, as is common practice.

90.   PRCA's anticompetitive behavior is also hypocritical considering the lawsuit brought against it by the Women's Professional Rodeo Association ("WPRA").   In that lawsuit, WPRA accused PRCA of antitrust violations because the PRCA had ceased negotiations with WPRA and started its own barrel racing sanctioning body.   In response, PRCA stated as follows:   "By this lawsuit WPRA improperly attempts to *maintain its existing monopoly* in the area of professional women's barrel race sanctioning, and *it has and intends to interfere with PRCA's ability to compete* for the sanctioning of barrel racing events."   Yet, that is precisely what PRCA is doing now—interfering with ERA's ability to compete for the sanctioning of multiple-event rodeos.

**Plaintiffs Brazile, Mote, and Motes, As Well As Other Class Members, Cannot Submit 2016 PRCA Membership Applications Due to The New Anticompetitive Bylaws**

91.   Little more than a week after passing the New Anticompetitive Bylaws, on or about October 1, 2015, PRCA changed its membership application (the "Updated 2016 Membership Application," attached as Exhibit B) to force professional rodeo cowboys to agree that they will comply and be bound by the New Anticompetitive Bylaws:

> **I, _____ (name of applicant), swear that the information above is true and accurate.   I hereby agree to become familiar with the Bylaws and Official Rodeo Rules of, and any other rules adopted by, the PRCA, and I agree to comply with and be bound by the same.   This includes Bylaws B1.2.1.1 and B1.2.1.2, which prohibit PRCA members, myself included, from being an officer, board member, employee or having an ownership or financial interest of any form in a Conflicting**

**Rodeo Association.   I understand that this prohibition on ownership and/or financial interests applies to any transfer to or equitable holding of such interests on my behalf to and including the third level of consanguinity of my family or any other entity or mechanism meant to hold such interests on my behalf in any manner. I also grant to the PRCA the right to request and receive documentation confirming my status regarding a Conflicting Rodeo Association and to publish such documentation and this affirmation that I am not an officer, board member, employee and do not have an ownership or financial interest of any form in a Conflicting Rodeo Association.   If your PRCA application is approved but your status regarding a Conflicting Rodeo Association subsequently changes, the PRCA reserves the right to revoke your PRCA membership at any time**

(bolding in original; underlining added).

92.     Upon information and belief, all rodeo athletes seeking 2016 PRCA membership, including Plaintiffs Brazile, Mote, Motes, and other class members must sign the Updated 2016 Membership Application and agree to these restrictions.

93.     In fact, the restrictions in the Updated 2016 Membership Application appear to be even more restrictive than the New Anticompetitive Bylaws as they purport on their face to extend those bylaws to any family members within the third level of consanguinity. Upon information and belief, these additional restrictions have never been approved by the PRCA's membership or board.

94.     These further restrictions are oppressive and serve to buttress the PRCA's substantial market power, suppress competition, restrain trade, and restrict professional rodeo athletes' ability to ply their trade in a free and competitive market.

95.     Moreover, in some cases, PRCA members had returned their 2016 Membership Applications prior to the enactment of the New Anticompetitive Bylaws and prior to the changes reflected in the Updated 2016 Membership Application.

96.     To account for this and to gain maximum impact from its New Anticompetitive Bylaws, PRCA sent a memo to its members expressly stating that it had passed the New Anticompetitive Bylaws and enclosing the Updated 2016 Membership Application, "the completion of which is necessary for [their] 2016 PRCA membership application."     Plaintiffs Brazile, Mote, and Motes as shareholders, board members, and intended participants in ERA have not returned and could not return executed Updated 2016 Membership Applications to PRCA.    They, therefore, have been unable to renew their PRCA membership making them ineligible to compete in PRCA-sanctioned rodeos in the 2016 season.

97.     Upon information and belief, other class members as ERA shareholders, board members, and intended participants have also been unable to return the Updated 2016 Membership Application, and PRCA has likewise refused to renew or grant PRCA membership to those individuals.

98.     Upon information and belief, in some cases where a rodeo athlete submitted their 2016 membership application online prior to the enactment of the New Anticompetitive Bylaws, PRCA has deceptively updated their files to include authorized versions of the Updated 2016 Membership Application even though those athletes never agreed to its restrictions.

