# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| THE ELITE RODEO ASSOCIATION d/b/a ELITE RODEO ATHLETES, TREVOR BRAZILE, BOBBY MOTE, AND RYAN MOTES, individually and on behalf of a class of similarly situated individuals, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CASE NO. 3:15-cv-03609-M |
| PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC., | § § § | |
| Defendant. | § § § | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## APPENDIX IN SUPPORT OF DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

Defendant Professional Rodeo Cowboys Association ("PRCA") files this Appendix in Support of Its Memorandum of Law in Opposition to Plaintiffs' Application for a Preliminary Injunction.

| Appendix Pages | Description |
|---|---|
| 3-14 | Declaration of Karl Stressman |
| 15-17 | Declaration of K.C. Jones |
| 18-21 | Declaration of R.C. "Doc" Trotter |
| 22-24 | Declaration of Dick Vetters |
| 25-27 | Declaration of Randy Bernard |
| 28-69 | Declaration of Andrew Dick |

| 70-78 | Exhibit A |
| 79-82 | Exhibit B |
| 83 | Certificate of Service |

Dated: December 4, 2015

Respectfully submitted,

s/ Michelle Davis
Michelle Davis
Texas Bar No. 24038854
Michelle.davis@skadden.com
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
2521 Springer Rd.
Midlothian, Texas 76065
Telephone:    (972) 723-6370
Facsimile:    (713) 483-9197
Shannon Ratliff
Texas Bar No. 16573000
sratliff@ratlifflaw.com
THE RATLIFF LAW FIRM PLLC
600 Congress Avenue, Suite 3100
Austin, Texas 78701-2984
Telephone:    (512) 493-9600
Facsimile:    (512) 493-9625

OF COUNSEL:
James A. Keyte (pro hac vice application
forthcoming)
james.keyte@skadden.com
Paul M. Eckles (pro hac vice application
forthcoming)
paul.eckles@skadden.com
Peter S. Julian (pro hac vice application
forthcoming)
peter.julian@skadden.com
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone:    (212) 735-3000
Facsimile:    (917) 777-0000

**ATTORNEYS FOR DEFENDANT
PROFESSIONAL RODEO COWBOYS
ASSOCIATION**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| THE ELITE RODEO ASSOCIATION d/b/a ELITE RODEO ATHLETES, TREVOR BRAZILE, BOBBY MOTE, AND RYAN MOTES, individually and on behalf of a class of similarly situated individuals, | §<br>§<br>§<br>§<br>§<br>§ |
| Plaintiffs, | §<br>§ |
| v. | § CASE NO. 3:15-cv-03609-M<br>§ |
| PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC., | §<br>§<br>§<br>§ |
| Defendant. | § |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF KARL STRESSMAN

    I, Karl Stressman, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

### THE HISTORY OF PRCA

    1.    I am the Commissioner of the Professional Rodeo Cowboys Association ("PRCA") and have held that position since December 2008.  Prior to becoming PRCA Commissioner, I was the director of event marketing for Wrangler Jeans and Shirts, focusing on the rodeo industry.  I am a long-time rodeo contestant, competing primarily in roping events.  I make this declaration based on my personal knowledge.

    2.    PRCA is the oldest rodeo-sanctioning body in the world.  Founded in 1936, the PRCA has been the leading force in growing the sport of rodeo in North America.  PRCA started in 1936, when a group of cowboys and cowgirls left a rodeo at Madison Square Garden in order

to boycott the promoter's next rodeo, which was to be held in the Boston Garden.  The cowboys demanded that the promoter in charge provide better prize money and judges who actually understood the sport of rodeo.  The promoter gave into the cowboys' demands, and the first rodeo association had thus been formed.  It called itself the Cowboys' Turtle Association. In 1945, the Cowboys' Turtle Association became the Rodeo Cowboys Association ("RCA").

3.      Fifteen years after its formation, RCA created its first true national championship event, the National Finals Rodeo ("NFR"), which today remains the "Super Bowl" of professional rodeo.  The PRCA spends approximately $700,000 to $1.2 million each year to organize and host the NFR.

4.      In 1975, the Rodeo Cowboys Association became what is now known as the Professional Rodeo Cowboys Association ("PRCA").  Since 1979, the PRCA has been headquartered in Colorado Springs, Colorado.  The headquarters also includes the ProRodeo Hall of Fame and the Museum of the American Cowboy, both of which are dedicated to honoring and memorializing the history and tradition of American rodeo.

5.      Among other things, PRCA enacts policies, bylaws, and rules through its Board of Directors.  PRCA's board is comprised of representatives from every sphere of the rodeo industry: there is a contract-personnel director (non-contestants that work the rodeo) as well as contestant directors, stock contractor directors and rodeo committee directors.  The PRCA Board of Directors is currently comprised of 9 members: 4 contestant members (2 timed event contestants and 2 rough stock contestants), 2 committee representatives, 2 stock contractor representatives and 1 contract personnel representative.

## PRCA SANCTIONED AND PRODUCED RODEOS

6.      PRCA currently sanctions and often helps produce professional rodeos across North America.  PRCA annually produces approximately 600 rodeos in thirty-eight states and multiple Canadian provinces.  PRCA rodeos are multiple event rodeos, which means that at each PRCA rodeo contestants compete in the following seven events:  bareback riding, saddle bronc riding, bull riding, tie-down roping, steer wrestling, team roping heading and team roping heeling.  There is an additional event, single steer roping, which is not standard at all PRCA rodeos.  It is important to PRCA that the seven standard events occur at its rodeos; PRCA does not consider "one-off" rodeos—rodeos in which contestants participate in only one of the PRCA's rodeo events—to be competing products of PRCA rodeos.

7.      PRCA has different membership levels representing an array of rodeo industry participants, such as cowboy and cowgirl contestants, stock suppliers, and rodeo committees. PRCA has roughly 5,000 contestant members and about 2,000 non-contestant members.  PRCA prides itself on having an open approach to its membership, and it welcomes contestants who rodeo for a living as well as contestants who rodeo part-time.

8.      As part of its business model, in addition to its standard rodeos, PRCA has a collection of tours in which its contestants can compete over the course of a rodeo year.  PRCA is directly involved in producing these events.  One example is the RAM National Circuit Finals. For it, PRCA divides the United States into twelve geographic "circuits" in which it holds its rodeos.  At the beginning of each year, contestants select a specific circuit in which they want to compete.  Top earners within each circuit can then compete in the circuit finals for that circuit. Two contestants from each circuit finals then advance to the annual RAM National Circuit Finals Rodeo and compete against one another to name a national circuit champion.

9.      Another example of a PRCA tour is the recently developed Wrangler Champions Challenge.  Launched in 2013, the Wrangler Champions Challenge this year had eleven teams made up of PRCA contestants competing against each other.  Each team is drafted by one of PRCA's sponsors.  The Champions Challenge now includes ten different rodeos, each of which pays out $128,000.  PRCA also offers its contestants the opportunity to compete in other special rodeo tour events, such as the All American ProRodeo Series, the Wrangler Million Dollar Tour and the Justin Boots Playoffs and Championships.

10.      PRCA's most prestigious rodeo event, of course, is the Wrangler National Finals Rodeo ("NFR"), a ten-day championship event (produced by PRCA) that is the premier rodeo event in North America.  The NFR is referred to as the "Super Bowl of Rodeo" and takes place annually in Las Vegas.  Every year, the NFR begins on the first Thursday of December and runs for ten days.  The event has sold out for more than twenty-five years straight.

11.      PRCA members earn the right to compete in the NFR by becoming, over the course of a season, one of the PRCA's top fifteen rodeo contestants in a given event.  PRCA's rankings are based wholly on members' performance at PRCA rodeos throughout the year (circuit championship rodeos are the only rodeos in which contestants' performances do not count towards NFR eligibility points).  Under PRCA's scoring system, a PRCA contestant earns one point for each dollar he or she wins at a PRCA rodeo.  At the end of the season, the fifteen contestants with the highest point totals in each of PRCA's seven events are eligible to compete at the NFR.  At the NFR, PRCA crowns eight World Champions, each of whom receives a winning pay-out, a gold buckle, and a specially crafted trophy saddle.  Last year, PRCA World Champions had a season earnings ranging between $202,380 to $502,809 (earned by Trevor Brazile, who I understand is an ERA owner and one of the named plaintiffs in the lawsuit).

12.     For the 2015 season, PRCA paid out over $46 million in prize money at its rodeos.  Within its membership, PRCA has one $5-million career earner, four $3-million career earners and more than 100 million-dollar career earners.  But most of PRCA's contestant members participate in fewer than thirty rodeos each year, a statistic that highlights PRCA's dedication to keeping its membership open to all levels of rodeo contestants.

## PRCA'S EFFORTS TO SUPPORT ITS RODEOS, CONTESTANTS AND OTHER MEMBERS

13.     In addition to continually creating new rodeo products like the tours and championship events mentioned above, PRCA commits substantial resources and undertakes substantial efforts on behalf of its diverse membership.

14.     For example, PRCA negotiates agreements with networks, like CBS Sports Network, in order to ensure that professional rodeo is broadcast on television.  As a result, ProRodeo is telecast to more than 56 million households. Further, all of the main sponsors associated with professional rodeo are the result of PRCA's efforts.  At the national level, PRCA has secured sponsorship agreements with Wrangler, RAM, Justin Boots, Coors, Pendleton Whisky and Montana Silversmiths, among others.  These sponsors are critical to ensuring that PRCA can market the sport of professional rodeo, including its top contestants, and can increase the purse sizes at PRCA rodeos.  PRCA also created, publishes, and distributes the *ProRodeo Sports News*, a magazine dedicated to covering the rodeo industry, again directly promoting its most recognizable and loved contestants.  Trevor Brazile has appeared on the cover of the *ProRodeo Sports News* 28 times since 2011.

15.     Because of these and other promotional activities (as well as the quality of PRCA rodeos), more than 35 million people currently identify themselves as fans of ProRodeo. In order

to keep its 35 million ProRodeo fans, as well as expand its fan base, PRCA has its own media team dedicated to managing its social media presence and promoting its contestants across Facebook, Twitter and other sites.  To satisfy its fans, PRCA also created the "ProRodeo FanZone," the official fan club of PRCA, which provides fans with access to an exclusive website containing blogs and forums, exclusive contests and giveaways and a welcome package with PRCA merchandise.

16.     In addition, PRCA also helps connect sponsors with individual cowboys through the PRCA Patch Sponsorship Program.  The program, which is free for contestants to participate in, makes it possible for PRCA members to enter into individual contracts with sponsors.  The program allows PRCA contestants to wear on their uniforms patches from up to nine sponsors during PRCA rodeos.

17.     PRCA also spends enormous time and resources on rodeo infrastructure, relieving much of the burden and cost that would otherwise fall to its various members.  PRCA established and enforced a variety of rules that now govern how PRCA rodeos function.  The rules governing conduct at competitions as well as scoring were created (and are routinely updated) by PRCA.  In addition to providing the rules, PRCA trains and provides rodeo committees with competent judges for all of its professional rodeos.

18.     Further, PRCA created and operates both the registration and pay-out systems for all of its professional rodeos.  PRCA also arranges insurance for its members. Because PRCA handles the eligibility and entrance requirements, rodeo committees themselves need not worry about registering contestants for their rodeos.  Rodeo committees also need not worry about paying out winners at their rodeos because all of the compensation is done through a propriety pay-out system, the entire infrastructure of which has been built by the PRCA.

19.     Perhaps most important for the continued growth of rodeo, PRCA makes it a priority to connect with and educate young people interested in the sport of rodeo.  In order to do so successfully, PRCA has developed a multi-tiered youth outreach program.  One way PRCA spurs interest among younger fans is by offering PRCA Championship Rodeo Camps, free camps funded by sponsors in which young people can learn about the sport of rodeo.  Camp curriculum typically includes an introduction to rodeo events with an emphasis on safety, fundamentals, chute procedures, livestock safety, an overview of riding equipment, injury prevention and management, fitness and nutrition, and an introduction to PRCA business and goal setting.  Last year alone, PRCA held camps in more than twenty towns with more than 1,000 young people participating.

20.     PRCA also acts as a sponsor for smaller, non-competing rodeo associations made up of young people, such as the National Intercollegiate Rodeo Association, the National High School Rodeo Association and National Little Britches Rodeo Association.  In addition to serving as sponsors for these associations, PRCA, through its Permit Program, gives the champions of these associations a dues free membership for the year they are eligible.  Just last year, the championship members of these youth associations, while competing mostly for their school teams, also managed to earn $539,409 from participating in PRCA events through the Permit Program.

21.     As part of its mission, and as direct result of its rodeos and tours, PRCA also helps raise money for multiple charities.  Annually, PRCA helps raise more than $16 million for local and national charities, ranging from college scholarships for local students to the Tough Enough to Wear Pink campaign against breast cancer.

22.     Finally, and importantly, PRCA also has instituted its Livestock Welfare Program, which has led to the adoption of more than sixty rules that ensure the care and humane treatment of livestock, in order to create the toughest livestock standards in the industry.  PRCA continues to monitor developments in the animal welfare arena and frequently updates its findings and rules.

## PRCA'S DECISION TO ADDRESS CONCERNS OVER FREE RIDING BY COMPETITORS AND MEMBERS WITH CONFLICTING OWNERSHIP INTERESTS

23.     As described, PRCA has undertaken enormous efforts to promote its best and biggest stars.  But, for some time, PRCA and its Board of Directors have been concerned about its members creating conflicts of interests by creating competing rodeos, and it also has been concerned about competing rodeos piggy backing on PRCA rodeo venues to do their rodeos. Over the past several months, these discussions came to a head because PRCA understood that many of the same stars it had been promoting—unhappy with PRCA leadership and its business model—were planning to form and own what became the Elite Rodeo Association ("ERA"). Starting in September 2015, ERA began to make a number of announcements that PRCA found troublesome.

24.     If this is all that ERA did (form and go compete), PRCA would have no problem. And, in fact, on September 15, 2015, ERA announced that its athletes would make the ERA Tour their "primary focus in 2016 and beyond" and that they would limit their participation in other professional rodeos (i.e. PRCA rodeos). (Pl. Ex. A).

25.     But PRCA grew increasingly concerned that ERA's athletes would attempt to use their membership in PRCA to subsidize and promote their own, for-profit venture.  Indeed, a day after its September 15th announcement, ERA released on its website an article in which ERA

owners responded to "top fan questions."  In the post, ERA specified that its members would pick and choose which PRCA rodeos they attended, all while focusing primarily on the ERA Tour.  The members also said that they planned to attend the NFR, but not attend other PRCA tour events like the Champions Challenge.  It seemed clear that ERA members intended to keep using PRCA to make money (to be used to grow the ERA) and receive free promotion, but without committing fully to PRCA events in a way that would best benefit PRCA.  These ERA announcements precipitated PRCA's decision to address—prospectively, starting in 2016— concerns about members with conflicting interests as well as piggy backing by competitors at PRCA rodeo venues.

  26. PRCA thereafter adopted two new bylaws—the Competing Events Bylaw and the Conflicting Rodeo Association Interest Bylaw—on September 22, 2015 with an effective date of October 1, 2015.  The Competing Events Bylaw states that any rodeo committee or other party contracting with the PRCA could not host a competing rodeo event seventy-two hours before, during, or seventy-two hours after a PRCA-sanctioned event.  The Conflicting Rodeo Association Interest Bylaw states that any person who is an officer, board member, employee, or has an ownership interest or financial interest of any form in a conflicting rodeo association shall not be granted PRCA membership.  Importantly, as explained earlier, PRCA rodeos are all multiple event rodeos in which contestants can participate in all seven rodeo events.  Thus, PRCA intentionally drafted the bylaws so they would not apply to any "one-off" rodeo or to any rodeo association intending to produce only "one-off" rodeos.  Two days after the PRCA adopted the bylaws, on September 24, 2015, ERA made another announcement confirming that its athletes intended to focus on the ERA Tour to the detriment of PRCA.

27.     Roughly a month later, on October 28, 2015, ERA made several announcements confirming PRCA's suspicion that ERA athletes planned to take a free ride on PRCA's rodeos and promotional efforts in order to subsidize ERA.  For example, in the October 28, 2015 announcement, ERA outlined the qualifying process through which cowboys could qualify for the ERA Tour. (Pl. Ex. D).  According to the announcement, ERA would select two new contestants to participate in ERA's championship tour (in addition to the ERA owners who were already participating on the tour).  The announcement stated that ERA would select these two additional contestants based on how they performed in other "qualifying rodeos" throughout the year.  The announcement defined "qualifying rodeos" as any rodeos that satisfied a list of specific factors.  After reading the announcement and reviewing ERA's definition of "qualifying rodeos," PRCA understood that almost all of ERA's "qualifying rodeos" were actually PRCA rodeos.  Indeed, ERA defined "qualifying rodeos" in a way that appeared to intentionally and obviously exclude almost all rodeos other than PRCA's.  The effect of ERA's announcement is clear: instead of developing its own qualifying circuit, ERA plans to use PRCA rodeos as an ERA qualifying system through which ERA can hand pick the new and talented contestants it wants on the ERA Tour.