99.     PRCA Commissioner Karl Stressman has emphasized that the inability to return Updated 2016 Membership Applications will have no impact on rodeo athletes' ability to compete in 2015 events, including the upcoming National Finals Rodeo.    Upon information and belief, PRCA has and continues to threaten the withholding of other PRCA membership benefits from professional rodeo athletes who agree to join and compete in the ERA Tour.

100.    Upon information and belief, PRCA has previously taken such actions in connection with PRCA members who wished to also compete in non-PRCA-sanctioned rodeos.

28

These actions have included penalizing rodeo athletes under Bylaw B10.3.6—entitled "Conduct Detrimental to Public Image"—for participating in and promoting non-PRCA-sanctioned rodeos.

101.   Upon information and belief, PRCA has used the "Conduct Detrimental" rule as anticompetitive and improper grounds to discourage PRCA members from participating in and promoting non-PRCA-sanctioned rodeos, and has or is likely to do so with respect to the ERA Tour.   PRCA's actions are or would be purely pretextual to give the New Anticompetitive Bylaws retroactive effect before the 2016 season.

**PRCA's Anticompetitive Conduct Harms Professional Athletes, Fans, and Competition in the Sport of Rodeo**

102.   PRCA's New Anticompetitive Bylaws are aimed at and if continued unabated will have the impact of reducing output in the market for the services of professional rodeo athletes.

103.   ERA is not attempting to supplant PRCA.   Indeed, the ERA Tour will revolve around a relatively moderate number of regular season events and the ERA World Championship in Dallas, while PRCA sanctions some six hundred (600) hundred rodeos a year. ERA Tour events focus on a limited number of top tier rodeo athletes who comprise a small percent of all PRCA members.

104.   Top tier athlete participation in the ERA Tour could provide more opportunities for other rodeo athletes to compete and win prize money in PRCA-sanctioned rodeos.   In addition, ERA intends to raise the overall popularity of the sport, which will only serve to increase the number of rodeo athletes.   Since only a small number of athletes will be able to join ERA and only upon earning the right through their ability and achievements, the benefits of an increase in rodeo athletes overall will accrue primarily to PRCA.   More interest

in rodeo will lead to more rodeo athletes which will lead to more PRCA dues-paying members and rodeos to sanction with more contestants.

105.   Absent PRCA's anticompetitive conduct, output for professional rodeo would increase, benefiting both consumers of and participants in professional rodeo.

106.   The anticompetitive nature of PRCA's conduct is also demonstrated by the fact that PRCA is actually choosing to risk losing revenue under the New Anticompetitive Bylaws.   By denying membership to ERA Tour members and any other rodeo athletes who have applicable interests in non-PRCA rodeo organizations, PRCA is reducing its own membership fees revenue.   It is also reducing the number of participants in PRCA-sanctioned rodeos and thereby reducing the amount of entry fees paid in connection with those rodeos.

107.   By threatening to lock out top-tier rodeo athletes from PRCA membership and rodeos, PRCA is also hurting the quality of its own product by reducing the skill and achievement level of the rodeo athletes who do compete in PRCA-sanctioned rodeos.

**PRCA's Monopoly Power in the Market for the Services of Professional Rodeos Athletes**

108.   PRCA has monopoly power in the market for the services of professional rodeo athletes in the United States.   The *Medlin* Court previously found that "there [was] evidence that the relevant product market is the market for professional cowboy contestants. That was the relevant product market which the PRCA apparently stipulated to and which was established in the case of *Stone v. PRCA,* No. 81-Z-1546 (D. Colo.)."   *Medlin v. Professional Rodeo Cowboys Ass'n*, No. 91-N-2082, 1991 U.S. Dist. LEXIS 20847 at *3 (D. Colo. Dec. 13, 1991) (citing *Stone v. Professional Rodeo Cowboys Ass'n*, No. 81-7-1546 (D. Colo. 1985)).