28.     More recently, ERA has shown how it plans to implement its strategy of being subsidized by PRCA and its premier rodeos.  For example, on or about November 21, 2016, ERA began promoting a new mobile application called the "Rodeo Results App," which allows rodeo fans to follow ERA's biggest contestants as they perform at PRCA events like the NFR.  Indeed, the promotional advertisement for the Rodeo Results App markets the application as a way for fans to "get live results in the palm of your hand at the WNFR and throughout the 2016 ERA Tour."  This is yet another example of how ERA intends to use PRCA events and resources

for its own benefit, in an attempt to drive traffic to ERA's favored mobile application and increase ERA's exposure.

## HARDSHIP SUFFERED BY THE PRCA IF COURT WERE TO GRANT ERA'S REQUESTED INJUNCTION

29.     It would be incredibly harmful to PRCA and its members if the new bylaws were preliminarily enjoined.

30.     First, if PRCA eventually won at trial after a preliminary injunction, it would create complete and unfixable chaos within PRCA.  PRCA would then be free to enforce its bylaws and expel from its membership all contestants violating the Conflicting Interests Bylaw. But PRCA would be unable to "unscramble the eggs" of the competitions and pay-outs made up to that date.  In fact, over that time before trial, there will have been hundreds of contestants excluded from competition by ERA cowboys and cowgirls who will never have ridden and with no way of reconstructing those competitions and results.  Not only would this wreak havoc on how to calculate standings for multiple event rodeo competitions or 2017 events that use 2016 results, it would make it impossible to pay the contestants that might otherwise have earned prize money (who never would have ridden to see where they place).

31.     Second, allowing ERA owners and employees—founders of an association that competes directly against the PRCA—to compete in PRCA events will generate enormous ill will within PRCA and create discord within the organization (even agreeing to suspend our bylaws until January 12, 2016 is having that effect now).  PRCA contestants have already expressed to PRCA extreme discomfort with ERA owners and employees taking prize money out of PRCA contestants' pockets to help fund a competing organization focusing only on cowboys who the ERA deems to be "elite."  I also believe that every decision by a rodeo judge

involving an ERA owner is going to be questioned: if ERA owners lose, they will cry that it's based on bias against them; if they win, many other contestants will say that judges were soft with them because of their lawsuit.  We are already hearing concerns along those lines.  This is only some of the loss of goodwill that PRCA will suffer if a preliminary injunction is granted, as we also have great concerns about how a preliminary injunction will affect our partnerships and negotiations with sponsors, stock contractors and other industry participants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2015 in Las Vegas. NV.

Karl Stressman

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| THE ELITE RODEO ASSOCIATION d/b/a ELITE RODEO ATHLETES, TREVOR BRAZILE, BOBBY MOTE, AND RYAN MOTES, individually and on behalf of a class of similarly situated individuals, §§§§§§ | |
| Plaintiffs, § | |
| § | CASE NO. 3:15-cv-03609-M |
| v. § | |
| § | |
| PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC., §§§ | |
| Defendant. § | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## DECLARATION OF K.C. JONES

I, K.C. Jones, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a cowboy that has participated in Professional Rodeo Cowboys Association ("PRCA") rodeos since 1995.  I compete in timed events, including steer wrestling, tie-down roping and team roping, and have qualified for the National Finals Rodeo eight times.  I have also started two rodeo-related businesses:  Rodeo Vegas (the Official NFR After Party of the PRCA) and Pro Fantasy Rodeo (the official fantasy rodeo game of the PRCA and WNFR).  I submit this declaration in support of the PRCA's opposition to plaintiffs' motion for a preliminary injunction.  Unless stated otherwise, the facts stated herein are based on my own personal knowledge.

2.     I receive a number of benefits from my membership in the PRCA.  The PRCA arranges for national sponsors of its rodeo events, negotiates for television contracts to broadcast

the events, and provides general publicity for its events, which includes promotion of contestants, such as myself.  The PRCA also provides insurance to all contestants.  The PRCA also helps to organize all PRCA rodeos, including providing judges and other officials, as well as a central entry office where contestants can sign up for events.  PRCA rules, regulations, judges and other services ensure that PRCA events are professionally run and provide for consistency from event to event.

3.      The PRCA is a membership driven organization.  One of the things I like best about the PRCA is that everyone who pays for a PRCA membership card has an equal opportunity to make money and qualify for the National Finals Rodeo.  There is no preferential or discriminatory treatment.  There are no guarantees based on past success.  Success is based on actual performance rather than reputation.

4.      I understand that plaintiffs are challenging two new PRCA bylaws:  one that disallows owners of a competitive rodeo from maintaining PRCA membership; and another that disallows rodeo venues from scheduling or producing a competitive rodeo 72 hours before, during or after a PRCA-sanctioned rodeo.

5.      I approve of the new bylaws because it is important that all cowboys be treated equally.  Again, one of the best things about the PRCA is that all cowboys have an equal chance to earn money and qualifying points for the National Finals Rodeo event.

6.      The new bylaws do not prevent me or other cowboys from participating in non-PRCA rodeos and events.  In fact, I have participated in The American, which is held at AT&T Stadium in Arlington.  The American is not affiliated with the PRCA and is billed as the world's richest single day rodeo.  To earn a qualifying spot in this year's The American, I won money at certain "jackpot" events, non-PRCA rodeos that act as qualifiers for The American. The American works with other single-event rodeo associations to host these jackpot events.  I won $400,000 through my performance at The American this year, and I plan to participate in next year's event as well if I qualify.

7.     I also understand that I am free next year to participate in other non-PRCA events, including ERA rodeos.  My understanding is that the new bylaws would preclude me from participating in PRCA rodeos only if I were to become an owner, officer, board member, or employee of a conflicting rodeo association or if I were to otherwise acquire a financial interest in such an association.  I am fine with that.

8.     I know the individuals involved with ERA.  I believe that they are trying to attract sponsorship money and purse money that will inevitably come at the expense of the PRCA and its members.  While I do not begrudge them their right to start their own business, I fully support the PRCA's efforts to protect itself and the thousands of cowboys who participate in its rodeos. Although the ERA owners complain about how tough making a living on the rodeo circuit can be, they are not seeking to improve the lives of cowboys competing on the circuit – they are attempting to take money away from them by creating a competing organization that will drive the money in the industry to certain anointed "stars" (i.e., themselves), while reserving the right to participate in the PRCA events with the biggest purses.  They – and only they – would avoid the cost, time and physical toil associated with traveling around the country and competing on the rodeo circuit.  They instead would profit from their new competing association while also cherry-picking which PRCA events to participate in and benefit from more rest and relaxation between events.  That is fundamentally unfair and will hurt the ability of rank-and-file cowboys competing on the rodeo circuit to make a living.  Again, I have no objection to them trying to start their own rodeo business, but if they so choose they should not be permitted simultaneously to take money away from cowboys who are relying upon PRCA events for their livelihood.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December _4_, 2015 in _Las Vegas_.

_signature_

K.C. Jones

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ELITE RODEO ASSOCIATION d/b/a §
ELITE RODEO ATHLETES, TREVOR §
BRAZILE, BOBBY MOTE, AND RYAN §
MOTES, individually and on behalf of a class §
of similarly situated individuals, §
　§
　　　　Plaintiffs, §
　§ CASE NO. 3:15-cv-03609-M
v. §
　§
PROFESSIONAL RODEO COWBOYS §
ASSOCIATION, INC., §
　§
　　　　Defendant. §

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF R.C. ("DOC") TROTTER, M.D.

I, R.C. Trotter, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.　　　I submit this declaration in support of the PRCA's opposition to plaintiffs' motion for a preliminary injunction. Unless stated otherwise, the facts stated herein are based on my own personal knowledge.

2.　　　I have been a practicing physician in Dodge City, Kansas for over 30 years. I first got involved with the Dodge City Rodeo in my capacity as a doctor but later became involved in management of the rodeo. I have been the President of the Dodge City Roundup Inc. Committee, a non-profit corporation, for the past 12 years.

3.　　　Although it is only 40 years old, the Dodge City Rodeo is now one of the top 25 rodeos in the world. We put on a six-night rodeo event as part of a 10 day event called the Dodge City Days festival, which is the second largest community event in the State of Kansas.

The festival begins with an outdoor concert in the same arena where our rodeo is held. The festival also includes an "Arts, Crafts, and Things Show," a car show, a western parade, and a barbeque competition. We also put on other events, including one of the nation's oldest and longest running Little Britches Rodeos, which are youth rodeos for kids ages 5 to 18. We host a Miss Rodeo Kansas Queen and Teen Pageants. We also put on the Dodge City Roundup High School Rodeo, which draws participants from across the state to the arena for a high school rodeo competition. And we put on a "Tough Enough to Wear Pink Night" event to raise money for breast cancer research.

4.     The main event, however, is the professional rodeo. The Dodge City Roundup is one of the few rodeos that has a true finals event. The rodeo takes place over sixnights beginning with an Xtreme Bulls competition, followed by five nights of PRCA rodeo events, culminating with "championship night" on Sunday that involves the top twelve contestants in each event competing for prize money and a championship buckle. Dodge City Roundup PRCA Rodeo has been named the PRCA's "Large Outdoor Rodeo Committee of the Year," nine times. The rodeo has also qualified as a Wrangler Million Dollar Tour Rodeo, Silver Series based on the amount of purse money the committee adds per event, which means money won at our event counts for purposes of qualification towards the 2015 Wrangler Champions Challenge Events.

5.     The festival is an important local event. With the PRCA's help and support, it is an event put on by the community for the benefit of the community. The Knights of Columbus help with selling programs at the rodeo. Local church groups help with clean-up. The Women's Chamber of Commerce handles food concessions and their profits go toward scholarships for local high school students. The festival is at least a $5 million driver for the local economy. It has also helped raise money for the Circle of Hope Cancer Survivors Group, a Dodge City organization that gives back to cancer patients and their families by providing financial assistance, resource information, group meetings, and free mammograms for women ages 35-64 that have no insurance or might have a high premium. From 2006-2015, the rodeo has raised more than $200,000 for the Circle of Hope.

6.     I am also involved with the Kansas Association of Rodeo Committees and have helped to create a Kansas-specific promotions program.  If a contestant rides in all the Kansas rodeos, they have the opportunity to win a bonus at the end of the year based on their performance in those rodeos.  As the "big dog," Dodge City wants to help drive contestants to participate in and help out the smaller rodeos in Kansas and that is the purpose of this promotion.  Dodge City also now hosts the Kansas Professional Rodeo Association Finals.

7.     We are supportive of the PRCA, which has brought structure and publicity to our events and to the sport of prorodeo generally.  Critically, PRCA brings in national sponsors, which also spend money at the local level.  Money from Wrangler and other national sponsors helps ensure that members' dues do not need to increase.  The PRCA points system, which builds toward the National Finals Rodeo, also benefits local rodeos because it means they all matter in the ultimate crowning of champions.  The PRCA also provides a wide range of services and benefits, including help with all of the logistics that go into putting on our rodeos, such as judges, entry and pay-out systems, and the provision of insurance.

8.     PRCA is a unique sports association because it is essentially run by and for its constituents.  Both contestants and rodeo committees have elected representatives who serve on the PRCA's board and have the opportunity to express their views and vote on major issues, including bylaws.  PRCA contestants have significantly more freedom than traditional athletes.  They have the option of deciding which events to participate in and which events to skip and can even change their mind at the last minute even though rodeo committees will incur stock charges based on their expectation of which contestants will show up.  For example, Trevor Brazile has skipped our rodeo after initially indicating he would come.  This makes it difficult to use particular contestants in marketing to potential fans and sponsors because you have no assurance any particular contestant will participate.

9.     The ERA has contacted us about putting on a rodeo in Dodge City.  It was clear from their proposal that they did not understand the economics of our festival.  They made demands in terms of purse money and other revenue sources that would just not be feasible for

us or consistent with what we are trying to accomplish, regardless of whether we separately put on a rodeo with PRCA.

10.   I understand that plaintiffs are challenging two new PRCA bylaws: one that disallows owners of a competitive rodeo from maintaining PRCA membership; and another that disallows rodeo venues from scheduling or producing a competitive rodeo 72 hours before, during or after a PRCA-sanctioned rodeo.

11.   I approve of the new bylaws. I think they are important to help preserve the integrity of the sport and to protect the interests of the vast majority of PRCA members. The bylaw about prohibiting owners of a competitive rodeo from participating in PRCA events will not have any major impact on our rodeo because, as I mentioned above, we have no assurance any particular contestants, especially these "elite" ERA cowboys and cowgirls, will participate in the first place. As for the 72 hour rule, we believe the rule makes sense. We have no interest in putting on another rodeo within 72 hours, but even if we did there is no reason that another organization should be allowed to reap the benefits of everything that the PRCA does and invests to put on our rodeo and make it a success.

12.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 3, 2015 in Las Vegas, Nevada

R.C. Trotter, M.D.

12-03-'15 09:34 FROM-  SOUTH POINT HOTEL     702-797-8101        T-597  P0004/0004 F-051

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ELITE RODEO ASSOCIATION d/b/a      §
ELITE RODEO ATHLETES, TREVOR           §
BRAZILE, BOBBY MOTE, AND RYAN          §
MOTES, individually and on behalf of a class   §
of similarly situated individuals,               §
                                        §
       Plaintiffs,                §
                                        §    CASE NO. 3:15-cv-03609-M
v.                                      §
                                        §
PROFESSIONAL RODEO COWBOYS             §
ASSOCIATION, INC.,                     §
                                        §
       Defendant.                §

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF DICK VETTERS

     I, Dick Vetters, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the

following is true and correct:

     1.     I am the Vice Chair of the Helotes Festival Association (HFA) Rodeo Committee,

a non-profit organization in Helotes, Texas and have worked with the committee for 27 years.  I

submit this declaration in support of the PRCA's opposition to plaintiffs' motion for a

preliminary injunction.  Unless stated otherwise, the facts stated herein are based on my own

personal knowledge.

     2.     The HFA rodeo is a part of "Cornyval" which began in 1966 as a way for Helotes

non-profit organizations to raise money.  The festival is generally held on the first weekend in

May each year.  In addition to PRCA rodeo events, the festival also includes carnival rides,

music, dancing, and craft and food booths.  There is also a parade on Saturday morning during

the festival, which includes military and high school bands and non-profit associations.  Money

raised from the festival goes to local police and fire departments, a local 4-H club, local Pop Warner football and other youth sports leagues, and a local senior citizen club. The HFA also gives out six college scholarships each year.

3.     The HFA Rodeo Committee has been putting on rodeos sanctioned by the PRCA for approximately 26 years. We have been very satisfied with our affiliation with the PRCA. PRCA provides numerous services, benefits and assistance that are crucial to our ability to put on professional rodeo events. We use volunteers at the events so we use PRCA publications and guidelines to train people as to what they need to do. The PRCA also provides trained and unbiased judges for our events, which is not something we would be capable of doing on our own. The PRCA also provides insurance for contestants and handles the entry and pay out systems for contestants, which saves us considerable time and expense. Safety for both contestants and the animals participating in the rodeos is something that we take very seriously. Our PRCA affiliation has also allowed us to attract more and better animals and cowboys to our rodeos. Other benefits we receive include media relations assistance and sponsor information. We also have year-round access to dedicated professionals at the PRCA office to help with any issues that come up. I also note that the PRCA is accommodating of smaller to medium-sized rodeos, such as our own, because it structures its fees based on seating capacity.

4.     I understand that plaintiffs are challenging two new PRCA bylaws:  one that disallows owners of a competitive rodeo from maintaining PRCA membership; and another that disallows rodeo venues from scheduling or producing a competitive rodeo 72 hours before, during or after a PRCA-sanctioned rodeo.

5.     I do not have a problem with either bylaw. I doubt that the bylaw dealing with owners of a competitive rodeo association will have much impact on our rodeo because the type of top athletes who left to form ERA does not come to our rodeo very often. As to the prohibition on scheduling a competitive rodeo within 72 hours, no other competitive rodeo association has contacted us about the possibility of doing a rodeo in Helotes, much less within 72 hours of our PRCA rodeo. While I do not think our market is large enough to support both a

PRCA rodeo and an ERA rodeo, in my experience there is nothing preventing ERA or any other organization from attempting to compete for our rodeo business. Despite our long and successful relationship with the PRCA, it has not pressed us for a multi-year commitment. Like all rodeo committees, we make our own decision each year as to whether to have our rodeo sanctioned by the PRCA. Some rodeo committees, like the one in Bandera, Texas, which is about 30 miles from Helotes, have elected to put on "open" rodeos some years and PRCA-sanctioned rodeos in other years.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 3, 2015 in *Las Vegas, NV.*

*Dick Vetters*

Dick Vetters

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ELITE RODEO ASSOCIATION d/b/a   §
ELITE RODEO ATHLETES, TREVOR   §
BRAZILE, BOBBY MOTE, AND RYAN   §
MOTES, individually and on behalf of a class   §
of similarly situated individuals,   §
  §
      Plaintiffs,   §
  §     CASE NO. 3:15-cv-03609-M
v.   §
  §
PROFESSIONAL RODEO COWBOYS   §
ASSOCIATION, INC.,   §
  §
      Defendant.   §

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF RANDY BERNARD

I, Randy Bernard, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I submit this declaration in connection with PRCA's opposition to plaintiffs' motion for a preliminary injunction.  Unless stated otherwise, the facts stated herein are based on my own personal knowledge.