109.   This market is protected by significant, and economically meaningful, entry barriers since there is no other major nationwide professional rodeo body with virtually all

professional rodeo athletes as members; the creation of such is not economically feasible due to cost of entry into the market.    PRCA's National Finals Rodeo has a long-standing tradition as the "Super Bowl" of rodeos.    Because PRCA controls access to the National Finals Rodeo and has been the predominant professional rodeo body for decades, there are significant barriers to entry for any other rodeo organization to enter the professional rodeo market.

110.    The total purse at PRCA-sanctioned rodeos exceeds $41 million on an annual basis, which is far and away—by orders of magnitude—the largest total for any national sanctioning body.    In fact, upon information and belief, there are only two other rodeo organizations that sanction events on a national basis: The International Professional Rodeo Association ("IPRA") and the United Professional Rodeo Association ("UPRA").    The total purses for events sanctioned by these associations come nowhere close to PRCA's annual purse. For example, the money leader in bareback bronc riding in 2014 for IPRA won $41,911.59 and for UPRA won $21,629.40, while the bareback bronc riding money leader in PRCA rodeos won $294,979.83.    The same disparity exists with the other events as well.    For instance, the 2014 IPRA all around money leader won $68,203.94, and the 2014 UPRA all around money leader won $17,139.66, while the PRCA all around money leader won $494,369.43.

111.    The market for professional rodeo athletes is a defined market with a dedicated fan base.    It is recognized by its fans and the market more generally as distinct from other sporting leagues and competitions.    Professional rodeo athletes spend years developing specialized skill sets that are not interchangeable with other sports.    For instance, professional rodeo athletes cannot simply start playing professional football or basketball.    Likewise, ERA cannot promote and organize rodeos without rodeo athletes and cannot turn to professional athletes in other sports, like football or basketball, as replacements.

112.   PRCA has claimed for years to be the preeminent rodeo sanctioning organization, with its champions recognized as the world champions in the sport.   Its own Commissioner Karl Stressman has described the PRCA as "the premier sanctioning body on the planet and is the established gold standard in the sport of professional rodeo."   PRCA sanctions and organizes the National Finals Rodeo, which is the premier rodeo event of the year.

113.   On a more subversive level, PRCA's willingness to forego the additional revenue from ERA rodeo athletes, rodeo committees, contractors, and vendors is clear proof that it is a monopolist.   With such power, PRCA can set its own rules—locking out ERA members, exempting PBR members, and ensuring that individual rodeo committees nationwide are scared to work with any other organization.

114.   The PRCA's ability to set the rules for competition in sport of rodeo demonstrates its monopoly power.

**The Irreparable and Substantial Injuries To ERA, Plaintiffs Brazile, Mote, Motes, and Other Class Members**

115.   PRCA's anticompetitive and illegal conduct, including the implementation and enforcement of the New Anticompetitive Bylaws, has and will continue to irreparably and substantially injure Plaintiffs and the Class.

116.   Upon information and belief, PRCA intends to continue to impose the New Anticompetitive Bylaws and/or other restrictions with anticompetitive effects in the U.S. market for professional rodeo athletes.   Absent such restrictions: (i) Plaintiffs Brazile, Mote, and Motes, as well as other members of the Class, would be free to participate and compete in the PRCA-sanctioned rodeos of their choosing in the 2016 season and beyond, including by singing up this December 2015—before the cut off currently set by the PRCA—to compete in upcoming PRCA-sanctioned rodeos in January and/or February 2016; and (ii) Plaintiff ERA would be able to

compete for the services and participation of additional rodeo athletes for the 2016 season and beyond in a competitive market.    Plaintiffs and the Class will suffer severe and irreparable harm if they are prevented from participating in, competing in, organizing, sponsoring, and/or sanctioning professional rodeo events in a competitive market.

117.    These injuries will continue to occur and will not be fully compensable by monetary damages.    As it stands, professional rodeo athletes within PRCA must compete year-round, nationwide, often at non-peak times.    The cost of earning is high.      Not only is it financially costly to travel and compete on a near-constant basis, but it is emotionally and personally costly too; without a dedicated professional league, rodeo athletes spend large periods of time away from their friends and families.    The near-constant competitive schedule under the PRCA's structure also greatly increases the risk of physical injuries and their effects on professional rodeo athletes.    Also financially incalculable is PRCA's damage to the rodeo sport. PRCA's attempts to prevent, or seriously impede, the new, innovative ERA Tour prevents the sport from evolving.    PRCA's allegiance is to its own bottom line and not to the sport of rodeo.