2.     Professional Bull Riders, Inc. (PBR) was formed in 1992 when 20 bull riders on the PRCA rodeo circuit pooled $1,000 each to start a standalone sport based on the single event of bull riding.  PBR held its first events in 1994.  I became the Chief Executive Officer of PBR in 1995 and held that position until 2010.

3.     While I worked for PBR, we did not view the PRCA as our competition because we were putting on a single event rather than acting as a rodeo association.  We viewed ourselves as forging our own trail and growing the business of professional bull riding.  PBR organized its

own series of events, attracted its own members, negotiated its own television contracts and sponsorship agreements and created its own qualifying tournament leading to its own "World Finals" championship event.  PBR did not prohibit its bull riders from competing in non-PBR events, but rather competed to obtain the best bull riders by offering larger and larger purses and enacting qualifying criteria that encouraged contestants to compete in its events rather than non-PBR events.

4.     Despite its relatively brief history, during the period that I was the CEO of PBR it was a major success and paid more in purses to contestants than any other bull riding organization.  PBR encouraged the loyalty of its bull riders by offering its world champions and other contestants who meet certain performance criteria the opportunity to buy into the company. Once bull riders acquired an ownership interest in PBR they were required to adhere to contractual commitments that precluded them from competing in non-PBR bull riding competitions.

5.     I understand that PBR sold all of its ownership to WME/IMG earlier this year. Consequently, my understanding is that all or most of the bull riders who compete in PBR events now are neither owners nor officers nor employees.

6.     I am now also affiliated with The American, a single day independent rodeo event that RFDTV partnered with Jerry Jones to create a few years ago.  We will be hosting our third annual event this coming February at AT&T Stadium in Arlington, Texas.  The event is broadcast live on RFD-TV and is sponsored by Polaris Ranger.  We market the event as the "[t]he world's richest one-day rodeo" with a total purse of $2 million.  Although PRCA members are free to compete in our event, we do not use PRCA points as part of our qualifying system and we have no affiliation with the PRCA.  We instead designed our own qualification system.  Ten spots in The American are invitational and the remaining ten spots are filled with "jackpot winners" from qualifying events that The American has set up with single-event rodeo associations.  Those athletes can qualify by competing at events hosted throughout the year by a variety of organizations, including Better Barrel Races, Professional Bull Riders, Ultimate Calf

and the United States Team Roping Championships.  Contestants advance from qualifiers to compete in the Semi-Finals in Fort Worth to earn a trip to The American.

7.      We do not offer ownership interests to contestants, but we have had no problem attracting top cowboy contestants, including Trevor Brazile.  Last year we had thousands of cowboys compete in qualifying events and nearly 600 compete in our Semi-Finals event in Fort Worth.

8.      Based on my experience with PBR and starting The American Rodeo, the marketplace for rodeos is wide open to anyone or group that has the resources and drive to put a rodeo together.  Contestants are available and there are numerous venues to consider for a rodeo or rodeo series.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on December 2/, 2015 in _____.

Randy Bernard

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ELITE RODEO ASSOCIATION d/b/a      §
ELITE RODEO ATHLETES, TREVOR           §
BRAZILE, BOBBY MOTE, AND RYAN          §
MOTES, individually and on behalf of a class   §
of similarly situated individuals,                 §
                                                   §
        Plaintiffs,            §
                                                   §    CASE NO. 3:15-cv-03609-M
v.                                                 §
                                                   §
PROFESSIONAL RODEO COWBOYS              §
ASSOCIATION, INC.,                      §
                                                   §
        Defendant.             §

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DECLARATION OF ANDREW DICK**

    I, Andrew Dick, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

    1.      My name is Andrew R. Dick.  I am employed as an economist at Charles River Associates ("CRA"), where I hold the position of Vice President.  My business address is 1201 F Street, N.W., Washington, D.C. 20004.  I received a Ph.D. in economics from the University of Chicago in 1989, a Master of Arts degree in economics from the University of Chicago in 1986, and a Bachelor of Arts degree in economics and political science from the University of Toronto in 1985.

    2.      My professional experience spans more than 25 years, including the last 19 years spent analyzing antitrust issues.  From 1996 to 2003, I was employed by the Antitrust Division of

the U.S. Department of Justice ("DOJ") where I held positions as Staff Economist and later Assistant Chief and Acting Chief of the Competition Policy Section.  Prior to that, I was an Assistant Professor of Economics at the University of California, Los Angeles.  I have written more than 20 research articles and book chapters on competition, market or monopoly power, the competitive effects and justifications of business policies and practices, and other issues relevant to antitrust economics.  My research has been published in the leading journals for antitrust economists, including *Antitrust Law Journal*, *Antitrust Magazine* and *Antitrust Source*.  For ten years, I was an associate editor for *Antitrust Magazine*.

3.      As an antitrust economist, I have evaluated competition issues in a broad variety of industries, including professional and amateur sports.  In the area of sports economics, I have applied my training and experience to define relevant markets, assess the existence of market and monopoly power, and analyze the competitive effects of business policies and practices by sports teams, leagues and associations.  I have submitted expert reports and deposition testimony in litigation and have made numerous submissions and presentations to federal, state, and foreign antitrust agencies in connection with competition investigations.  Exhibit A provides my curriculum vitae, which includes a list of cases where I have provided expert testimony.

4.      I was retained by counsel for the Professional Rodeo Cowboys Association ("PRCA") to analyze from an antitrust economics perspective the association's Competing Events Bylaw and Conflicting Interests Bylaw.  Using my training and professional experience as an antitrust economist, I analyzed the following questions:

- • Does the PRCA have market or monopoly power in plaintiffs' alleged antitrust market?

- Do the bylaws at issue in this case exclude competition in a relevant market?

- Would the Elite Rodeo Association's ("ERA") proposed business model likely result in the association free riding on the PRCA's past and ongoing investments?

- Are the PRCA's bylaws designed in such a way as to discourage free riding on those investments?

5.     Assisted by professional economics staff working at my direction, I have reviewed and analyzed, *inter alia,* information from the complaint, briefs and declarations submitted by the parties in this dispute, documents from the PRCA and ERA, interviews with PRCA officials and other industry participants, additional publicly available information, and the relevant economics literature.  The materials that I relied on or considered are listed in Exhibit B.

6.     My study of materials related to this matter is ongoing.  I reserve the right to supplement this declaration with any opinions or conclusions that I reach after further study, particularly if new or additional relevant information becomes available.   CRA is being compensated for my time at the usual and customary charge of $860 per hour.  My compensation is not dependent on the outcome of this matter.

## I. SUMMARY OF OPINIONS

7.     The PRCA lacks market or monopoly power in the market alleged by plaintiffs for professional rodeo athletes in the United States.  There is vibrant competition for the services of professional rodeo athletes; marketplace dynamics are inconsistent with the PRCA having market or monopoly power; and examples of successful entry confirm that the PRCA lacks market or monopoly power.

8.    From an economics perspective, the Competing Events Bylaw and Conflicting Interests Bylaw do not exclude competition.  Neither of these bylaws creates differential costs for a new entrant into rodeo sanctioning relative to the PRCA.  The creation of such "entry barriers" would be a prerequisite for competitive exclusion.

9.    The prevention of free riding is a legitimate economic justification for the bylaws at issue.  Under plaintiffs' proposed business model, the ERA would free ride on the PRCA's past and ongoing investments.  Free riding concerns become particularly acute when athletes who partake in the membership benefits offered by one association also are employed by, own financial stakes in, or hold a governance position in, a competing economic venture. Commingling interests in directly competing economic ventures would create divided loyalties and strong conflicts of interest for those cowboys, which would compromise the incentive and ability of the PRCA and the ERA to compete independently, freely and vigorously.  The PRCA bylaws at issue directly address these concerns.

## II. PRCA LACKS MARKET OR MONOPOLY POWER IN PLAINTIFFS' ALLEGED MARKET

10.    In this section, I explain why the PRCA lacks monopoly power in plaintiffs' alleged antitrust market.  This conclusion is supported by economic evidence reflected in the form of large purses offered by PRCA-affiliated rodeos as well as non-PRCA rodeos, the ability of athletes to switch on short notice which rodeos to participate in, and multiple recent successful entries into rodeo-hosting services.

A.       **Economic Principles of Market and Monopoly Power**

11.       Plaintiffs allege that the "PRCA possesses a dominant share of and has monopoly power in the market for professional rodeo athletes in the United States."[1]   However, plaintiffs confuse market share with market or monopoly power.   A large market share does not give a firm the ability to control market output and affect price unless the firm can prevent or seriously impede entry and expansion by rivals.   As a matter of economics, "[m]arket shares are, at best, only a rough guide to market power" and using market share to infer market power "can mislead and obscure the analysis."[2] Finding market power "requires [an] examination of the barriers to the entry or expansion of competitors."[3]

12.       Economists define a barrier to entry as "a cost of producing … which must be borne by a firm which seeks to enter an industry but is not borne by firms already in the industry."[4]   Where entry barriers exist or are created, an incumbent may be able to exercise market power or monopoly power. In economics, market power is "the ability to avoid the strictures of perfect competition," although economists typically worry most about "*substantial* market power, that is, the ability to charge significantly supranormal prices or offer significantly

---

[1] Complaint, ¶ 133.  *See also* ¶ 3 (The PRCA "has a long-standing monopoly in the rodeo industry").

[2] Franklin M. Fisher, "Detecting Market Power," chapter 14 in *Issues in Competition Law and Policy* (W.D. Collins, ed.), American Bar Association, Antitrust Section, 2008, pp. 353-71 at pp. 358, 360 (hereinafter Fisher, *Detecting Market Power*).  *See also* Franklin M. Fisher, 1979, "Diagnosing Monopoly," *Quarterly Review of Economics and Business*, Vol. 19, No. 2, pp. 7-33 at p. 18 ("The confusion of monopoly with large share is dangerous") *and* Jonathan B. Baker and Timothy F. Bresnahan, 1992, "Empirical Methods of Identifying and Measuring Market Power," *Antitrust Law Journal,* Vol. 61, No. 1, pp. 3–16 at p. 4 ("[I]f entry into a market is easy, no firm can exercise market power, no matter how large its market share.").

[3] Fisher, *Detecting Market Power*, p. 371.

[4] George J. Stigler, *The Organization of Industry*, University of Chicago Press, Chicago, IL, 1968 (hereinafter Stigler, *Organization of Industry*), p. 67.  *See also* Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed.), Boston, Addison-Wesley, 2005 (hereinafter Carlton and Perloff, *Modern Industrial Organization*), p. 77 ("[L]ong-run profits can only persist if a firm has an advantage over potential entrants … a long-run barrier to entry is a cost that must be incurred by a new entrant that incumbents do not (or have not had to) bear.").

subnormal product quality for a nontrivial time period *without* losing so much business to competitors (or potential competitors) as to make such actions unprofitable."[5] Monopoly power is an extreme form of substantial market power "where prices can be held above (and perhaps product quality below) the competitive level by a significant amount and for a significant period of time."[6]  Simply put, "[m]onopoly power is the power to *raise* prices *while* competitors are excluded either due to anticompetitive acts or external barriers to entry."[7]

13.     In Section III, I analyze the requirements for a new rodeo sanctioning body to enter, and conclude that rodeo sanctioning satisfies what economists call "free entry" conditions. This is *not* meant to imply that entry into the rodeo sanctioning business is literally costless. Rather, I use the definition of "free entry" as it is commonly used in the economics literature: "'Free' entry … is entry by firms suffering no cost differentials *relative to existing firms*."[8] Creating a rodeo show or tour costs real money and requires not insubstantial effort.  However, as long as incumbents and would-be entrants face similar cost conditions over the course of their entry and subsequent growth, there are no economic barriers to entry, and in that situation incumbent firms cannot exercise market or monopoly power.

14.     Economics also teaches us that "there is no such thing as a free lunch,"[9] which is simply another way of saying that entry is not a costless endeavor.  A corollary is that efforts to avoid bearing similar costs that an incumbent faced or continues to face — such as by piggybacking on the past and ongoing investments made by the incumbent — constitutes free

---

[5] Fisher, *Detecting Market Power*, p. 354 (emphasis in original).  *See also* Carlton and Perloff, *Modern Industrial Organization*, pp. 642-3.

[6] Fisher, *Detecting Market Power*, p. 354.

[7] *Ibid.*, pp. 359-60 (emphasis in original).

[8] Stigler, *Organization of Industry*, p. 70 (emphasis added).

[9] Milton Friedman, *There's No Such Thing as a Free Lunch*, Open Court Publishing Company, 1975.

riding.  I discuss the implications of free riding as it relates to this case in Sections IV and V below. Before doing so, I explain how applying the economic principles of market and monopoly power to the facts of this case demonstrate that the PRCA does not have market or monopoly power.

**B.      Economic Evidence Demonstrates that the PRCA Lacks Market or Monopoly Power**

15.      The PRCA lacks market power with respect to professional rodeo athletes. Competition is vibrant within plaintiffs' alleged "market for the services of professional rodeo athletes" as well as in the rodeo industry at-large, including the rodeo-hosting services of local venues and organizing committees.[10]   The bylaws at issue in this case focus on multi-event rodeos similar to PRCA-sanctioned rodeos.  Although single-event sports are not covered by these bylaws, they *are* directly relevant to the economic analysis of market power because the athletes who participate in multi-sport rodeos like the PRCA can and do compete in these single-event sports.  As a matter of economics, the competing buyers in plaintiffs' alleged market for the services of professional rodeo athletes include multi-sport rodeos as well as single-event sports (such as bull riding, steer wrestling, or team roping) where athletes may ply their trade and compete for compensation.

16.      For an economist, evidence that there is freedom of competition — for example, when athletes can earn substantial compensation in both PRCA and non-PRCA events — would demonstrate that the PRCA lacks market or monopoly power over rodeo cowboys.   Plaintiffs observe that the "total purse at PRCA-sanctioned rodeos exceeds $41 million on an annual

---

[10] Complaint, ¶ 41.

basis,"[11] an amount which set a record high in 2014.[12]   Cowboys also participate and earn substantial compensation in rodeos and rodeo-style events not affiliated with the PRCA, including shows organized by other sanctioning bodies, such as Professional Bull Riders (PBR), the United Professional Rodeo Association (UPRA), and the International Professional Rodeo Association (IPRA), as well as "open rodeos," which are independent events not affiliated with a sanctioning body.

17.    The PBR, which is a sanctioning body for bull riders, hosts more than 300 bull riding events across three tours, an international circuit, and a World Finals each year.[13]   PBR publicizes that it awards more prize money to top bull riders than the PRCA awards to top contestants.[14]   The PBR's top lifetime money earner has earned more over a shorter professional career than the PRCA's career earning leader.[15]

18.    Economic evidence also indicates that the IPRA and UPRA are competitors in plaintiffs' alleged antitrust market.   Plaintiffs assert that these two national rodeo sanctioning bodies "pale in comparison to PRCA" in terms of their prize money.[16]   However, the top finishers from these sanctioning bodies in 2014 received prize money that would rank them *among the top PRCA finishers.* The top two prize-money earners in the IPRA in 2014 earned

---

[11] Complaint, ¶ 110.

[12] PRCA 2015 Media Guide, p. 311. In the 2015 season, the PRCA paid out more than $46 million in prize money. Declaration of Karl Stressman, ¶ 12.

[13] PBR 2015 Media Guide, *available at* http://www.pbr.com/media/11551637/pbr_media_guide_2015.pdf, pp. 4-6.

[14] Brett Hoffman, "Major League Money," PBR Blog, March 6, 2010, available at http://www.pbr.com/en/news/blogs/brett-hoffman/2010/3/major-league-money.aspx.

[15] PBR's top lifetime money earner J.B. Mauney received career earnings of $6.71 million in the 10 years since he became a professional bull rider (as of December 3, 2015). *See* http://www.pbr.com/en/riders/all-time-money-earners.aspx.  PRCA's top lifetime money earner Trevor Brazile received career earnings of $5.53 million in the 19 years since he started riding with the PRCA.  *See* PRCA 2015 Media Guide, p. 330 *and* Declaration of Trevor Brazile, ¶ 4.

[16] Plaintiffs' Memorandum of Law in Support of Its Application for a Preliminary Injunction, p. 19.