## COUNT I

### Violation of Section 1 of the Sherman Act:    Group Boycott

118.    Plaintiffs repeat and re-allege each allegation contained in paragraphs 1 through 117.

119.    The New Anticompetitive Bylaws constitute an agreement to eliminate competition for the services of professional rodeo athletes in the United States in violation of Section 1 of the Sherman Act.    PRCA is the organizer of, and participant in, this unlawful combination or conspiracy.    PRCA's Board, which implemented these bylaws, represents and acts on behalf of a consortium of different entities and individuals involved in the sport of

rodeo.   Indeed, the Board has specifically designated rodeo committee, stock contractor, contestant and contract personnel directors.

120.   As a condition of membership (new or continued) in the PRCA and participation in PRCA-sanctioned rodeos, members, rodeo organizations, vendors, and other parties involved in the sport of rodeo know and must agree to follow the New Anticompetitive Bylaws.   These agreements are evident from the face of the bylaws themselves.

121.   The Competing Rodeo Bylaws expressly state that "any rodeo committee and/or contracting party involved in producing a PRCA-sanctioned event _**agrees**_ not to schedule, produce, promote or participate in a Competing Rodeo Event seventy-two hours before, during or seventy-two hours after a PRCA-sanctioned event."

122.   With respect to the lockout of ERA athletes from PRCA rodeos under the Conflicting Rodeo Association Bylaws, the rodeo committees that run those rodeos also have to agree to do so in compliance with the PRCA's bylaws, including enforcement of the lockout on ERA athletes.

123.   In addition, PRCA is using its New Anticompetitive Bylaws to prevent rodeo committees from selecting a competing organization, like ERA, from which to seek sanctioning.   Rodeo committees that wish to stay in the PRCA's good graces must agree due to the PRCA's coercion to forego involvement with non-PRCA events, like the ERA Tour.

124.   The New Anticompetitive Bylaws operate as a group boycott, which is _per se_ unlawful.

125.   Alternatively, the New Anticompetitive Bylaws also constitute an unreasonable restraint of trade under the rule of reason.   There is a relevant market for the services of professional rodeo athletes.   The New Anticompetitive Bylaws orchestrated by

PRCA and agreed to by its members, rodeo committees, and other contracting parties substantially restrain and injure competition in that market and will continue to do so.

126.   PRCA has dominant market power in the relevant market.   The group boycott of ERA and other rodeo athletes with involvement in non-PRCA-sanctioned rodeos, as well as PRCA's prohibition of rodeo committees and other contracting parties from involvement in non-PRCA rodeos, are naked restraints of trade without any pro-competitive purpose or effect. In fact, prohibiting the top rodeo athletes from competing in PRCA actually reduces PRCA membership fees, rodeo entry fees, and the quality of PRCA-sanctioned rodeos.   It also reduces output in the market on a whole by attempting to decrease the availability of rodeo events.

127.   Moreover, the New Anticompetitive Bylaws are not in any way necessary for the production of rodeo competitions or the achievement of any pro-competitive objective. Indeed, on their very face, the New Anticompetitive Bylaws exempt PBR and other single event rodeo competitions.

128.   Plaintiffs have suffered and will suffer antitrust injury to their business and/or property by reason of the continuation of this unlawful combination or conspiracy.

129.   The New Anticompetitive Bylaws have injured and will continue to injure Plaintiffs Brazile, Mote, and Motes by threatening to deprive them of the ability to work as rodeo athletes in a free and open market.

130.   These bylaws have also injured ERA by threatening to restrain ERA's ability to recruit, now and in the future, additional rodeo athletes to become shareholders and compete in ERA events, as well as ERA's ability to work with many of the stakeholders in the rodeo industry to set up ERA events.

131.   Competition in the sport of rodeo is hurt from the group boycott PRCA has orchestrated.   The number of televised rodeo events, the level of fan interest, the influx of current and future rodeo athletes, the growth of rodeo associations and stock contractors, plus levels of sponsorship, all will suffer from Plaintiffs and absent Class members being locked out from PRCA and ERA being destroyed before it ever launches its inaugural season.