$68,203.94 and $60,853.90, which would rank those cowboys among the top ten PRCA finishers in 2014 in terms of prize money.[17]   The top finisher in the UPRA had 2014 earnings of $21,629.40, which would rank him among the top 30 PRCA finishers.[18]

19.   In addition to competing in rodeos affiliated with other sanctioning bodies, cowboys also earn compensation in open rodeos.  Many of these open rodeos offer significant prize money to attract top athletes and fund these purses, in part by signing commercial sponsors (*e.g.*, Cinch Jeans, Coca-Cola) and by developing popular event formats that combine rodeos with other types of entertainment (*e.g.*, live concerts or Western-themed fairs).  Since 2011, RodeoHouston has operated as a non-PRCA sanctioned rodeo that attracts "mammoth crowds and offers corresponding paydays."[19]   This rodeo is described as "innovative in trying to put money in the cowboys' pocket" and in 2012 it paid out more than $2 million in prize money.[20]

20.   Another example is The American, which bills itself as "[t]he world's richest one-day rodeo."[21]   In the rodeo's inaugural season in 2014, the top-earning rider at The American received $1.1 million in prize money, or twice Trevor Brazile's all-time single-season earnings record in the PRCA, even after adjusting for inflation.[22]   In 2015, The American paid out a total

---

[17] Declaration of Eric S. Hochstadt, Exhibits K and N, and http://www.prorodeo.com/prorodeo/standings/prca-world-standings/world-standings?eventType=AA&year=2014.

[18] Declaration of Eric S. Hochstadt, Exhibits L and N and http://www.prorodeo.com/prorodeo/standings/prca-world-standings/world-standings?eventType=AA&year=2014 .

[19] Steve Campbell, "Rodeo goes without sanctioning again after format works," *Houston Chronicle*, February 27, 2012, *available at* http://www.chron.com/sports/article/Rodeo-goes-without-sanctioning-again-after-format-3365595.php.

[20] *Ibid.*

[21] http://www.rfdtv.com/story/23228599/theamerican.

[22] http://www.rfdtv.com/story/29835949/rfd-tvs-the-american-presented-by-polaris-ranger-returns-feb-28-2016-to-att-stadium#.VlYyiXYo43E. PRCA 2015 Media Guide, p. 330. United States Department of Labor, Bureau of Labor Statistics,  CPI for All Urban Consumers (CPI-U) 1982-84=100 (Unadjusted) - CUUR0000SA0, *available at* http://data.bls.gov/cgi-bin/surveymost?bls.

of $2 million in cash awards plus another half-million dollars in prizes to cowboy contestants.[23] For 2016, The American has announced plans to offer a cash-and-prize purse worth more than $3 million.[24] Such lucrative purses offered by non-PRCA rodeos, including new entrants, are inconsistent with the PRCA possessing market or monopoly power in plaintiffs' alleged "market for the services of professional rodeo athletes." [25]

21.     To an economist, observing large and growing payouts to top PRCA athletes would constitute evidence that competition is vibrant in plaintiffs' asserted market for professional rodeo athletes' services.  Plaintiffs assert that the expiration of the Medlin injunction in 2001 has allowed the PRCA to "interfere with competition in the rodeo industry" and, specifically, to reduce competition in the alleged market for professional rodeo athletes' services.[26]  However, from an economic perspective, this claim is belied by the fact that half of the top 20 all-time single-season earnings leaders on an inflation-adjusted basis are from rodeo seasons between 2002 and 2014, or *after the expiration* of the Medlin injunction.[27]  The average top money-winner in inflation adjusted dollars in seasons during the Medlin injunction period (the 1992 through 2001 seasons) earned $341,113.  Since the expiration of the Medlin injunction, the average top money-winner in a season has earned $406,527 after adjusting for inflation, or a 19% increase.[28]  The record annual payouts that top PRCA athletes have recently received are

---

[23] http://www.rfdtv.com/story/23228599/theamerican.

[24] http://www.rfdtv.com/story/29835949/rfd-tvs-the-american-presented-by-polaris-ranger-returns-feb-28-2016-to-att-stadium#.VlYyiXYo43E.

[25] Complaint, ¶ 41.

[26] Plaintiffs' Memorandum of Law in Support of Its Application for a Preliminary Injunction, pp. 14-16.

[27] PRCA 2015 Media Guide, pp. 345-402. United States Department of Labor, Bureau of Labor Statistics,  CPI for All Urban Consumers (CPI-U) 1982-84=100 (Unadjusted) - CUUR0000SA0, *available at* http://data.bls.gov/cgi-bin/surveymost?bls.

[28] *Ibid.*  Prize money is in 2014 inflation-adjusted dollars.

inconsistent with the association having market or monopoly power over professional rodeo athletes in the post-Medlin injunction world.

22.     The PRCA's athlete compensation structure and contestant rules provide additional economic evidence inconsistent with plaintiffs' allegation that the PRCA acts as a monopolist over professional rodeo athletes. If the PRCA were a monopolist, it would have strong economic incentives to restrict horizontal competition among its contestant members and among local host committees: such competition serves only to drive up the compensation earned by PRCA athletes, and thus reduces the proceeds that the association could extract.[29] In reality, PRCA contestants are free to choose which events to participate in — be it a PRCA-sanctioned, competitor-sanctioned or open rodeo — right up until performance time.[30] Riders can choose between rodeos operating in different venues at the same or adjacent times based on the relative purse size and venue quality, and I understand that riders sometimes postpone deciding which rodeos to participate in until the very last minute.[31] Permitting this type of horizontal competition is inconsistent with plaintiffs' allegation that PRCA acts as a monopolist over contestant members.

23.     Also, top PRCA contestants receive a disproportionately large share of total earnings. The economics literature explains that a large compensation differential between top winners and other contestants can encourage athletes to compete intensely by investing greater

---

[29] I note that the PRCA's proceeds from rodeo committees are relatively small, typically 6% of a rodeo's purse (Complaint, ¶ 55), plus approval fees that range from $600 to $1,000 per rodeo depending on the size of the purse (PRCA 2014 Rule Book, §B15.1.3) and committee dues that range from $400 to $800 depending on the rodeo's purse size (PRCA 2014 Rule Book, §B1.5.13.3). These seemingly small proceeds appear inconsistent with plaintiffs' characterization of PRCA as a monopolist over professional rodeo athletes' services.

[30] Declaration of Tony Garritano, ¶ 9; Declaration of Trevor Brazile, ¶ 12 and Declaration of Ryan Motes, ¶ 7. The PRCA Rule Book provides for only modest financial penalties in the case that a contestant decides not to "turn out" at a rodeo in favor of competing elsewhere. PRCA 2014 Rule Book, §B10.1.7.

[31] Declaration of Tony Garritano, ¶ 14.

effort to improve their chances of receiving a top payout.[32]   Encouraging this competition is inconsistent with plaintiffs' allegation that the PRCA acts as a monopolist over athlete members, but instead is consistent with the PRCA competing vigorously to attract top athletic talent for its shows.  Structuring payouts to encourage athletes to put forward their maximal effort is also inconsistent with the PRCA having market or monopoly power over consumers of rodeos (*e.g.*, fans and sponsors).  Instead, this evidence is consistent with PRCA rodeos competing against many other sports and non-sports forms of entertainment and sponsorship opportunities available to fans and sponsors, respectively.

24.   The PRCA's compensation structure, whereby the all-time single-season earnings leaders receive a disproportionate share of total PRCA rodeo payouts, provides further evidence that the top riders have credible competitive alternatives to which to sell their athletic services — including, as with PBR and the ERA here, separating from PRCA membership and forming their own sanctioning body. In sum, various marketplace dynamics observed in the rodeo industry are inconsistent with the economic indicia of market or monopoly power.

25.   Finally, the fact that non-PRCA rodeos and sanctioning bodies, as well as sanctioning bodies for rodeo-style events, have successfully entered the marketplace and attracted large numbers of cowboy contestants to participate in their events provides additional evidence that the PRCA cannot exercise market or monopoly power over rodeo athletes.  This

---

[32] *See, e.g.*, Edward P. Lazear and Sherwin Rosen, 1981, "Rank-Order Tournaments as Optimum Labor Contracts," *Journal of Political Economy*, Vol. 89, pp. 841-69.  For applications of this economics literature to the sports industry, *see* Michael T. Maloney and Robert E. McCormick, 2000, "The Response of Workers to Wages in Tournaments: Evidence from Foot Races," *Journal of Sports Economics*, Vol. 1, pp. 99-123 *and* James G. Lynch, 2005, "The effort effects of prizes in the second half of tournaments," *Journal of Economic Behavior and Organization,* Vol. 57, pp. 115-29.

**APPENDIX IN SUPPORT OF DEFENDANT'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**     **App.   39**

history of entry resembles what economists call a "contestable" marketplace, in which there are no economically meaningful barriers to entry or expansion.[33]

26.    PBR's success as a sanctioning body demonstrates the lack of economic barriers to entry or expansion.  PBR was formed in 1992 and has grown into a successful sanctioning body.[34]  To enter, PBR bore similar types of entry costs as the PRCA, including organizing its own annual tournament and qualification system,[35] arranging its own television and sponsorship contracts,[36] and competing for athletes' time, effort and loyalty by offering larger and larger purses.[37]  According to PBR's Media Guide, "[i]nvestors like Spire Capital Partners and partnerships with Ford, Wrangler, Jack Daniel's, Dickies, and the city of Las Vegas have helped the PBR annually award more than $10 million."[38]

---

[33] William J. Baumol, 1982, "Contestable Markets: An Uprising in the Theory of Industry Structure," *American Economic Review*, Vol. 72, No. 1, pp. 1–15 at pp. 3–4 ("A contestable market is one into which entry is absolutely free, and exit is absolutely costless. We use 'freedom of entry' in Stigler's sense, not to mean that it is costless or easy, but that the entrant suffers no disadvantage in terms of production technique or perceived product quality relative to the incumbent, and that potential entrants find it appropriate to evaluate the profitability of entry in terms of the incumbent firms' pre-entry prices. In short, it is a requirement of contestability that there be no cost discrimination against entrants.").

[34] http://pbr.com/en/education/history.aspx.

[35] PBR riders qualify for the PBR Built Ford Tough World Finals based on their performances in PBR Built Ford Tough Series events, BlueDEF Velocity Tour events, or PBR international circuit events (*see* http://www.pbr.com/en/news/press-releases/2015/10/professional-bull-riders-world-finals-qualifiers-announced.aspx). PBR's BlueDEF Velocity Tour and PBR's Touring Pro Division give riders who are not part of the Built Ford Tough Series the opportunity to qualify for the Built Ford Tough Series and for the PBR World Finals (*see* http://www.pbr.com/en/velocity/standings.aspx *and* http://www.pbr.com/en/tpd/standings.aspx).

[36] Declaration of Randy Bernard, ¶ 3.

[37] Brett Hoffman, "Major League Money," PBR Blog, March 6, 2010, available at http://www.pbr.com/en/news/blogs/brett-hoffman/2010/3/major-league-money.aspx *See, e.g.*, "The World Finals is just one example of a PBR event that pays the bigger bucks. Other examples are the Iron Cowboy Invitational and the Touring Pro Championship (formally the Challenger Tour Championship)."

[38] PBR 2015 Media Guide, p. 4.  Other rodeo organizers also have attracted major sponsors.  For example Cinch Jeans is a commercial sponsor for multiple rodeo-themed events including the Denver Shootout, Cheyenne Frontier Days, Pikes Peak or Bust Rodeo, San Angelo Cinch Shoot-Out, New Year's Eve Buck & Ball (in Gillette, WY), Fort Madison Shoot-Out, Ellensburg-Shoot Out and Cinch Boyd Gaming Chute-Out. http://www.cinchrodeo.com/eventlanding.aspx.

---

27.     The American is an open rodeo that launched in 2013 and hosted its first rodeo in March of 2014.[39]  The American Rodeo designed its own qualification system that relies on *non-PRCA* events. Ten spots in The American are invitational and the remaining spots are filled by the winners of qualifying events that The American arranged with single-sport associations. Athletes can qualify by competing at events hosted throughout the year by a variety of organizations, including Better Barrel Races, Professional Bull Riders, Ultimate Calf Roping, and the United States Team Roping Championships.[40]  Riders advance from these qualifiers to compete in Semi-Finals to earn a trip to the American Rodeo.[41]   The 2015 winner of The American, K.C. Jones, is a PRCA member who did *not* receive an invitation by virtue of his PRCA affiliation — rather, he qualified by competing at other events that The American has partnered with for purposes of operating their own qualifying system.[42]  According to publicity materials for The American, in 2015 "nearly 4,000 entries were fielded at 70 qualifying events for the half-million-dollar American Semi-Finals in Fort Worth, where nearly 600 athletes from around the world battled for 38 byes into THE AMERICAN."[43]

28.     In sum, data on cowboy compensation in PRCA and non-PRCA sanctioned events, numerous examples of competition for cowboys' athletic services, and successful entry by non-PRCA rodeos and sanctioning bodies all serve as direct economic evidence that the PRCA lacks market or monopoly power over the athletes that choose to participate in its events.

---

[39] Rainer Sabin, "Real cowboys coming to AT&T Stadium for richest 1-day rodeo ever," *Dallas Morning News*, August 22, 2013, *available at* http://www.dallasnews.com/sports/more-sports/headlines/20130822-att-stadium-to-host-richest-1-day-rodeo-in-sport-s-history-in-march.ece.

[40] http://www.rfdtv.com/story/30056290/about-the-american-2016.

[41] *Ibid.*

[42] Declaration of K.C. Jones, ¶ 6. *See also* http://www.agjournalonline.com/article/20150318/NEWS/150319912/.

[43] http://www.rfdtv.com/story/29835949/rfd-tvs-the-american-presented-by-polaris-ranger-returns-feb-28-2016-to-att-stadium#.VlYyiXYo43E.

## III. THE BYLAWS AT ISSUE DO NOT EXCLUDE COMPETITION

29.     From an economics perspective, the bylaws at issue do not exclude competition. As I explain in this section, the economics literature associates competitive exclusion with the creation of barriers to entry. However, neither the Conflicting Interests Bylaw nor the Conflict Events Bylaw creates economic barriers to entry. Therefore, applying the principles of economics, the bylaws do not exclude competition.

### A.      Economics Associates Exclusion of Competitors with the Creation of Entry Barriers.

30.     To an economist, the power to exclude competition is the critical prerequisite to be able to exercise monopoly power.   "Monopoly power is the power to *raise* prices *while* competitors are excluded either due to anticompetitive acts or external barriers to entry."[44] Similarly, economists identify exclusionary conduct as actions "used by a firm to eliminate rivals from a market or harm them, thereby either helping to maintain or create a monopoly."[45] Therefore, as a matter of economics, competitive exclusion results from actions by an incumbent firm that raise substantial barriers to entry or expansion in the path of would-be rivals and that prevent the rivals from exerting competitive discipline on the incumbent's pricing.

31.     I have analyzed the Competing Events Bylaw and the Conflicting Interests Bylaw based on the economic principles of exclusionary conduct. As I explain below, as a matter of economics, neither bylaw excludes competition.

---

[44] Fisher, *Detecting Market Power*, pp. 359-60 (emphasis in original).

[45] Carlton and Perloff, *Modern Industrial Organization*, pp. 661-2.

**B.     As a Matter of Economics, the PRCA's Competing Events Bylaw Does Not Exclude Competition.**

32.     The PRCA's Competing Events Bylaw does not create an economic barrier to entry or place the ERA at a relative cost disadvantage.  The bylaw does not exclude competition because it does not force a new sanctioning association to bear costs of entry and expansion dissimilar to those borne by the PRCA — it simply prohibits local rodeo committees and contracting parties from hosting a competing rodeo event 72 hours before, during, or after any PRCA-sanctioned rodeos they host.  As I explained previously, the rodeo industry is best characterized as a "free entry" or "contestable" marketplace.[46] The ERA can partner with numerous local committees and venues to help produce its own tournament and qualification system leading up to its planned World Championship Rodeo.  The Competing Events Bylaw does not place the ERA at a relative cost disadvantage for entering the market.

33.     Also, the Competing Events Bylaw does not restrict local organizing committees from working with competing sanctioning bodies to host rodeos, provided they are held outside a 72-hour window before, during and after PRCA shows run by the same committee. Since most PRCA-sanctioned rodeos are not more than four days long, and since many local organizing committees host only a single rodeo during the year, there are many other weeks or months throughout the year when a committee could host a full-scale rodeo sanctioned by a competing association.[47]  Furthermore, ERA's planned schedule envisages scheduling a relatively small

---

[46] Recall that economists do not use the term "free entry" to indicate that entry is literally costless, but rather that new firms can enter "suffering no cost differentials *relative to existing firms*." Stigler, *Organization of Industry*, p. 70 (emphasis added).

[47] *See* the 2015 PRCA Rodeo Schedule, *available at* http://www.prorodeo.com/prorodeo/rodeo/rodeo-results/2015-rodeo-results. More than ninety percent of these rodeos are four days long or shorter.

number of shows each year.[48]   Thus, there are numerous host committees, show dates, and venues available to ERA to put on its planned rodeos while not violating the PRCA's Competing Events Bylaw.