## COUNT II

### Violation of Section 2 of the Sherman Act: Monopolization

132.   Plaintiffs repeat and re-allege each allegation contained in paragraphs 1 through 131.

133.   PRCA possesses a dominant share of and has monopoly power in the market for professional rodeo athletes in the United States.

134.   As described above, PRCA seeks to unlawfully maintain its monopoly power in this market by exclusionary conduct.   Specifically, PRCA seeks to prohibit promotion and participation in non-PRCA events to prevent professional rodeo athletes from being involved with associations such as ERA.   Because PRCA has monopoly power in the market, it is able to use such power and the threat of expulsion of Plaintiffs and other Class members to exclude competition and prevent ERA from competing with PRCA.   If ERA does not have professional rodeo athletes to compete in and promote ERA and the ERA Tour, it cannot conduct business. The PRCA knows this and enacted these New Anticompetitive Bylaws to coerce professional rodeo athletes to abandon ERA under threat of being locked out.

135.   By using the New Anticompetitive Bylaws to boycott and restrict ERA from access to necessary resources, and illegitimately suppressing lawful competition from ERA, PRCA is demonstrating willful maintenance of monopoly power over the market for professional

rodeo athletes in an exclusionary manner with anticompetitive intent.    The exercise of this

monopoly power in an exclusionary manner will result in fewer top-tier associations such as

ERA, causing antitrust injury from reduced competition on a myriad of fronts, including reduced

choices for professional rodeo athletes, fans, rodeo committees, stock contractors, vendors,

facilities and many other parties involved in the sport of rodeo.    PRCA's unlawful maintenance

and exercise of its monopoly power is the result of greed, discrimination, and desire for control

rather than the result of a superior product or business acumen or any legitimate non-pretextual

pro-competitive business justification.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as

follows:

1.    Certifying the Class under Federal Rule of Civil Procedure 23(a) and

23(b)(2);

2.    Declaring that PRCA, through its actions described herein, has violated

and threatens to continue violating Sections 1 and 2 of the Sherman Act;

3.    Enjoining PRCA from: (i) further implementing and/or enforcing, either

directly or indirectly, the New Anticompetitive Bylaws; (ii) implementing any new bylaws, rules,

policies, or procedures with the same or similar purpose or effect of (a) withholding, revoking, or

diminishing any benefit of PRCA membership from any professional rodeo athletes who choose

to participate or involve themselves in any way in ERA or the ERA Tour; or (b) impeding,

preventing, or otherwise restricting in any way the ability of any rodeo committee, contracting

party, or third party to be involved with ERA or the ERA Tour; and (iii) using existing bylaws,

rules, policies or procedures to retaliate in any way against professional rodeo athletes for choosing to participate or involve themselves in any way in ERA or the ERA tour.

       4.     Awarding Plaintiffs and the Class their costs and disbursements in this action, including reasonable attorneys' fees under Section 16 of the Clayton Act;

       5.     Granting Plaintiffs and the Class such other and further relief as may be appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Dated:   November 9, 2015

Respectfully submitted,

s/ T. Ray Guy
T. Ray Guy
Texas Bar No. 08648500
ray.guy@weil.com
Olivia Zimmerman Miller
Texas Bar No. 24074724
olivia.miller@weil.com
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201-6950
Telephone:      (214) 746-7700
Facsimile:      (214) 746-7777

OF COUNSEL:
James W. Quinn (*pro hac vice to be submitted*)
James.quinn@weil.com
Eric S. Hochstadt (*pro hac vice to be submitted*)
eric.hochstadt@weil.com
John R. Gerba (*pro hac vice to be submitted*)
john.gerba@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:      (212) 310-8000
Facsimile:      (212) 310-8007

**ATTORNEYS FOR PLAINTIFFS THE ELITE RODEO ASSOCIATION d/b/ELITE RODEO ATHLETES, TREVOR BRAZILE, BOBBY MOTE, AND RYAN MOTES,** individually and on behalf of a class of similarly situated individuals