34.     In the 2015 PRCA season, more than 480 cities hosted PRCA rodeos.[49]   If the Competing Events Bylaw had been in effect for the 2015 season, competitors to the PRCA would still have had more than 6,400 options outside the 72-hour window for hosting a competing rodeo on a Friday, Saturday, or Sunday between the first weekend of June and Labor Day weekend in areas that have PRCA rodeos.[50] Even conservatively assuming that a competitor would only want to host a rodeo on a summer weekend in a city that already has a PRCA rodeo (*i.e.,* the competitor chose to forego efforts to build the sport of professional rodeo in any cities without a PRCA rodeo), the Competing Events Bylaw still leaves *literally thousands* of open opportunities for competitors.

35.     I understand that the PRCA does not require local organizing committees or venues to enter into exclusive, long-term arrangements with the association.  Local committees are free to choose with whom they affiliate (or do not affiliate) and they can change their affiliation based on their assessment of which opportunities are best.[51]   From the principles of economics, we know that the ability of local committees to easily switch sanctioning bodies

---

[48] The complaint describes ERA as planning to schedule a "limited schedule of events." Complaint, ¶ 8. Similarly, the CEO and President of the ERA describes the planned number of ERA rodeos as "moderate" in number and "limited compared to [PRCA] rodeos."  Declaration of Tony Garritano, ¶¶ 3, 28.

[49] 2015 PRCA Rodeo Schedule.

[50] *Ibid.*

[51] Declaration of Dick Vetters, ¶ 5.

helps prevent the exercise of market or monopoly power.[52]  In fact, there are several instances of local committees switching their sanctioning affiliations.

36.     RodeoHouston and the Pikes Peak or Bust Rodeo are examples of local organizing committees that switched from hosting PRCA-sanctioned rodeos to hosting open rodeos.  The Pikes Peak or Bust Rodeo cited greater sponsorship opportunities as a factor that prompted its choice to switch; similarly, RodeoHouston found that its decision to switch was validated by "set[ting] an attendance record and rak[ing] in even bigger piles of money than usual." [53]  Hailey, Idaho's Days of the Old West rodeo is an example of an organizing committee that has switched sanctioning affiliations multiple times.  In 2002, the Hailey rodeo chose to switch from affiliating with the Intermountain Professional Rodeo Association to being sanctioned by the PRCA.[54]  Then, in 2005 this rodeo chose to switch back to the Intermountain Professional Rodeo Association.[55]  Among the reasons the local organizing committee cited for leaving the PRCA was that "thousands of dollars had to be raised to compete with other rodeo

---

[52] Franklin M. Fisher, 1979, "Diagnosing Monopoly," *Quarterly Review of Economics and Business*, Vol. 19, No. 2, pp. 7-33 at p. 13.

[53] Steve Campbell, "Rodeo goes without sanctioning again after format works," *Houston Chronicle*, February 27, 2012, *available at* http://www.chron.com/sports/article/Rodeo-goes-without-sanctioning-again-after-format-3365595.php and Lincoln Rogers, "New Pikes Peak or Bust Rodeo Format Good to Mosher: Colo. bareback cowboy earns 2nd place after four years away from rodeo," *Fence Post*, July 22, 2014, available at http://www.thefencepost.com/news/12251922-113/rodeo-mosher-ppob-2014 ("The reason we decided to (change) was really a financial decision. …By going to an invitation only rodeo (sponsored by Cinch), we were able to increase our giving to local military charities by having the ability to expand our sponsor base." "Another bonus out of becoming an invitational rodeo was the ability to create a mix of current competitors and those from the recent past, including a few who let their PRCA cards expire but still had the right stuff to compete.").

[54] Jeff Cordes, "Hailey rodeo is upgraded to PRCA event," *Idaho Mountain Express*, May 8-14, 2002, *available at* http://archives.mtexpress.com/2002/02-05-08/02-05-08oldwest.htm.

[55] Sawtooth Rangers Riding Club Board of Directors, "Hailey rodeo rejoins IMPRA circuit," *Idaho Mountain Express*, April 27, 2005, *available at* http://archives.mtexpress.com/index2.php?issue_date=04-27-2005&ID=2005102866#.VlSZmnarSY1.

committees to obtain any participants."[56] This is consistent with vigorous competition for rodeo contestants.

37.    Plaintiffs contend that the Competing Events Bylaw has a "chilling effect" that discourages local organizing committees from working with competing sanctioning bodies for fear that the committee will forego the possibility of earning revenues from hosting PRCA-sanctioned shows.[57]   As a matter of economics, however, if local committees have viable alternatives to replace revenues from hosting PRCA-sanctioned rodeos, then committees do not face economic barriers to switching affiliations.   As I noted earlier, various local committees have organized successful open rodeos after severing ties with the PRCA.[58]   The success of these committees demonstrates there are viable substitutes to affiliating with the PRCA as a way to generate revenues. Furthermore, if as plaintiffs assert, ERA rodeos will be more successful and popular with fans than current PRCA rodeos, then the ERA should be able to make local committees "whole" by offering them equal (or better) terms to displace a PRCA-sanctioned rodeo.  In their complaint, plaintiffs in fact contend that ERA is "offering [local host committees] better economic terms to those offered by the PRCA to sanction rodeos."[59]   In summary, the PRCA's Competing Events Bylaw does not exclude competition as a matter of economics.  The bylaw does not create barriers to entry and local rodeos can switch sanctioning affiliations, as they have done in the past, to find the best opportunities.

---

[56] *Ibid.*

[57] Complaint, ¶ 14.

[58] RodeoHouston and the Pikes Peak or Bust Rodeo are two recent examples.  *See* ¶¶ 19 and 36, *supra.*

[59] Complaint, ¶ 14.

### C.   As a Matter of Economics, the PRCA's Conflicting Interests Bylaw Does Not Exclude Competition.

38.   The PRCA's Conflicting Interests Bylaw does not create a barrier to entry or place the ERA at a relative cost disadvantage.  As a matter of economics, this bylaw does not exclude competition because it does not force a new sanctioning association to bear costs to sign up rodeo athletes that are dissimilar to the costs borne (in the past and on an ongoing basis) by the PRCA.

39.   There are numerous rodeo cowboys to which the ERA can turn for professional rodeo athlete services to put on rodeo shows, as plaintiffs themselves acknowledge.  The complaint states the ERA will feature a small percentage of all rodeo athletes and will have a limited schedule of events.[60]  With a relatively small number of athletes in the ERA's planned ranks, there are numerous potential rodeo cowboys available to the ERA to affiliate with, even if they choose to become owners, officers, board members or employees of the ERA.  Plaintiffs note that "there are enough athletes to participate in both" the PRCA's Champions Challenge and the ERA Tour.[61]

40.   Under the PRCA's Conflicting Interests Bylaw, contestant members may participate in a competing association's rodeos provided they do not serve as an officer, board member or employee, or hold an ownership or financial interest in the competing association. The ERA has chosen to organize itself with its athletes serving as employees/owners/officers, but this is not the only (or necessarily even the predominant) form of organization among rodeo sanctioning bodies or other professional sports sanctioning entities. The PRCA has nearly five

---

[60] Complaint, ¶¶ 8, 11, 103.

[61] Plaintiffs' Memorandum of Law in Support of Its Application for a Preliminary Injunction, p. 17.

thousand contestant members who are neither owners nor officers nor employees. The PBR, while initially formed with modest seed money from cowboys, is majority-owned by WME | IMG and has many hundreds of members who are neither owners nor officers nor employees.[62] Sanctioning bodies in various other professional sports generally are not owned by the athletes themselves and, where owners/officers do include athletes, the large majority of the association's athlete members are non-owners/officers. NASCAR and the Masters Golf Tournament are two examples of organizations where sanctioning bodies are not owned by the athletic competitors.[63]

41.     Since it is not uncommon for sanctioning bodies to be owned by entities other than the athletes who participate in their sporting contests, barring owners of a competing sanctioning body does not create an economic barrier to entry for the ERA. The ERA has chosen to organize itself as an economic venture owned by its athletic contestants. Even with the PRCA's bylaws in place, however, there are numerous potential athletes available to the ERA and the PRCA (and other rodeos or sanctioning bodies).

### IV. THE PREVENTION OF FREE RIDING IS A LEGITIMATE ECONOMIC JUSTIFICATION FOR THE BYLAWS AT ISSUE

42.     In this section, I explain the economic principle of free riding, describe how the ERA's proposed business model would free ride on the PRCA's past and ongoing investments, and explain how the bylaws at issue deter free riding.

---

[62] WME | IMG purchased its controlling stake in PBR from Spire Capital Partners in May 2015. *See* https://www.spirecapital.com/portfolio/pbr *and* http://img.com/news/news/2015/april/wme---img-acquires-professional-bull-riders,-inc-.aspx.

[63] Stephen F. Ross and Stefan Szymanski, *Fans of the World, Unite!: A (Capitalist) Manifesto for Sports Consumers*, Stanford University Press, 2008, pp. 73-80.

### A.       Economic Principles of Free Riding

43.       Economics defines "free riding" as the situation where "one firm benefits from the actions of another without paying for it. … Where free riding is possible, … [a firm] prefers to rely on the efforts of others and does not do its share."[64]  By appropriating to itself some of the benefits created by others without making a corresponding contribution to the cost of creating those benefits, the free rider directly imposes costs on other members of the group, and deprives them of the full fruits of their labor and investments.  Membership associations may adopt rules and practices intended to discourage free riding by more closely aligning the interests of individual members so as to encourage each of them to *devote best efforts* and *pull collectively* to maximize joint output.  The two bylaws at issue in this case are strong examples of rules intended to discourage free riding by a subset of PRCA members to their own narrow pecuniary benefit but to the detriment of the association's much broader membership.

44.       Left uncorrected, economics predicts that free riding will lead to a reduction in product quality by causing both the PRCA and the ERA to under-invest in producing high-quality shows.[65]  If the ERA can have its entry subsidized by a competitor, it will have less need to invest in attracting athletes and building relationships with venues, local organizing committees and other contributors to rodeo events so as to create a more attractive product than the PRCA and other sanctioning associations currently offer.  Likewise, if it is forced to subsidize a new competitor, the PRCA will have less incentive to invest in improving the quality and popularity of its shows, knowing that its rivals would directly benefit from each dollar it invests.

---

[64] Carlton and Perloff, *Modern Industrial Organization*, p. 414.

[65] Lynne Pepall, Daniel J. Richards, and George Norman, *Industrial Organization: Contemporary Theory and Practice* (3rd ed.), Mason, Ohio, Thomson South-Western, 2005, pp. 469-71.

45.     Economics also predicts that free riding, if left untreated, will lead to a reduction of output.[66]  Plaintiffs envision a world where ERA owners can win prize money at PRCA events that will then be used to fund the start-up costs of the ERA.  Since the prize money awarded at PRCA events would partially be used to fund entry by one of the PRCA's competitors, the PRCA would rationally choose to reduce its purse sizes or other investments. Over time, this would cause output to fall because fewer rodeo athletes will be attracted into the sport, and the remaining athletes will have weakened incentives to put forward their best effort into promoting PRCA rodeos and growing the sport.

46.     Other athletic sanctioning bodies have faced similar threats of free riding from members who attempted to start a competing economic venture while maintaining their existing affiliation with the incumbent organization. In 1994, Greg Norman attempted to start the World Golf Tour as a series for golf's elite players with fewer tournaments and bigger purses than the incumbent PGA Tour.[67] The PGA Tour, worried about the potential for free riding from golfers "trying to conduct a tour at the expense of the PGA Tour," threatened to suspend the membership of any PGA Tour member who played on the World Golf Tour.[68] As one observer at the time put it: "why would a network pay millions of dollars for broadcast rights [to the PGA Tour] if, out of the blue, the tour's top players could decide to make themselves a pile of money by putting on a quickie made-for-TV skins game or some schlock Challenge of the

---

[66] *Ibid.*

[67] Michael Mayo, "PGA Tour Defends Turf From Upstart," *Sun-Sentinel*, November 30, 1994, *available at* http://articles.sun-sentinel.com/1994-11-30/sports/9411290672_1_new-tour-world-tour-commissioner-tim-finchem.

[68] *Ibid.*

Superstars?"[69] The founders of the ERA seek to engage in a similar free ride on the efforts of the PRCA.[70]

**B.      The ERA's Proposed Business Model Would Free Ride on the PRCA's Investments.**

47.     The PRCA makes substantial and ongoing investments to increase the quality of and grow consumer demand for rodeos, thereby developing the popularity and public images of cowboys who participate in PRCA-sanctioned rodeos.  These investments include, but are not limited to:

- The PRCA offers membership to winners from the National High School Rodeo Association (NHSRA) and the National Intercollegiate Rodeo Association (NIRA).  This fosters growth in the future of rodeo by developing future rodeo athletes.[71]

- The PRCA promotes rodeos, contestants, and sponsors by publishing *ProRodeo Sports News*, "the definitive information source for the professional rodeo athlete, avid fan or anyone who enjoys the Western way of life."[72]  Named plaintiffs have been beneficiaries of this, with Trevor Brazile appearing on the cover of *ProRodeo Sports News* 28 times since 2011.[73]

---

[69] Thomas Boswell, "Sand in Golf's Engine," *Washington Post,* February 15, 1995.

[70] Note that plaintiffs acknowledge the "PGA Tour's growth in popularity, prize money, and television coverage." Complaint, ¶ 5. Allowing the ERA to free ride on the efforts of the PRCA would make it more difficult for the PRCA to achieve similar success.

[71] Declaration of Karl Stressman, ¶ 20.

[72] http://www.prorodeo.com/prorodeo/media/psn-subscription-info.

[73] Declaration of Karl Stressman, ¶ 14.

- The PRCA pays for the National Finals Rodeo and Champions Challenge to be broadcast on CBS Sports Network, which is available in tens of millions of homes.[74]

- The PRCA provides insurance to contestant members and member rodeos.[75]

- The PRCA trains judges, who safeguard the integrity and improve the quality of on-field competition among rodeo athletes.[76]

- The PRCA bears the cost of organizing and scheduling cowboy entries and processing rodeo payouts, thereby relieving local committees of the expense of building the infrastructure to handle these critical functions.[77]

- The PRCA sets standards and monitors the quality of its stock contractors.  This leads to improved performance and fewer animal injuries.[78]

48.    Each of these activities requires ongoing investments in time, effort and money on the part of the PRCA.  Plaintiffs' proposed business model would force the PRCA to subsidize the creation of a competitor by allowing the ERA to free ride on the PRCA's investments.

49.    Plaintiffs assert that the ERA does not plan to supplant PRCA rodeos and instead seeks to "co-exist" with the PRCA.[79]  Plaintiffs' intention to "co-exist" with the PRCA is inconsistent with the type of behavior economists expect from horizontal competitors.  A core

---

[74] http://www.reviewjournal.com/business/rfd-tv-devastated-lose-rodeo-broadcast-rights.

[75] Declaration of Karl Stressman, ¶ 18; Declaration of R.C. Trotter, ¶ 7; Declaration of K.C. Jones, ¶ 2; Declaration of Dick Vetters, ¶ 3.

[76] Declaration of Karl Stressman, ¶ 17; Declaration of R.C. Trotter, ¶ 7; Declaration of K.C. Jones, ¶ 2; Declaration of Dick Vetters, ¶ 3.

[77] Declaration of Karl Stressman, ¶ 18; Declaration of R.C. Trotter, ¶ 7; Declaration of K.C. Jones, ¶ 2; Declaration of Dick Vetters, ¶ 3.

[78] Declaration of Karl Stressman, ¶ 22.

[79] Complaint, ¶¶ 11, 74 and Declaration of Tony Garritano, ¶¶ 3, 29.

economic principle is that competitors profit from displacing — not co-existing with — their rivals.[80]  Directly contrary to this core tenet, plaintiffs' declarations make clear that they believe their association will be economically viable only if ERA's owners and officers can maintain their direct involvement in the PRCA.[81]

50.    While plaintiffs' declared intentions are *inconsistent* with vibrant and free competition, they are *consistent* with the view that the ERA would free ride on PRCA investments and relationships with cowboys, organizing committees and sponsors.    The economic theory of free riding explains why the ERA would not want to displace the PRCA or have the association scale back its event calendar.[82]  If the PRCA were displaced, the ERA would have to bear the cost of running a full complement of qualifying events to support its end-of-season championship finale. Instead, the ERA seeks the Court's permission to force the PRCA to subsidize the ERA.

51.    One form of the subsidy that plaintiffs seek from the PRCA is a direct financial subsidy. Plaintiffs seek to force the PRCA to fund the start-up costs of the ERA by allowing ERA owners to continue to compete for PRCA prize money as they start a competitor.[83] The ERA's proposed business model would require the PRCA to help underwrite the risk of launching a new competitor by allowing ERA owners to continue to participate in PRCA events. As one of plaintiffs' declarations spelled out, the ERA's owners seek to continue to compete in PRCA events "because ERA is still a new organization that is launching a new product in

---

[80] Stigler, *Organization of Industry*, p. 5.  ("Competition … connotes rivalry between two or more men or groups for a given prize. … Sporting events are clear illustrations: we should be shocked if two teams called off the event or arranged a tie, and divided the prize.")

[81] Declaration of Trevor Brazile, ¶ 25; Declaration of Bobby Mote, ¶ 33; and Declaration of Ryan Motes, ¶ 21.

[82] Carlton and Perloff, *Modern Industrial Organization*, p. 414.

[83] Plaintiffs' Memorandum of Law in Support of Its Application for a Preliminary Injunction, p. 12.

rodeo."[84]   Another of plaintiffs' declarations explained even more directly: "[N]othing is guaranteed and we are taking a risk with ERA in order to improve the sport of rodeo for all. Continuing to compete in certain PRCA-sanctioned rodeos while we launch ERA will allow me to continue to make a living and support my family."[85]

52.     Plaintiffs recognize that, under their proposed business model, they would not be able to launch the ERA absent their continued participation in and subsidization by PRCA-sponsored events.[86]   As I explained earlier, however, under alternative business models that would *not* involve the PRCA's subsidization of ERA owners/officers, ERA cowboys would continue to have access to many alternatives to earn substantial compensation outside of PRCA-sanctioned events.

53.     Another form of subsidy is the ERA's plan to free ride on PRCA events for its qualifying system.   ERA has expressed its intention to run its own World Championship Rodeo to compete with PRCA's National Finals Rodeo, but without investing in a full complement of smaller rodeos necessary to support their championship event.   According to plaintiffs, the ERA season will "consist of a moderate number of rodeos," and they seek to "[s]upplement [the] ERA schedule with PRCA-sanctioned rodeos."[87]   As I explained earlier, various other sanctioning bodies such as PBR underwrote their own costs of entry, including organizing and running a qualifying tournament system for their athletes.   These costs — not unlike those borne each year

---

[84] Declaration of Trevor Brazile, ¶ 25.

[85] Declaration of Bobby Mote, ¶ 33.

[86] Declaration of Ryan Motes, ¶ 21 ("I need to continue being a PRCA member so that I can compete in these rodeos and earn a living.").

[87] Declaration of Tony Garritano, ¶ 28 and Declaration of Bobby Mote, ¶ 30.

by the PRCA — do not constitute an economic barrier to entry nor do they constitute a barrier to economic success, as PBR's success and growth demonstrate.

54.     Finally, the ERA's business model would allow that association's employees, owners and officers to free ride on the investments the PRCA makes in developing their public images as rodeo athletes.  Trevor Brazile has declared his intention to continue to compete in the PRCA rodeos where he has "had positive experiences and [has] developed strong ties to and relationships with the rodeo committees."[88]   Additionally, plaintiffs have stated they seek to continue riding in PRCA events so they can "continue to develop [their] fan base and sponsorship opportunities."[89]   Allowing ERA's employees/owners/investors to free ride on the investments and relationships that PRCA members collectively make with rodeo committees, fans and sponsors would strongly disincentivize future investments.

55.     The economic prediction that the ERA's business model will lead to free riding is confirmed by the available evidence.  The ERA is already free riding on investments by the PRCA.  For example, on November 21, ERA's Facebook page featured an advertisement for the ERA's "Rodeo Results App" which the ERA touts as a way to "follow Bobby Mote and all your favorite #ERAAthletes at the WNFR [PRCA's Wrangler National Finals Rodeo] and throughout the 2016 ERA Tour" complete with "live scoring after each ride."[90]   I understand that the PRCA spends approximately $700,000 to $1,200,000 each year to organize and host the WNFR.[91]   ERA is free riding on the PRCA's substantial investments by attracting the attention of fans who tune

---

[88] Declaration of Trevor Brazile, ¶ 25.

[89] Declaration of Bobby Mote, ¶ 30. *See also* Declaration of Trevor Brazile, ¶ 25 ("absent PRCA's new bylaws kicking me out of the organization and banning me from PRCA-sanctioned rodeos, I intended to and would compete in a number of PRCA rodeos where I could have won prize money and increased my fan base.").

[90] https://www.facebook.com/erarodeo/, *accessed* November 21, 2015.

[91] Declaration of Karl Stressman, ¶ 3.

in to watch PRCA members participate in the WNFR and then steering those fans over to competing events in which those very same athletes have a strong profit interest, namely the 2016 ERA Tour. As I explained above, economics predicts that left unchecked, this free riding will lead to a reduction in rodeo output and quality.

### C.     The Competing Events Bylaw Deters Free Riding

56.     The Competing Events Bylaw is designed to discourage free riding by local organizing committees affiliated with the PRCA.  The bylaw incentivizes local rodeo committees to become dedicated partners with the entire PRCA membership in organizing and promoting the sanctioned events they are hosting.  The bylaw is designed to more closely align the *individual* interests of any particular local organizing committee with the *collective* interests of other PRCA members.

57.     If local committees that belong to the PRCA were completely free to host non-PRCA rodeos during or in close temporal proximity to when they host PRCA-sanctioned rodeos, the committees could ride the coat-tails of PRCA's organizational and marketing efforts for their own benefit.  For instance, the PRCA has invested in efforts to ensure that rigorous livestock standards are followed by its stock contractors.[92]  If a local organizing committee were free to host a competing rodeo in close temporal proximity to a PRCA-sanctioned rodeo, the competing rodeo could rely on the stock contractor that was already in place to serve the PRCA event. The competing rodeo, and hence the local organizing committee that partnered with the competing rodeo, would benefit from the PRCA's investments in vetting stock contractors without bearing the costs associated with that vetting. Since the PRCA-wide investments are funded and

---

[92] Declaration of Karl Stressman, ¶ 22.

supported by the entire association membership, the competing rodeo and the local committee would enjoy a free ride on the rest of the PRCA membership.  Free riding would reduce or eliminate the incentive of other PRCA members to organize and promote high-quality rodeos, which is integral to growing the popularity of the sport.

58.     To combat this free riding, the Competing Events Bylaw seeks to align the interests and incentives of individual organizing committees with the interests and incentives of:

- Other organizing committees in neighboring cities and towns, because the demand for their own rodeo shows is impacted (positively or negatively) by the dedication and level of effort devoted by the host committee in question;

- Corporate sponsors, because the return they earn from publicizing PRCA-sanctioned events is impacted (positively or negatively) by the dedication and level of effort devoted by the host committee in question; and

- PRCA contestant members, because the size of the potential purse for which they will compete is impacted (positively or negatively) by the dedication and level of effort devoted by the host committee in question.

59.     The Competing Events Bylaw is narrowly tailored with respect to both its scope and timing.  The bylaw's restrictions apply only to "competing events," which are defined as rodeos in which contestants compete in two or more specified types of events.[93]  The bylaw restrictions limit the types of events that local committees can host only during a 72-hour window before, during and after their own event.[94]  As earlier noted, since the large majority of PRCA-sanctioned rodeos last four days or less, in practice this means that a PRCA rodeo held on

---

[93] Complaint, ¶ 80.

[94] *Ibid.*

one weekend usually would not preclude the local committee from hosting a non-PRCA rodeo either the weekend immediately preceding or immediately following (or both).

### D. The Conflicting Interests Bylaw Deters Free Riding

60. The Conflicting Interests Bylaw is designed to discourage free riding by PRCA contestant members. The bylaw incentivizes cowboys to become dedicated partners with the entire PRCA membership in helping produce and promote the sanctioned rodeos in which they are riding. The bylaw is designed to more closely align the *individual* interests of cowboy contestants with the *collective* interests of other PRCA members.

61. If PRCA contestants were completely free to take a position as an employee, owner or officer in a competing rodeo association, they could ride the coat-tails of other PRCA members' collective organizational and marketing efforts. In particular, ERA employees, owners, and officers could use fan loyalty, sponsorship associations, and relationships with rodeo organizing committees that they developed *in their capacity as PRCA members* to profit in their capacity as financial stakeholders in the profitability of the competing ERA venture.

62. For example, as I noted earlier, plaintiffs have expressed their intention to continue riding in "PRCA-sanctioned rodeos [to] allow [them] to continue to develop [their] fan base and sponsorship opportunities."[95] The PRCA membership at-large has invested and continues to invest in developing these fan bases and sponsorship associations — through investments such as publishing the *ProRodeo Sports News*, maintaining a social media presence, organizing tours, facilitating connections between PRCA members and commercial sponsors,

---

[95] Declaration of Bobby Mote, ¶ 30. *See also* Declaration of Trevor Brazile, ¶ 25 ("absent PRCA's new bylaws kicking me out of the organization and banning me from PRCA-sanctioned rodeos, I intended to and would compete in a number of PRCA rodeos where I could have won prize money and increased my fan base.").

operating the "ProRodeo FanZone" fan club, arranging television coverage of PRCA events featuring PRCA athletes, and sponsoring online fantasy rodeo games.[96]   Likewise, plaintiff Trevor Brazile has expressed his wish to continue participating in PRCA-affiliated rodeos where he has "developed strong ties and relationships with the rodeo committees."[97]   The PRCA membership at-large has invested and continues to invest in developing relationships with and fostering local organizing committees, such as by providing trained event judges, operating contestant entry and pay-out system, providing insurance, ensuring high quality stock, and assisting with media relations.[98]

63.   PRCA contestant members can free ride on the investments of other PRCA members by taking a position as an officer, board member, employee or owner in a competing rodeo association.  The combination of holding a direct profit stake in a competitor to the PRCA with the opportunity to participate in PRCA-sanctioned rodeos creates a strong conflict of interest between that PRCA contestant and all other PRCA members, be they:

- Local committees, whose expected economic opportunity from hosting PRCA-sanctioned rodeos is affected (positively or negatively) by the effort and dedication to the PRCA from contestants;

- Corporate sponsors, whose expected return from publicizing PRCA-sanctioned events is affected (positively or negatively) by the level of effort and dedication to the PRCA exhibited by contestants; and

---

[96] Declaration of Karl Stressman, ¶¶ 9, 14-16. Declaration of K.C. Jones, ¶ 1.

[97] Declaration of Trevor Brazile, ¶ 25.

[98] Declaration of R.C. Trotter, ¶ 7 and Declaration of Dick Vetters, ¶ 3.

- Other contestant members, whose economic opportunities are very likely to be diminished by the continued participation in PRCA-sanctioned events by cowboys with conflicted interests.

64.   The Conflicting Interests Bylaw seeks to align the individual interests and incentives of every contestant member with the interests of other PRCA members by restricting the types of outside activities that members are permitted to engage in.  The bylaw is narrowly tailored: it restricts only those types of activities that involve "pursuing interests in Conflicting Rodeo Associations" and it defines such associations as entities that produce, promote or sanction multiple professional rodeo contests in which contestants compete in two or more specified events.[99]  Thus, the bylaw does not restrict members from pursuing interests in non-professional rodeo associations (*e.g.*, high school and collegiate groups) or single-event associations (*e.g.,* bareback riding only). Together, the Competing Events and Conflicting Interests Bylaws help to align the incentives of all parties involved in the production of PRCA rodeos. The bylaws deter free riding, which, if left unchecked, is very likely to reduce output and product quality.

### V. OWNERSHIP INTERESTS AND/OR GOVERNANCE RIGHTS IN A COMPETING ECONOMIC VENTURE GREATLY EXACERBATE FREE RIDING CONCERNS

65.   Competitive incentives become fundamentally altered when someone actively participates in a firm and at the same time has a significant profit stake or voice in the strategic decisions of a direct competitor.[100]   The commingling of ownership, governance and

---

[99] Complaint, ¶ 76.

[100] *See* Steven C. Salop and Daniel P. O'Brien, 2000, "Competitive effects of partial ownership: Financial interest and corporate control." *Antitrust Law Journal*, pp. 559-614.

participation in the affairs of a direct competitor creates the inevitability of strong conflicts of interest between the two parties.  As a matter of economics, these conflicts of interest become especially injurious when a product or service is created through "team effort" or "joint production".  In these settings, the free riding concerns discussed in the preceding section become even more pronounced — and therefore the economic justification for policies and practices designed to curb free riding become still more apparent.

### A.     The Economics of Joint Production and Shirking

66.     The organization and production of PRCA-sanctioned rodeo shows is a classic example of what economists call "joint production."[101]  Joint production is defined as production in which (1) a product or service (here, a professional rodeo or rodeo tour) is produced using multiple different types of inputs (here, venue hosting services, cowboy services, livestock, sponsorships and myriad inputs provided by a sanctioning body); (2) those inputs are owned by different persons (*e.g.*, venue owners, local organizing committees, cowboys, stock contractors, sponsors and the PRCA itself); and (3) the value of the output from the joint production process exceeds the standalone value of the sum of the inputs.[102]

67.     In many settings involving joint production — and rodeos exhibit this property — the level of effort and dedication exerted by each individual will be difficult to measure precisely.  Cowboys exercise discretion when it comes to their level of participation at rodeos, including which rodeos to ride in and how much to contribute to the common good of the rodeo (*e.g.*, by participating in joint promotional and fan appreciation efforts).

---

[101] The canonical article in this economics literature is Armen A. Alchian and Harold Demsetz, 1972, "Production, Information Costs, and Economic Organization," *American Economic Review*, Vol. 62, No. 5, pp. 777-95.

[102] *Ibid.*, p. 779.

68.     Economic theory explains that membership associations like the PRCA that engage in joint production are naturally vulnerable to the phenomenon of "shirking."  Shirking involves reducing work effort in favor of consuming more leisure, evading responsibilities, and not carrying one's full weight.  Shirking is a continual risk facing membership associations because the additional output produced by the joint venture derives from the cooperative interaction of *all* the members. Because it is difficult (costly) to measure individual members' efforts and reward their individual contribution to the joint effort, the link becomes attenuated between an individual member's effort and the compensation that he or she receives for that effort.[103]  As a result, shirking can be individually rational even though such behavior injures the collective welfare of the association's members.

69.     Shirking can take many forms. For example, contestants may choose not to participate fully in marketing efforts undertaken by the rodeo association as a whole, such as attending autograph sessions held in conjunction with rodeos.[104] Contestants may also choose to limit their participation in youth camps organized by the PRCA where aspiring rodeo cowboys are mentored by PRCA members,[105] or they may elect to skip opportunities to meet with sponsors of local rodeo organizing committees and show the PRCA's appreciation to its current and prospective new sponsors.[106] Finally, members may shirk by not reliably showing up at

---

[103] *Ibid.*, p. 780.

[104] For example, there are free autograph sessions held in conjunction with the National Finals Rodeo. http://nfrexperience.com/home/contestant_autograph_sessions.

[105] Tony Bruguiere, "Young Rodeo hopefuls get free day of training from rodeo professionals," *Fence Post,* April 1, 2013, *available at* http://www.thefencepost.com/home/5729915-111/rodeo-prca-camp-youth.

[106] For example, the San Dimas Western Days Rodeo offers the "opportunity to meet and greet many rodeo contestants" as a benefit to attract sponsors. http://www.sandimasrodeo.com/updates/pdf/2015-Sponsor-Package.pdf.

rodeos they have entered, making it difficult for local committees to plan their marketing activities.[107]

70.     While the risk of shirking is an inherent feature of membership associations where it is difficult (costly) to police individual members' effort, the likelihood and severity of shirking are greatly magnified if some members also hold strong financial interests in the profitability of a directly competing economic venture.   These outside profit interests magnify the gains from shirking: not only does the rodeo contestant have the incentive to shirk on efforts to help make PRCA rodeos a success, he is also able to parlay the benefits derived from participating in PRCA events (e.g., purse money, fan appreciation, sponsorship affinity) into additional profit for the competing ERA venture in which he holds a significant financial stake.   A fundamental economic tenet is that when you increase the gains associated with an activity, you will increase its supply:[108] thus, economics predicts that allowing PRCA members to have outside profit interests in a competing venture will lead to increased shirking and reduced effort by those contestants to promote PRCA-sanctioned rodeos.

**B.      The Adverse Competitive Effects of Ownership Interests in a Direct Competitor**

71.     Economists have shown empirically that competitive incentives can become distorted or misaligned when individuals have ownership stakes in a competing economic venture in which they participate.[109] When some members of an association hold an ownership

---

[107] Declaration of R.C. Trotter, ¶ 8.

[108] Carlton and Perloff, *Modern Industrial Organization*, p. 59.

[109] For example, some surgeons with operating privileges at traditional hospitals have opened ambulatory surgical centers, where many outpatient surgeries can be performed. Economists who study this issue have found that these surgeons choose to perform higher-revenue surgeries (for patients with commercial insurance) at the facilities in which they have an ownership interest, while they perform less-lucrative surgeries (for Medicaid beneficiaries) at the traditional hospitals in which they have privileges but no ownership stake.  Jon R. Gabel, et
*(cont'd)*

interest in a directly competitive venture, this creates a conflict between the economic interests of the overall association and those of the investor subgroup. It is in the economic interest of the PRCA membership at-large to compete independently, freely, and vigorously against rival sanctioning associations such as the ERA, to win the loyalty and patronage of as many riders, fans, sponsors and local organizing committees as possible. Independent, free, and vigorous competition benefits the overall membership. For those PRCA members who also own stakes in the ERA, however, aggressive competition with the ERA erodes the value of their ownership investment.[110] The economic incentive of ERA investors, therefore, is to dial-back on the aggressiveness of competition between the PRCA and the ERA in order to protect the value of their investments in the ERA. This creates a conflict of interest within the PRCA membership between the "rank and file" and the ERA investor subgroup. Equally or more importantly, the loss of independent and vigorous competition harms consumers.

72. The problem of free riding is particularly acute when ownership and governance are highly concentrated among a small number of persons. Unlike, for example, an IBM employee owning a small number of shares of Apple stock, the ERA proposes to be tightly-held, with ownership and governance being concentrated in a relatively small number of persons.[111] This means that every owner, officer and employee of the ERA will have a direct and significant

---

*(cont'd from previous page)*
al., 2008, "Where do I send thee? Does physician-ownership affect referral patterns to ambulatory surgery centers?" *Health Affairs*, Vol. 27, No. 3, pp. w165-74.

[110] *See* David Reitman, 1994, "Partial ownership arrangements and the potential for collusion," *The Journal of Industrial Economics*, Vol. 42, No. 3, pp. 313-22 at pp. 315-6 ("[F]irms will produce less aggressively if they own shares in the profits of competing firms.")

[111] The ERA has stated its ranks will be limited to the top one percent of rodeo athletes. *See* https://eraprorodeo.com/explore-era/faq/. According to the complaint, "ERA is owned by the rodeo athletes themselves; the number of shares each rodeo athlete owns in ERA corresponds to their competitive accomplishments. The majority of ERA's board is comprised of professional rodeo athletes" (Complaint, ¶26). "ERA is owned by, and the Board is almost exclusively made up of, full-time rodeo athletes (with the lone exception being ERA's CEO Tony Garritano)" (Declaration of Trevor Brazile, ¶ 18).

**APPENDIX IN SUPPORT OF DEFENDANT'S MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**     **App.  64**

financial stake in the profitability of the ERA.  This also means that ERA athletes will have a clear economic incentive, when they wear their PRCA member hat, to find ways to free ride on the PRCA whether by shifting costs from the ERA to the PRCA (e.g., piggybacking on the PRCA qualification system when organizing ERA's Championship Rodeo), or by misappropriating benefits accruing to investments by the PRCA membership (e.g., piggybacking on the logistical and marketing investments for PRCA-sanctioned rodeos by scheduling an ERA rodeo immediately before, during or after a PRCA event).

73.     For instance, if ERA cowboys are permitted to remain members in the PRCA, they may use their access to other PRCA members, sponsors, fans and partners to advance the profit interests of the ERA at the expense of the PRCA.  PRCA members have access to promotional events where they can interact with fans, such as Rodeo Vegas, the Official NFR After Party of the PRCA.[112]  If ERA owners were permitted to attend such events in their capacity as PRCA members, they would have the economic incentive to use those opportunities to promote the ERA's interests instead of the PRCA. In particular, an ERA owner would have the economic incentive to use his access to encourage other PRCA contestant members to enlist with the ERA and encourage PRCA fans and sponsors to switch their loyalties (and spending) to the ERA.  Because ERA owners would be engaging in these activities while retaining their membership in the PRCA, their incentives would be guided by their divided loyalties, and their conduct would represent free riding on the investments made by the PRCA, *not* arm's length competition.  In this way, the ERA would be able to blunt competition with the PRCA by using its rival's own efforts to instead promote the ERA.

---

[112] Declaration of  K.C. Jones, ¶ 1.

### C.   The Adverse Competitive Effects of Governance Rights in a Direct Competitor

74.     When some members of an association hold governance rights in a directly competing economic venture, independent and aggressive competition is compromised in other ways as well.  There are two separate but reinforcing ways in which commingling participation in one economic venture with governance rights in a competing economic venture softens competition.

75.     First, ERA cowboys will have direct knowledge of that association's business strategies in their capacity as ERA officers.  If those same cowboys also can participate in PRCA rodeos, they will have a strong economic incentive to use their knowledge of ERA's business plans to influence how much or little effort they devote to PRCA rodeos and how much or little effort to invest in contributing to marketing, training and other collateral efforts undertaken by the PRCA membership as a whole.  For example, if an ERA cowboy (by virtue of being an ERA officer) knows that ERA is working to sign Cinch Jeans as a sponsor, then he will have less incentive (acting as a PRCA cowboy) to support efforts by the PRCA to promote its sponsor Wrangler by participating in PRCA/Wrangler advertising materials or promotional events or by appearing at events where Wrangler's sponsorship is featured.

76.     Second, consistent with what I discussed above, if ERA cowboys were permitted to remain members in the PRCA while also serving as officers of the ERA, they could use their access to other PRCA members, sponsors, fans and partners to advance the interests of the ERA. For example, if these ERA officers gain access to PRCA sponsors in their capacity as PRCA members, they would have an economic incentive to try to convince these sponsors to advertise instead with the ERA. Because the ERA officers would hold governance positions within the ERA, they would be able to offer PRCA sponsors credible assurances, opportunities and

concessions that someone who was only a member in another sanctioning body could not. As an example, someone with governance rights in the ERA could promise PRCA sponsors reduced advertising rates or other inducements, such as naming rights to ERA events, to entice these sponsors away from the PRCA. Again, because ERA officers would be engaging in these activities while retaining their membership in the PRCA, their incentives would be guided by their divided loyalties, and their conduct would represent free riding on the investments made by the PRCA, *not* arm's length competition.

77.     Whether by using their knowledge of ERA's business plans to guide what level of effort to devote to PRCA-supported activities, or using their positions as ERA officers to capitalize on opportunities to undermine PRCA-supported activities, economics predicts that ERA cowboys will have divided loyalties between the two competing rodeo associations.  The result will be a reduction in independent, aggressive competition between the ERA and PRCA, with consumers as the losers.

**D.     The Conflicting Interests Bylaw Limits the Conflict of Interest Stemming from PRCA Members Having Ownership or Governance Stakes in Competing Ventures**

78.     The Conflicting Interests Bylaw prohibits members from becoming owners, officers, board members or employees of a competing rodeo association. As explained above, the difference between simply participating in another association's events and being an owner, officer, board member or employee of another association is that the latter entitles a rider to a stream of profits from the competing organization. In addition, owners, officers, board members and employees of competing organizations are involved in governing decisions of those organizations.

79.     By prohibiting its members from holding positions as owners, officers, board members or employees of competing organizations, the PRCA is rationally responding to the adverse effects of ownership interests and governance rights while still allowing its member athletes to participate in any event they choose.   Barring owners and governors of competing rodeo organizations from membership in the PRCA serves to better align each member's economic incentives and his ability to act on those incentives with the interests of the association's membership at-large.   As I have explained, the PRCA operates in a competitive environment where free riding by any member risks reducing output and quality. The bylaws at issue help deter this free riding, which is especially important when faced with free riding in the context of ownership interests and governance rights in a competing economic venture.

## VI. CONCLUSION

80.     As I have explained above, contrary to plaintiffs' allegations, the PRCA lacks market or monopoly power in plaintiffs' alleged market. Competition for the services of professional rodeo athletes is vibrant; marketplace dynamics are inconsistent with the PRCA having market or monopoly power; and prior entry into the market confirms the PRCA lacks market or monopoly power.

81.     From an economics perspective, the Competing Events Bylaw and Conflicting Interests Bylaw do not exclude competition.   Neither of these bylaws creates economic barriers to entry or expansion that place competing rodeos or sanctioning associations at a cost disadvantage relative to the PRCA.

82.     Rather, the PRCA bylaws address the economically-legitimate free riding concerns stemming from PRCA members having ownership or governance stakes in a competing

rodeo association.   Economics predicts that free riding, if left uncorrected, will lead to a reduction in output and product quality. Free riding in the context of ownership interests or governance rights in a competing economic venture is particularly harmful to competition. The prevention of such free riding is therefore a legitimate economic justification for the bylaws at issue.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2015 in _Washington D C ._

_____
Andrew Dick, Ph.D.

# EXHIBIT A

**CRA** Charles River Associates

## Andrew R. Dick
Vice President

PhD, Economics
University of Chicago

MA, Economics
University of Chicago

BA, Economics
and Political Science
University of Toronto

Andrew Dick, a vice president in the Competition Practice at Charles River Associates, is an expert in analyzing the competitive effects of mergers and acquisitions, alleged collusion, and a variety of business practices. In both government service and private practice, Dr. Dick has provided economic analysis in support of antitrust litigation. Dr. Dick has practical antitrust experience in a broad array of industries, including broadcast and cable media, computer software and services, consumer products, entertainment and media services, industrial materials and building materials, manufacturing, paper products, payment networks, pharmaceuticals, retailing and distribution, sports entertainment, and transportation, among others. Since joining CRA in 2003, Dr. Dick has appeared before the US Department of Justice, the Federal Trade Commission, and various state and foreign competition agencies to assist clients with respect to a wide range of transactions and antitrust issues. He has submitted expert reports in proceedings in US district court. Before joining CRA, Dr. Dick was acting chief of the Competition Policy Section of the DOJ's Antitrust Division. Prior to that, he was a member of the UCLA faculty and was a research fellow at the University of Chicago's Graduate School of Business. Dr. Dick has published widely on antitrust topics such as horizontal restraints, tacit collusion, efficiencies, and the use of regression analysis. His articles have appeared in such leading publications as *Antitrust Law Journal*, *Journal of Law and Economics*, and *Antitrust Magazine*.

## Representative project experience

- Assisted Caraustar with obtaining unconditional antitrust clearance of its acquisition of Newark Group.

- Assisted Norbord with obtaining unconditional antitrust clearance of its acquisition of Ainsworth Lumber Co.

- Assisted General Electric with obtaining antitrust clearance subject to specific divestitures in its acquisition of the power generation equipment division of Alstom.

- Assisted NewPage with obtaining antitrust clearance subject to specific divestitures for its sale to Verso Paper.

- Assisted Albertsons LLC with obtaining antitrust clearance subject to specific divestitures for its acquisition of Safeway Inc.

- Assisted Office Depot with obtaining antitrust clearance for its acquisition of OfficeMax without any divestitures.

- Assisted International Paper with obtaining antitrust clearance for its acquisition of Temple-Inland subject to consent provisions.

- Assisted Zuffa LLC, owner of the Ultimate Fighting Championship mixed martial arts promotion, with obtaining antitrust clearance for its acquisition of the Strikeforce promotion.

- Assisted NBC Universal with obtaining US antitrust clearance for its television and online media joint venture with Comcast subject to consent provisions.

- Assisted CVS Pharmacy with obtaining unconditional antitrust clearance for its acquisition of Universal American in the Medicare Part D sector.

- Assisted Live Nation with obtaining US antitrust clearance for its merger with Ticketmaster Entertainment subject to consent provisions.

- Assisted JBS SA with its acquisition of the livestock ranch and beef processing assets of Smithfield Foods.

- Assisted the National Hockey League in litigation successfully upholding the League's rules on franchise ownership transfers and relocations.

- Assisted CF Industries with obtaining antitrust clearance from the FTC in connection with its acquisition of Terra Industries in the nitrogen fertilizers industry.

- Assisted Watson Wyatt Worldwide and Towers Perrin, two large professional services companies, with obtaining expedited US antitrust clearance for their merger.

- Provided economic analysis on behalf of Whole Foods Markets and Wild Oats Market during the antitrust review and subsequent litigation involving their merger.

- Assisted the National Hockey League in litigation relating to its rules on digital media rights.

- Assisted Federated Department Stores (Macy's/Bloomingdale's) with obtaining antitrust approval for a $17 billion merger to create a nationwide department store chain comprised of nearly 1,000 retail locations.

- Assisted counsel in defense against a class action lawsuit alleging price coordination and other restraints of trade in a building products and distribution industry.

- Assisted the largest US retail pharmacy chain (CVS Pharmacy) and the second largest pharmaceutical benefits management company (Caremark) with obtaining expedited and unconditional antitrust clearance for their $21 billion merger.

- Assisted the Wm. Wrigley Jr. Company with obtaining US and EU antitrust clearance for its acquisition by Mars.

- Provided economic analysis in support of the merger combining National/Alamo and Enterprise Rental Car, obtaining US and Canadian antitrust clearance.

- Assisted counsel with avoiding a Second Request in a transaction combining the second- and third-largest secure document printing companies in the US.

- Assisted two European pharmaceutical companies that develop and market neurological treatments obtain unconditional and expedited clearance from US and European antitrust authorities.

Charles River Associates                                      Andrew R. Dick

- Assisted counsel with avoiding a Second Request in a transaction combining suppliers of cement and ready-mix.

- Assisted NBC with obtaining unconditional antitrust clearance for its $14 billion acquisition of Vivendi Universal.

- Assisted Alcatel and Lucent with obtaining expedited and unconditional antitrust clearance in the US and Europe for their $17 billion merger.

- Assisted NewPage with obtaining unconditional antitrust clearance for a merger creating the largest North American supplier of coated paper used in the printing and publishing sector.

- Assisted International Paper with obtaining unconditional antitrust clearance for an acquisition creating the largest North American supplier of containerboard and corrugated packaging.

- Assisted Caesars Entertainment with obtaining federal antitrust clearance and state regulatory approval in connection with its sale to Harrah's Entertainment in a $9 billion transaction.

- Assisted US and Japanese semiconductor mask-making equipment suppliers with securing unconditional regulatory clearance for their merger.

- Assisted Live Nation Entertainment with obtaining unconditional and expedited antitrust clearance for its acquisition of House of Blues.

- Advised the Department of Justice by evaluating the likely competitive effects of a proposed acquisition between agricultural feedstuff producers and an alleged conspiracy involving rail carriers.

- Provided pre-merger antitrust risk assessments to clients in a wide range of industries, including paper products, broadcast television, food retailing, financial exchanges, fuel centers, building products, automotive equipment, online travel agencies, and mineral products.

- On behalf of various clients, evaluated the competitive effects of particular business practices including alleged bundling, buyer power, tacit collusion, and exclusion.

## Selected industry experience

- Computer software and hardware—CAD/CAM, computer-generated animation, desktop software, enterprise database software, business continuity / disaster recovery services, test scanners, speech recognition software

- Consumer products—alcoholic beverages, confectionery, cosmetics, film, lawn and garden products, office supplies, shaving razors

- Consumer and business services—concert promotion services, educational services, outdoor advertising, rental car agencies, building products distribution, secure document printing, professional services firms

- Defense—defense services procurement, satellite imaging

- Distribution—building supply products, paper products, food service, secure document destruction, office supplies

- E-commerce—online travel agencies, secure e-transactions

- Electronic payment systems—ATM, credit and debit card networks

- Energy—electricity, natural gas, oilfield services

- Entertainment and media—broadcast and cable television programming, network and spot television advertising, local television stations, radio advertising, billboards and other outdoor media, casino gaming, concert promotion services, professional, publishing, sports leagues and associations

- Equipment and machinery—aircraft engines, electrical equipment, gas engines, industrial water purifiers, mining and drilling apparatus, railcars, semiconductor manufacturing equipment, educational scanning equipment

- Health care—insurance, physician services, radiation therapy equipment, branded and generic pharmaceuticals, pharmaceutical distribution, pharmaceuticals benefit management (PBM) services

- Industrial products and building products—containerboard, fiberglass, wood panels, lumber, hot and cold rolled steel, specialty steels, glass reinforcements, industrial chemicals, cement and ready-mix, building distribution services, road de-icing salt, pool supplies (see also paper and wood products)

- Manufacturing and other industries—automotive equipment, builder's hardware, photographic inks, engines, explosives detection equipment, livestock ranching and meat processing, flexible packaging materials

- Paper and wood products—coated and uncoated paper for publications, label stock, structural wood panels, gypsum wallboard, plywood, bleached paperboard, linerboard and containerboard, corrugated packaging materials, pulp, tissue products, specialty paper products, engineered lumber

- Retailing—department stores, drug stores, mass merchandising, office supply superstores, supermarkets

- Telecommunications—telecommunications equipment

- Transportation— rail transportation services, air and ocean freight-forwarding, transportation equipment manufacturing, airlines

## Expert testimony

*Expert Declaration on Behalf of Zuffa, LLC Submitted to the Federal Trade Commission.* December 1, 2011.

*Miguel V. Pro and Davis Landscape, Ltd., individually and on behalf of all others similarly situated v. Hertz Equipment Rental Corporation.* US District Court for the District of New Jersey. Expert report, May 19, 2011. Deposition testimony July 27, 2011.

*Amylin Pharmaceuticals, Inc. v. Eli Lilly and Company.* US District Court for the Southern District of California. Expert declaration, May 13, 2011.

*In Re: Delta/AirTran Baggage Fee Antitrust Litigation.* US District Court for the Northern District of Georgia, Atlanta Division. Expert reports, January 7, 2011 and February 4, 2011. Deposition testimony, February 25, 2011.

*Affinion Benefits Group, LLC v. Econ-O-Check Corp.* US District Court for the Middle District of Tennessee, Nashville Division. Expert declaration, October 22, 2010. Expert report, October 2, 2010.

*Gulf States Reorganization Group, Inc. v. Nucor Corporation, et al.* US District Court for the Northeastern District of Alabama Eastern Division. Expert report, July 24, 2008.

*Harrah's Entertainment, Inc.'s Acquisition of Control of Caesars Entertainment, Inc.* Nevada Gaming Commission. Expert report, April 22, 2005.

## Government experience

| | |
|---|---|
| 2002–2003 | *Acting Chief of Competition Policy,* Antitrust Division, US Department of Justice |
| 1999–2002 | *Assistant Chief of Competition Policy,* Antitrust Division, US Department of Justice |

Dr. Dick shared responsibility for supervising the casework of 50 antitrust economists, managing the preparation of testifying experts for litigation, coordinating analysis between economic and legal staffs, and briefing the Assistant Attorney General on enforcement recommendations. He had primary responsibility for economic analysis in the areas of broadcast and cable media, computer software and hardware, paper products, outdoor advertising, and electricity, among other sectors. Dr. Dick prepared to serve as the division's testifying expert in merger and civil non-merger investigations in the steel and software industries. In 2002, he received the Assistant Attorney General's Award of Distinction.

| | |
|---|---|
| 1996–1999 | *Staff Economist*, Antitrust Division, US Department of Justice |

Dr. Dick analyzed proposed mergers and participated in investigations of horizontal agreements, vertical restraints, and alleged unfair trade practices. His work spanned the traditional range of antitrust issues, including product and geographic market definition, market structure, competitive effects, entry, efficiencies, and remedies. Dr. Dick also prepared to serve as a testifying expert in a merger review involving high-pressure laminate producers.

## Teaching and research experience

| | |
|---|---|
| 1989–1996 | *Assistant Professor*, University of California, Los Angeles, Department of Economics |

|      | Dr. Dick taught graduate- and undergraduate-level industrial organization at UCLA and twice received the Warren C. Scoville Distinguished Teaching Award. He published research in the fields of industrial organization, antitrust, international trade and trade policy, and the Japanese economy. He was a frequent speaker at research conferences and other universities. |
|------|------|
| 1991 | *Visiting Assistant Professor*, University of Chicago, Graduate School of Business |
|      | As a John M. Olin Faculty Research Fellow in residence at the Center for the Study of the Economy and the State, Dr. Dick conducted research on collusion and the effects of partial ownership. |
| 1995–1996 | *Assistant Professor of Economics*, Claremont McKenna College |
|      | Dr. Dick taught courses in industrial organization and microeconomic analysis. |

## Professional service

| 2005–2015 | *Associate Editor, Antitrust Magazine* |
|------|------|
| 1995–2000 | *Associate Editor, International Journal of Industrial Organization* |

## Publications

### Antitrust publications

"Findings from the Second Request Compliance Burden Survey."  With Peter Boberg.  *The Threshold*, Summer 2014; pp. 26-37.

 "The Office Depot-OfficeMax Merger and the Changing Retail Landscape."  With Kevin Arquit, Matthew Reilly, Andrew Lacy and Peter Boberg.  *Global Competition Review USA,* November 25, 2013.

"Merger Policy Twenty-Five Years Later: Unilateral Effects Move to the Forefront." *Antitrust Magazine,* fall 2012; pp. 25–32.

"Counseling on Complex Issues." Panelist in *Antitrust Magazine* symposium, spring 2008; pp. 6–24.

"Cartels." *The Concise Encyclopedia of Economics*, ed. David R. Henderson. Liberty Fund Publishing, 2008; pp. 61–63.

"Regression Analysis." With Peter Boberg. *Antitrust Magazine,* Fall 2005; pp. 85–89.

"The Effect of Format Changes and Ownership Consolidation on Radio Station Outcomes." With Charles J. Romeo, *Review of Industrial Organization*, Vol. 27, No. 4, December 2005; pp. 351–86.

"Presumptions, Assumptions and the Evolution of US Antitrust Policy." With Gregory S. Vistnes. *Trade Practices Law Journal*, Vol. 13, No. 4. December 2005; pp. 238–243.

"Coordinated Effects Analysis: The *Arch Coal* Decision." *Antitrust Source,* March 2005; pp. 1–15.

"If Cartels Were Legal, When Would Firms Fix Prices?" *How Cartels Endure and How They Fail: Studies of Industrial Collusion,* ed. Peter Grossman. Edward Elgar, 2004; pp. 144–173.

"Coordinated Interaction: Pre-Merger Constraints and Post-Merger Effects." *George Mason University Law Review*, Vol. 12, No. 1, Fall 2003; pp. 65–88.

"The Merger Guidelines and the Integration of Efficiencies into Antitrust Review of Horizontal Mergers." With William J. Kolasky. *Antitrust Law Journal*, Vol. 71, No. 1, 2003; pp. 207–251.

"Cartels and Tacit Collusion." *The New Palgrave Dictionary of Economics and the Law*, ed. Peter Newman; Macmillan Press, London, 1998; pp. 206–211.

"When Are Cartels Stable Contracts?" *Journal of Law and Economics*, Vol. 39, No. 1, April 1996; pp. 241–84.

"Identifying Contracts, Combinations and Conspiracies in Restraint of Trade." *Managerial and Decision Economics*, Vol. 17, No. 2; March–April 1996; pp. 203–216. Reprinted in *Economic Inputs, Legal Outputs: The Role of Economists in Modern Antitrust*, ed. Fred McChesney (Wiley & Sons, 1998); pp. 11–24.

"Japanese Antitrust: Reconciling Theory and Evidence." *Contemporary Policy Issues*, Vol. 11, No. 2, April 1993; pp. 50–61.

"Are Export Cartels Efficiency-Enhancing or Monopoly-Promoting?" *Research in Law and Economics*, Vol. 15, Summer 1992; pp. 89–127.

## Other selected publications

"US–Japan Telecommunications Trade Disputes: The Role of Regulation." *The Effects of US Trade Protection and Promotion Policies*, ed. Robert C. Feenstra, University of Chicago Press, 1997; pp. 117–157.

"Explaining Managed Trade as Rational Cheating." *Review of International Economics*, Vol. 4, No. 1, February 1996; pp. 1–16.

*Industrial Policy and Semiconductors: Missing the Target*. American Enterprise Institute, 1996.

"Does Import Protection Act as Export Promotion? Evidence from the United States." *Oxford Economic Papers*, Vol. 46, No. 1, January 1994; pp. 83–101.

"Accounting for Semiconductor Industry Dynamics." *International Journal of Industrial Organization*, Vol. 12, No.1, January 1994; pp. 35–51.

"Strategic Trade Policy and Welfare: The Empirical Consequences of Foreign Ownership." *Journal of International Economics*, Vol. 35, No. 3-4; November 1993; pp. 227–249.

"An Efficiency Explanation for Why Firms Second Source." *Economic Inquiry*, Vol. 30, No. 2, April 1992; pp. 332–354. Co-winner of the *Economic Inquiry* best article of the year award.

"The Competitive Effects of Japan's Export Cartel Associations." *Journal of the Japanese and International Economies*, Vol. 6, No. 3; September 1992; pp. 275–298.

"Learning-by-Doing and Dumping in the Semiconductor Industry." *Journal of Law and Economics*, Vol. 34, No. 1; April 1991; pp. 133–160.

## Selected antitrust conference presentations

US Chamber of Commerce, Global Regulatory Cooperation Program, "Merger Workshop for Competition Commission of India," Washington, DC, 2010.

New York State Bar Association, "Partial Acquisitions: Economic Analysis and Case Applications," New York, 2006.

Golden State Antitrust and Unfair Competition Law Institute, "Recent Developments in Antitrust Economics," San Francisco, 2005.

ABA Section of Antitrust Law Seminar, "Coordinated Effects Analysis: What Does it Mean After *FTC* v. *Arch Coal*?," Washington, DC, 2004.

UCLA Law First Annual Institute on US and EU Antitrust Aspects of Mergers and Acquisitions, "Coordinated Effects in Merger Analysis" and "Using Economics to Support a Merger Efficiencies Defense," Los Angeles, 2004.

Canadian Competition Bureau Roundtable on Tacit Collusion, "The Role of Asymmetries in Analyzing Coordinated Interaction," Ottawa, 2004.

Competition Law and Policy Forum, "Coordinated Effects in Merger Analysis," Cambridge, Canada, 2004.

Federal Trade Commission/US Department of Justice Joint Workshop on Merger Enforcement, "Strengthening the Micro Foundations for Coordinated Interaction in Merger Analysis," Washington, DC, 2004.

US Department of Justice/Federal Trade Commission, "Hearings on Health Care and Competition Law and Policy," chairman for session on "Monopsony Power," Washington, DC, 2003.

Federal Trade Commission Roundtable on "Understanding Mergers: Strategy and Planning, Implementation and Outcomes," Washington, DC, 2002.

Organization for Economic Cooperation and Development Conference on "Topics in Competition Policy," Vienna, 2001.

# EXHIBIT B

## Materials Relied on and Considered in Drafting Declaration

### Case Documents and Declarations

1. Complaint.
2. Plaintiffs' Memorandum of Law in Support of Its Application for a Preliminary Injunction.
3. Declaration of Bobby Mote.
4. Declaration of Dick Vetters.
5. Declaration of Eric S. Hochstadt.
6. Declaration of K.C. Jones.
7. Declaration of Karl Stressman.
8. Declaration of R.C. Trotter.
9. Declaration of Randy Bernard.
10. Declaration of Ryan Motes.
11. Declaration of Tony Garritano.
12. Declaration of Trevor Brazile.

### Academic Articles

1. Armen A. Alchian and Harold Demsetz, 1972, "Production, Information Costs, and Economic Organization," *American Economic Review*, Vol. 62, No. 5, pp. 777-95.
2. David Reitman, 1994, "Partial ownership arrangements and the potential for collusion," *The Journal of Industrial Economics*, Vol. 42, No. 3, pp. 313-22.
3. Edward P. Lazear and Sherwin Rosen, 1981, "Rank-Order Tournaments as Optimum Labor Contracts," *Journal of Political Economy*, Vol. 89, pp. 841-69.
4. Franklin M. Fisher, "Detecting Market Power," chapter 14 in *Issues in Competition Law and Policy* (W.D. Collins, ed.), American Bar Association, Antitrust Section, 2008, pp. 353-71.
5. Franklin M. Fisher, 1979, "Diagnosing Monopoly," *Quarterly Review of Economics and Business*, Vol. 19, No. 2, pp. 7-33.
6. James G. Lynch, 2005, "The effort effects of prizes in the second half of tournaments," *Journal of Economic Behavior and Organization*, Vol. 57, pp. 115-29.
7. Jon R. Gabel, et al., 2008, "Where do I send thee? Does physician-ownership affect referral patterns to ambulatory surgery centers?" *Health Affairs*, Vol. 27, No. 3, pp. w165-74.
8. Jonathan B. Baker and Timothy F. Bresnahan, 1992, "Empirical Methods of Identifying and Measuring Market Power," *Antitrust Law Journal*, Vol. 61, No. 1, pp. 3–16.
9. Michael T. Maloney and Robert E. McCormick, 2000, "The Response of Workers to Wages in Tournaments: Evidence from Foot Races," *Journal of Sports Economics*, Vol. 1, pp. 99-123.
10. Steven C. Salop and Daniel P. O'Brien, 2000, "Competitive effects of partial ownership: Financial interest and corporate control." *Antitrust Law Journal*, pp. 559-614.
11. William J. Baumol, 1982, "Contestable Markets: An Uprising in the Theory of Industry Structure," *American Economic Review*, Vol. 72, No. 1, pp. 1–15.

**Books**

1. Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed.), Boston, Addison-Wesley, 2005.
2. George J. Stigler, *The Organization of Industry*, University of Chicago Press, Chicago, IL, 1968.
3. Lynne Pepall, Daniel J. Richards, and George Norman, *Industrial Organization: Contemporary Theory and Practice* (3rd ed.), Mason, Ohio, Thomson South-Western, 2005.
4. Milton Friedman, *There's No Such Thing as a Free Lunch*, Open Court Publishing Company, 1975.
5. Stephen F. Ross and Stefan Szymanski, *Fans of the World, Unite!: A (Capitalist) Manifesto for Sports Consumers*, Stanford University Press, 2008.


**Publicly Available Materials**

1. 2015 PRCA Rodeo Schedule, *available at* http://www.prorodeo.com/prorodeo/rodeo/rodeo-results/2015-rodeo-results.
2. Brett Hoffman, "Major League Money," PBR Blog, March 6, 2010, *available at* http://www.pbr.com/en/news/blogs/brett-hoffman/2010/3/major-league-money.aspx.
3. Jeff Cordes, "Hailey rodeo is upgraded to PRCA event," *Idaho Mountain Express*, May 8-14, 2002, *available at* http://archives.mtexpress.com/2002/02-05-08/02-05-08oldwest.htm.
4. Lincoln Rogers, "New Pikes Peak or Bust Rodeo Format Good to Mosher: Colo. bareback cowboy earns 2nd place after four years away from rodeo," *Fence Post*, July 22, 2014, *available at* http://www.thefencepost.com/news/12251922-113/rodeo-mosher-ppob-2014.
5. Michael Mayo, "PGA Tour Defends Turf From Upstart," *Sun-Sentinel*, November 30, 1994, *available at* http://articles.sun-sentinel.com/1994-11-30/sports/9411290672_1_new-tour-world-tour-commissioner-tim-finchem.
6. PBR 2015 Media Guide.
7. PRCA 2014 Rule Book.
8. PRCA 2015 Media Guide.
9. Rainer Sabin, "Real cowboys coming to AT&T Stadium for richest 1-day rodeo ever," *Dallas Morning News*, August 22, 2013, *available at* http://www.dallasnews.com/sports/more-sports/headlines/20130822-att-stadium-to-host-richest-1-day-rodeo-in-sport-s-history-in-march.ece.
10. Sawtooth Rangers Riding Club Board of Directors, "Hailey rodeo rejoins IMPRA circuit," *Idaho Mountain Express*, April 27, 2005, *available at* http://archives.mtexpress.com/index2.php?issue_date=04-27-2005&ID=2005102866#.VlSZmnarSY1.
11. Steve Campbell, "Rodeo goes without sanctioning again after format works," *Houston Chronicle*, February 27, 2012, *available at* http://www.chron.com/sports/article/Rodeo-goes-without-sanctioning-again-after-format-3365595.php.

12. Thomas Boswell, "Sand in Golf's Engine," *Washington Post,* February 15, 1995.
13. Tony Bruguiere, "Young Rodeo hopefuls get free day of training from rodeo professionals," *Fence Post,* April 1, 2013, *available at* http://www.thefencepost.com/home/5729915-111/rodeo-prca-camp-youth.
14. United States Department of Labor, Bureau of Labor Statistics,  CPI for All Urban Consumers (CPI-U) 1982-84=100 (Unadjusted) - CUUR0000SA0, available at http://data.bls.gov/cgi-bin/surveymost?bls.
15. http://img.com/news/news/2015/april/wme---img-acquires-professional-bull-riders,-inc-.aspx.
16. http://nfrexperience.com/home/contestant_autograph_sessions.
17. http://pbr.com/en/education/history.aspx.
18. http://www.agjournalonline.com/article/20150318/NEWS/150319912/.
19. http://www.cinchrodeo.com/eventlanding.aspx.
20. http://www.pbr.com/en/news/press-releases/2015/10/professional-bull-riders-world-finals-qualifiers-announced.aspx.
21. http://www.pbr.com/en/riders/all-time-money-earners.aspx.
22. http://www.pbr.com/en/tpd/standings.aspx.
23. http://www.pbr.com/en/velocity/standings.aspx.
24. http://www.prorodeo.com/prorodeo/media/psn-subscription-info.
25. http://www.prorodeo.com/prorodeo/standings/prca-world-standings/world-standings?eventType=AA&year=2014.
26. http://www.reviewjournal.com/business/rfd-tv-devastated-lose-rodeo-broadcast-rights.
27. http://www.rfdtv.com/story/23228599/theamerican.
28. http://www.rfdtv.com/story/29835949/rfd-tvs-the-american-presented-by-polaris-ranger-returns-feb-28-2016-to-att-stadium#.VlYyiXYo43E.
29. http://www.rfdtv.com/story/30056290/about-the-american-2016.
30. http://www.sandimasrodeo.com/updates/pdf/2015-Sponsor-Package.pdf.
31. https://eraprorodeo.com/explore-era/faq/.
32. https://www.facebook.com/erarodeo.
33. https://www.spirecapital.com/portfolio/pbr.

## <u>CERTIFICATE OF SERVICE</u>

On December 4, 2015, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


<u>s/ Michelle Davis</u>
Michelle Davis