**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| THE ELITE RODEO ASSOCIATION | § | |
| d/b/a ELITE RODEO ATHLETES, | § | |
| TREVOR BRAZILE, BOBBY MOTE, | § | |
| AND RYAN MOTES, individually and on | § | |
| behalf of a class of similarly situated | § | |
| individuals, | § | No. 3:15-cv-03609-M |
| | § | |
|     Plaintiffs, | § | |
| | § | |
| PROFESSIONAL RODEO COWBOYS | § | |
| ASSOCIATION, INC., | § | |
| | § | |
|     Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Plaintiffs' Motion for a Preliminary Injunction [Docket

Entry #13] and Defendant's Motion to Dismiss [Docket Entry #21].  For the reasons

stated below, both Motions are **DENIED**.

### I.   BACKGROUND

Plaintiffs The Elite Rodeo Association ("ERA"), and Trevor Brazile, Bobby

Mote, and Ryan Motes, individually and on behalf of a class of similarly situated

individuals, seek preliminary relief from two bylaws adopted by Defendant Professional

Rodeo Cowboys Association, Inc. ("PRCA").  Plaintiffs claim the bylaws violate federal

antitrust laws, constituting agreements that unreasonably restrain trade in violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"), and monopolization in

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ("Section 2").  The PRCA

moves to dismiss the case under Federal Rule of Civil Procedure 12(b)(6).

The PRCA, the largest and most prestigious rodeo sanctioning organization in North America, is a not-for-profit membership organization.[1]  Its membership includes nearly 5,000 rodeo contestants and more than 2,000 non-contestants, including local rodeo organizing committees, livestock contractors, rodeo announcers, judges, and entertainers.[2]  The PRCA develops rodeo rules and procedures, trains judges, and contracts with rodeo organizing committees to sanction and support multiple-event rodeos that involve seven standard events: bareback riding, saddle bronc riding, bull riding, tie-down roping, team roping, steer wrestling, and barrel racing.[3]  The PRCA takes a six percent cut of the purse (prize money generally comprised of contestant entry fees and sponsorship money raised by local rodeo committees) at PRCA-sanctioned rodeos.[4]

The PRCA is an open membership organization—as a general matter, competitors who register and pay entry fees can compete in the approximately 600 PRCA-sanctioned rodeos that take place each year.[5]  Contestants accrue one point for each dollar they earn in PRCA events, and top earners are eligible to compete in the PRCA's annual championship event, the Wrangler National Finals Rodeo ("NFR"), which is held in Las Vegas and broadcast live on the CBS Sports Network.[6]  The NFR, considered "the Super

---

[1] 2015 PRCA Media Guide, Pl. App. [Docket Entry #15] at 96; Colo. Sec. of State, Pl. App. [Docket Entry #15] at 134; Def. Br. [Docket Entry #19] at 2.

[2] Karl Stressman Decl., Def. App. [Docket Entry #20] at ¶7; 2015 PRCA Media Guide, Pl. App. [Docket Entry #15] at 96.

[3] 2015 PRCA Media Guide, Pl. App. [Docket Entry #15] at 96, 104–05; Stressman Decl., Def. App. [Docket Entry #20] at ¶6.

[4] Tony Garritano Decl., Pl. App. [Docket Entry #15] at ¶10.

[5] Stressman Decl., Def. App. [Docket Entry #20] at ¶6; 2015 PRCA Media Guide, Pl. App. [Docket Entry #15] at 96.

[6] Stressman Decl., Def. App. [Docket Entry #20] at ¶¶3, 10–11; Def. Br. [Docket Entry #19] at 3–4.

Bowl of rodeo,"[7] offers the largest purse in the sport—around $12 million,[8] and PRCA-sanctioned rodeos award significantly more money annually than those sanctioned by any other rodeo association.[9]  In 2015, the total purse for PRCA-sanctioned rodeos was approximately $48 million.[10]  Plaintiffs maintain that "being a PRCA member is the only real option for anyone that wants to be a full-time professional rodeo athlete."[11]

     Recently, approximately eighty of the PRCA's most successful and highest-profile rodeo contestants—including its all-time highest earner and repeat world champion, Plaintiff Trevor Brazile—formed the ERA, a member-owned, for-profit, rodeo association.[12]  Plaintiffs claim that the member-owned structure is essential to the ERA's success, because it allows the ERA to consistently present top competitors at its rodeos and gives members greater financial security than they had otherwise.[13]  The ERA's founders sought to avoid certain aspects of the PRCA system; for example, purse sizes at PRCA rodeos often are not determined until a rodeo begins and then can vary greatly, with the result that a competitor can win more rodeos than another competitor but earn fewer points toward competing in the NFR; further, start times for PRCA events are determined randomly, so that high-profile competitors often compete at odd hours, before empty arenas, which interferes with their ability to obtain sponsors; and finally,

---

[7] Stressman Decl., Def. App. [Docket Entry #20] at ¶3.

[8] Garritano Decl., Pl. App. [Docket Entry #15] at ¶13; Stressman Decl., Def. App. [Docket Entry #20] at ¶12; Pl. Br. [Docket Entry #14] at 19.

[9] *See* Andrew Dick Testimony, Hr'g Tr. Dec. 29, 2015, at 228–29; Pl. Br. [Docket Entry #14] at 19.

[10] Garritano Testimony, Hr'g Tr. Dec. 29, 2015, at 121.

[11] Bobby Mote Decl., Pl. App. [Docket Entry #15] at ¶4.

[12] Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 8, 17; Garritano Decl., Pl. App. [Docket Entry #15] at ¶¶3–4.

[13] *See, e.g.*, Mote Testimony, Hr'g Tr. Dec. 29, 2015, at 89 – 90, 128.

competitors endure long seasons of cross-country travel, often competing in seventy or more rodeos, so as to amass enough points to qualify for the NFR.[14]

The ERA's inaugural season is set to begin in March 2016 and to culminate in November 2016, with the first ERA World Championship, at the American Airlines Center in Dallas. The regular season is set to consist of fifteen days of competition, in eight cities.[15] Venues and sponsors are lined up for those events.[16] The ERA has a five-year, multimillion dollar agreement with the City of Dallas to host the ERA World Championship, and with Fox Sports to broadcast the entire ERA season.[17] The World Championship will award a payout in excess of $3 million, making it "one of the largest payouts in rodeo history," according to an ERA press release.[18]

On September 15, 2015, the ERA's members announced that in 2016, they intended to prioritize the ERA's season, while continuing to compete in PRCA-sanctioned rodeos.[19] Shortly thereafter, motivated at least in part by the ERA's announcement,[20] the PRCA announced that at a closed emergency meeting, its board of directors had enacted two bylaws, to take effect on October 1, 2015.[21] The first bylaw states:

---

[14] Trevor Brazile Decl., Pl. App. [Docket Entry #15] at ¶¶6–13.

[15] ERA Press Release, PRCA Hearing Exhibit, [Docket Entry #44] at Tab 14.

[16] Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 42.

[17] ERA Press Release, Pl. App. [Docket Entry #15] at 19–20.

[18] *Id.*

[19] ERA Press Release, Pl. App. [Docket Entry #15] at 15–16.

[20] *See* Stressman Testimony, Hr'g Tr. Dec. 29, 2015, at 201; Response Br. [Docket Entry #19] at 5 ("The PRCA board of directors had been concerned for several years about potential conflicting interests of its members as well as the potential for competitors . . . piggy-backing on PRCA rodeo venues. The ERA's activities in 2015 brought these issues to a head.").

[21] Garritano Decl., Ex. E [Docket Entry #15] at 28; Stressman Testimony, Hr'g Tr. Dec. 29, 2015, at 203.

In order to ensure that PRCA members—whose popularity and success are the result of participation in PRCA-sanctioned rodeos and related PRCA promotional efforts and activities (and the associated costly investments the PRCA has made in promoting PRCA events and rodeo sports in general)—are not pursuing interests in Conflicting Rodeo Associations while receiving the benefits of PRCA membership and are putting forth their best efforts on behalf of the PRCA, *any person applying for PRCA membership who is an officer, board member, employee or has an ownership or financial interest of any form in a Conflicting Rodeo Association shall not be issued a membership, permit or renewal of membership with the PRCA*.[22]

The second bylaw provides:

In light of the PRCA's long-standing and ongoing efforts to create popular and successful PRCA-sanctioned professional rodeo competitions and promote rodeo sports in general, including but not limited to creating the National Finals Rodeo event and qualifying points systems, soliciting corporate sponsors and television contracts, establishing rodeo rules and regulations, and developing youth and new contestant growth programs—and in order to protect the quality of all PRCA-sanctioned events—*any rodeo committee and/or contracting party involved in producing a PRCA-sanctioned event agrees not to schedule, produce, promote or participate in a Competing Rodeo Event seventy-two hours before, during or seventy-two hours after a PRCA-sanctioned event*.  The PRCA shall have the right to approve specific events that are in conflict with this Bylaw should the PRCA deem any such event to be in the interest of its members and the promotion of professional rodeo sports in general.[23]

The bylaws apply only to rodeos, like ERA rodeos, in which competitors participate in two or more events.  Plaintiffs presented evidence from the PRCA Commissioner and CEO, Karl Stressman, that he met with rodeo committees after the adoption of the bylaws and implied that non-sanctioned, non-ERA rodeo committee

---

[22] Garritano Decl., Ex. E [Docket Entry #15] at 28 (emphasis added).
[23] *Id.* (emphasis added).

events that conflicted with the bylaws would likely receive exemptions.[24]  In contrast, he

stated that the ERA is not likely to receive an exemption.[25]

Plaintiffs then filed this lawsuit and moved for a preliminary injunction against

enforcement of the bylaws.  The PRCA moved for dismissal.  The Court held a hearing

on both motions on December 29, 2015, hearing testimony from Trevor Brazile, Bobby

Mote, Ryan Motes, ERA CEO and President Tony Garritano, PRCA Commissioner and

CEO Karl Stressman, and Defendant's expert, economist Dr. Andrew Dick.

## II.    LEGAL STANDARDS

"To be entitled to a preliminary injunction, a movant must establish (1) a

likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that

the threatened injury if the injunction is denied outweighs any harm that will result if the

injunction is granted; and (4) that the grant of an injunction will not disserve the public

interest."  *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015) (quoting *Trottie v.

Livingston,* 766 F.3d 450, 451 (5th Cir. 2014)).  If a party fails to satisfy any one of the

four elements, a district court may not grant a preliminary injunction.  *Miss. Power &

Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).  A preliminary

injunction is an "extraordinary and drastic remedy" that is to be granted "only when the

movant, by a clear showing, carries the burden of persuasion" as to each element.  *Digital

Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 772 (N.D. Tex. 2012) (quoting *Holland

Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).

---

[24] Stressman Testimony, Hr'g Tr. Dec. 29, 2015, at 210.
[25] *Id.*

To survive a Rule 12(b)(6) Motion to Dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard requires more than a sheer possibility that the defendant acted unlawfully, and a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## III.   ANALYSIS

The Court concludes that Plaintiffs have not made a clear showing that they will suffer irreparable harm absent a preliminary injunction, nor that they are likely to succeed on the merits their claims. However, Plaintiffs have pled sufficient facts to raise their prospects for relief above a speculative level.

### i.      Irreparable Harm

To satisfy the "irreparable harm" prong of the preliminary injunction test, a movant must show that "irreparable injury is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 569 (5th Cir. 2010). In general, "a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). The irreparable harm element "must be satisfied by independent proof." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

Plaintiffs claim they will suffer irreparable harm because they will be forced to choose between: 1) not competing in PRCA rodeos, including the NFR; and 2) giving up ownership interests in the ERA, which may lead to an unsuccessful inaugural season and the eventual destruction of the ERA. Plaintiffs argue that competitors who choose the first option will not be able to make a living as professional rodeo athletes, and that their inability to compete constitutes irreparable harm in and of itself. Plaintiffs also claim that many ERA members will be forced to choose the second option, in order to support themselves and their families, thus compromising the ERA's ability to find sponsors and business partners. Plaintiffs further claim that the ERA will not be able to establish itself because of lack of access to rodeo committees and contractors if PRCA members are unable to schedule, produce, promote, or participate in ERA events during, and for seventy-two hours before and after, PRCA events.

The Court concludes that Plaintiffs have not presented sufficient evidence to support their positions. The evidence shows that ERA members are projected to be able to earn as much through ERA rodeos as they previously earned through the PRCA. For example, Plaintiffs presented evidence regarding Bobby Mote's net earnings. He testified that his net earnings in 2015 were $30,000: approximately $100,000 earned at forty-eight regular season rodeos, and $40,000 at the NFR, offset by $110,000 in costs for medical expenses, travel, entry fees, and the like.[26] For the ERA's 2016 regular season events, the evidence was that a very successful ERA competitor could earn approximately $80,000 at regular season ERA events,[27] and an additional $3 million will

---

[26] Mote Testimony, Hr'g Tr. Dec. 29, 2015, at 93, 104, 117.
[27] Garritano Testimony, Hr'g Tr. Dec. 29, 2015, at 176.

be awarded at the World Championship.[28]  The ERA's business model also minimizes the

athletes' expenses, by eliminating entry fees which can exceed $20,000 per year,[29] and

reducing the number of rodeos ERA competitors attend, thus reducing travel costs which

can exceed $50,000 per year.[30]  An ERA member could thus potentially accrue gross

earnings of $80,000 in eight trips, instead of $100,000 in forty-eight.[31]

Further, the ERA did not prove that its owners would be excluded or impeded

from lucrative "open rodeos," which are not sanctioned by any sanctioning body, most

significantly RodeoHouston, Calgary Stampede, and The American.  RodeoHouston

awarded approximately $2 million in prizes in 2012, and The American has announced

plans to award a purse worth $3 million in 2016.[32]  Currently, participation in those

rodeos is largely based on performance in the PRCA, but ERA owners participated in

PRCA rodeos in 2015, and thus, to the extent invitations to open rodeos are based on the

previous year's NFR results, it appears ERA owners' eligibility for this year is already

---

[28] PRCA Hearing Exhibit [Docket Entry #44], Tab 5, at 12.

[29] PRCA Hearing Exhibit [Docket Entry #44], Tab 5, at 12; Garritano Testimony, Hr'g Tr. Dec. 29, 2015,  at 175; *see also* Brazile Decl., Pl. App. [Docket Entry #15] at ¶13 ("Entry fees for rodeos can exceed $20,000 annually.").

[30] *See* Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 18 (noting that he spends approximately $50,000 on gas and $30,000 on entry fees, in addition to other travel expenses incurred for more than seventy rodeos per year); Mote Testimony, Hr'g Tr. Dec. 29, 2015, at 93 (stating that his expenses in 2015 totaled approximately $110,000).

[31] Of course, presumably not every ERA participant can earn $80,000 during the ERA's regular season, but Plaintiffs have not presented evidence from which the Court can conclude that, overall, ERA owners do not have a comparable chance of making a living in professional rodeo as compared to PRCA competitors.  *Cf.* Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 20 (recognizing that, like competitors who do not place at ERA rodeos, PRCA competitors who do not perform well "don't get a dime").

[32] Dick Declaration, Def. App. [Docket Entry #20] at ¶¶19–20; *see also* K.C. Jones Decl., Def. App. [Docket Entry #20] at ¶6 (stating that rodeo cowboy Jones won $400,000 based on performance at The American in 2015).

determined.[33]  (If that assumption of the Court is incorrect, it is due to Plaintiffs' failure

to prove otherwise.)  Further, Plaintiffs made no showing that, in the future, if the top

rodeo athletes do not participate in the PRCA, open rodeos will likely continue to invite

participants based only on PRCA standings.

Plaintiffs also claim that a regular television schedule for ERA events, guaranteed

to include forty-two hours of television coverage, will enable the athletes to attract better

sponsorships, merchandising, and licensing opportunities.[34]  Brazile also testified

that the PRCA has nothing to do with his current sponsorships.[35]  Although the rodeo

profession presents substantial risk to cowboys, the evidence indicates that there is a

reasonable possibility that ERA members' net earnings in 2016, even without an

injunction, may equal or exceed their net earnings in the PRCA.

Plaintiffs also have not shown that their inability to compete in PRCA rodeos

constitutes irreparable harm in and of itself.  It is true that some courts have concluded

that lost playing time can constitute irreparable harm to professional athletes.  *See*, *e.g.*,

*Brady v. Nat. Football League*, 779 F. Supp. 2d 992, 1035–36 (D. Minn. 2011),

*abrogated on other grounds sub nom Brady v. Nat. Football League*, (8th Cir. 2011);

*Linseman v. World Hockey Ass'n*, 439 F. Supp. 1315, 1319–20 (D. Conn. 1977); *Denver*

---

[33] Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 16–17 ("[I]f you are a top ten finisher [at the NFR], then you are seeded at the American. . . . [Calgary] take[s] the top ten from the [NFR].").

[34] Garritano Testimony, Hr'g Tr. Dec. 29, 2015, at 156–57 (agreeing that if the ERA is successful, ERA owners will have better sponsorship, merchandising, and licensing opportunities than they have with the PRCA); Mote Testimony, Hr'g Tr. Dec. 29, 2015, at 105 ("I think through the added exposure that I'll get through the ERA, through 42 hours of television, that my opportunities to have sponsorships will allow me to supplement my income."); Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 47–48 (stating that Brazile earns at least $450,000 per year from sponsorships).

[35] Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 46.

*Rockets v. All-Pro Management, Inc.*, 325 F. Supp. 1049, 1062, 1057 (C.D. Cal. 1971),

*reinstated by Haywood v. Nat'l Basketball Ass'n*, 401 U.S. 1204 (1971).  However, those

cases differ from this one in important respects.

  In cases recognizing lost playing time alone as constituting irreparable harm,

athletes were entirely locked out of their sports.  *See Brady*, 779 F. Supp. 2d at 1036

(recognizing that a National Football League lockout would lead to players "sitting out a

season" and "time spent off the playing field"); *Linseman*, 439 F. Supp. at 1319 (holding

that preventing a hockey player from participating in a professional hockey league caused

irreparable harm where an alternate league was an "amateur" league, in which he could

not "practice against the very best competition" or achieve "superstar" status); *Denver

Rockets*, 325 F. Supp. at 1055, 1057 (finding that a basketball player unable to play for

the National Basketball Association after high school would suffer irreparable injury

where competition there was "superior to the quality of competition" in the only other

professional league, and thus the player's "physical condition, skills and coordination

[would] deteriorate from lack of high[ ]level competition, [and] his public acceptance as a

super star [would] diminish to the detriment of his career").[36]

  Here, Plaintiffs are unable to compete in the PRCA because they own and are

competing professionally in the competing ERA, arguably at a higher level of

---

[36] In other cases, athletes demonstrated that restrictions on their ability to play for teams of their choosing caused particular harms.  *See Jackson v. NFL* , 802 F. Supp. 226, 230–31 (D. Minn. 1992) (finding that demonstrated harms, such as "inability to play for teams that . . . better utilize their skills, and thus maximize their value, [and] inability to switch to teams that . . . play on natural grass (which may prolong a player's career)" were irreparable).  Such demonstrated harms were not proven here.

competition, and which they claim will lead to increased exposure to fans, improved ability to attract sponsors, better health, and longer careers.

Plaintiffs point to *Medlin v. Professional Rodeo Cowboys Association*, 1991 LEXIS 20847 (D. Colo. 1991), in which a district court found that a PRCA bylaw, which banned competitors who had participated in any non-PRCA rodeo from the NFR, caused those cowboys irreparable harm. However, like the plaintiffs in *Brady*, *Linseman*, and *Denver Rockets*, the plaintiffs in *Medlin* showed that, if they were locked out of the NFR, they could not compete at the pinnacle of their sport, because PRCA-sanctioned rodeos were "the best rodeos in the country" and NFR champions were widely recognized as the world champions in the sport. *Id.* There was no alternative for professional rodeo cowboys. Here, Plaintiffs seek to create competing rodeos and a world championship better than the NFR.[37] As discussed below, the evidence indicates that they will have a successful first season, regardless of the PRCA bylaws. Thus, the Court finds that the kinds of harms recognized in prior lost-playing-time cases are not present here. Plaintiffs have not shown that they are likely to spend a year on the sidelines getting rusty, suffering injury, and fading in popularity.

Plaintiffs also rely on *North American Soccer League v. National Football League*, 465 F. Supp. 665, 669 (S.D.N.Y. 1979), which held that that a National Football League bylaw, prohibiting NFL team owners from having a financial interest in another major team sport, threatened irreparable harm to the North American Soccer League ("NASL"). Recognizing that the NASL was a "newcomer to the ranks of professional team sport leagues," the court found that the rule jeopardized the NASL's ability to

---

[37] Garritano Testimony, Hr'g Tr. Dec. 29, 2015, at 152–53.

establish vital business relationships, because potential business partners and investors needed to be convinced that it was "a stable and successful league with a bright economic future." *Id.* The destabilizing effect of NFL owners divesting themselves of their interests in the NASL constituted irreparable harm. *Id.* at 671–72.

Plaintiffs have not proven to this Court that the ERA will suffer the same type of destabilizing effect due to the bylaws at issue here. In *North American Soccer League*, the court found that in the absence of an injunction, NFL owners were not likely to abandon the NFL for the NASL; rather, NFL owners would immediately begin selling their NASL interests. *Id.* Here, Plaintiffs have not proven that ERA members will choose the PRCA over the ERA. As an initial matter, although the stock agreement was not introduced, the testimony was that the ERA owners' stock agreements obligate them to participate in ERA events.[38] The testimony was not clear as to whether they can relieve themselves of that obligation or of their stock ownership.[39] Further, none of the three named Plaintiffs who are actually ERA owners testified they would leave the ERA if an injunction was denied. Instead, the ERA's witnesses speculated that *other* ERA owners might abandon it. Brazile recognized that, as the highest earner in rodeo history, he would likely be able make a living competing only in ERA and open rodeos, and stated that he did not believe he would give up his ownership interest in the ERA if the Court denied a preliminary injunction.[40] It is not clear whether Plaintiff Bobby Mote will be able to participate in rodeo at all in the future, because of a serious neck injury.[41] He

---

[38] Garritano Testimony, Hr'g Tr. Dec. 29, 2015, at 173–74.
[39] Garritano Testimony, Hr'g Tr. Dec. 29, 2015, at 180–81.
[40] Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 26, 43.
[41] Mote Testimony, Hr'g Tr. Dec. 29, 2015, at 102 ("[A]t my age, there's no guarantees that I come back from . . . neck surgery. I mean, I'm being optimistic at best.").

did not testify that he would leave the ERA, if he continues to compete, instead stating that *other* members of the ERA, at "different stages in their career[s]," might "have to not be involved in the ERA."[42]  Finally, although Plaintiff Ryan Motes said he needed to compete in PRCA rodeos to make a living, he did not testify that he would leave the ERA without a preliminary injunction barring enforcement of the new PRCA bylaws.[43]  The evidence also showed that the ERA apparently does not now need to recruit additional participants; it has commitments from eighty competitors, about the number the evidence indicated the ERA desired.[44]

Even if some ERA members give up their ownership interests, the evidence does not show that the ERA will be unsuccessful.  According to its CEO, the ERA has "secured the assets needed to enter the marketplace."[45]  Eight cities have scheduled ERA events in 2016, for a total of fifteen days of competition, all of which will be broadcast on a major television network.[46]  Apparently, none of these events conflict with the PRCA bylaws.[47]  Some sponsors are lined up for those events,[48] and the ERA has an anonymous financial backer, who, according to Garritano, the ERA may turn to for additional financial support in the absence of a preliminary injunction.[49]

---

[42] Mote Testimony, Hr'g Tr. Dec. 29, 2015, at 97.
[43] Motes Testimony, Hr'g Tr. Dec. 29, 2015, at 64.
[44] Garritano Testimony, Hr'g Tr. Dec. 29, 2015, at 174–75.
[45] Garritano Testimony, Hr'g Tr. Dec. 29, 2015, at 165.
[46] Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 24; Mote Testimony, Hr'g Tr. Dec. 29, 2015, at 118; ERA Press Release, PRCA Hearing Exhibit [Docket Entry #44], Tab 14.
[47] Mote Testimony, Hr'g Tr. Dec. 29, 2015, at 117–18.
[48] Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 42.
[49] Garritano Testimony, Hr'g Tr. Dec. 29, 2015, at 157–58.

As Brazile testified, "we don't know what is going to happen" without an injunction.[50] *See also* Garritano Testimony, Transcript at 157–58 (stating that he did not know what would happen if the injunction were denied).  A preliminary injunction cannot be granted based on speculation.  *Janvey*, 647 F.3d at 601.  Plaintiffs bore the burden of making a clear showing of irreparable harm sufficient to justify injunctive relief, but their evidence did not meet that burden.

###### ii.        Likelihood of Success on the Merits

A movant must present a prima facie case to show a likelihood of success on the merits.  *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey*, 647 F.3d at 595–96).

###### a.  Plaintiffs' Section 1 Claim

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."[51]  To succeed on a Section 1 claim, "plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market."  *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015) (quoting *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996)).  "Section 1 is only concerned with concerted conduct among separate economic actors rather than their independent or merely parallel action" and therefore generally does not apply to the actions of single entities.  *Id.*; *Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 190 (2010).

---

[50] Brazile Testimony, Hr'g Tr. Dec. 29, 2015, at 43.
[51] 15 U.S.C. § 1.

Plaintiffs claim the PRCA bylaws are not the action of a single entity, but rather constitute an agreement among separate economic actors with separate interests. "Agreements made within [professional organizations and associations] can constitute concerted action . . . when the parties to the agreement act on interests separate from those of the [entity] itself, and the intra-[entity] agreements may simply be a formalistic shell for ongoing concerted action." *Am. Needle*, 560 U.S. at 200; *Abraham & Veneklasen Joint Venture*, 776 F.3d at 327. Courts engage in a "functional analysis of the parties' actual participation in the alleged anticompetitive conduct" to determine if concerted action occurred. *Abraham & Veneklasen Joint Venture*, 776 F.3d at 327; *Am. Needle, Inc.*, 560 U.S. at 200. The "key" consideration is whether the agreement "joins together 'separate decisionmakers,' *i.e.*, 'separate economic actors pursuing separate economic interests.'" *Abraham & Veneklasen Joint Venture*, 776 F.3d at 327–28 (quoting *Am. Needle,* 560 U.S. at 195).

In *American Needle*, the Supreme Court held that the NFL and its teams engaged in concerted action when they voted to authorize their intellectual property company to exclusively license their intellectual property. The Court found that the NFL and its teams were legally capable of conspiring, because they did "not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action," but instead "compete[d] with one another . . . to attract fans, for gate receipts and for contracts with managerial and playing personnel." 560 U.S. at 196–97. Thus, the teams acted to advance their own interests in agreeing to collectively license their intellectual property. *Id.* at 199–200. That they were operating independently through a corporation did not protect their agreement from Section 1 scrutiny.

"Competitors 'cannot simply get around' antitrust liability by acting 'through a third-party intermediary or joint venture.'" *Id.* at 202 (quoting *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 336 (2d Cir. 2008)).

Various rules and bylaws enacted by sports associations have been found to constitute concerted action. *See, e.g.*, *Hennessey v. Nat'l Collegiate Athletic Ass'n*, 564 F.2d 1136, 1147 (5th Cir. 1977) (NCAA bylaw limiting the maximum number of assistant football and basketball coaches colleges could employ); *Nat. Hockey League Players Ass'n v. Plymouth Whalers*, 419 F.3d 462, 469–70 (6th Cir. 2005) (Canadian hockey league eligibility rule preventing teams from signing twenty-year-olds playing college hockey in the United States); *Brady*, 779 F. Supp. 2d at 1040 (agreement of NFL teams to lock out players); *North Am. Soccer League*, 465 F. Supp. At 665 (proposed NFL bylaw preventing team owners from owning other sports teams).[52]

Relying on *Abraham & Veneklasen Joint Venture*, 776 F.3d at 327, Defendant argues that the *only* circumstances where an association is legally capable of conspiring with its members is where the association's board is "dominated by members that compete with one another outside" the association, and thus the "composition of the PRCA board effectively precludes plaintiffs from showing that the vote on the subject bylaws constitutes 'concerted action.'" Def. Br. [Docket Entry #19] at 8–9. The PRCA's nine-member board of directors is made up of two directors representing rodeo

---

[52] In *Medlin v. PRCA*, No. 91-N-2082 (D. Colo. Dec. 13, 1991), the court, without discussion, stated that the bylaw "appear[ed] to be a horizontal conspiracy." *Id.*; *see also Stone v. Professional Rodeo Cowboys Association*, No. 81-Z-1546 (D. Colo. 1985) (enjoining enforcement of a PRCA bylaw under the Sherman Act). The Court gives these cases little weight. *Stone* enjoined a PRCA bylaw only after a jury verdict found the existence of a conspiracy, and *Medlin* reflects little analysis of the issue of conspiracy.

committees, two directors representing stock contractors, a director representing contract personnel, and four directors representing rodeo contestants,[53] only two of whom are now actively competing.[54]   Therefore, the board is not dominated by horizontal competitors. Defendant asks the Court to dismiss Plaintiffs' Section 1 claim based on this allegedly fatal flaw.

*Abraham & Veneklasen Joint Venture* raised the question of whether every association can conspire with its members, regardless of the association's size and composition, along with the structure of its governing body.  776 F.3d at 327–30.  The court there distinguished *American Needle*—where *all* NFL teams had to approve the rule and *all* had an economic incentive to conspire—from the facts in its case, where the American Quarter Horse Association ("AQHA") adopted bylaws through a board composed of "a tiny number of economic actors," some of whom competed with each other, and numerous others who were not involved in the relevant market, and thus did not profit from the challenged exclusionary conduct.  *Id.* at 328–29.  Ultimately, however, the court assumed that AQHA and its members *could* legally conspire through AQHA bylaws and focused on whether the facts showed that they actually *had* conspired through the particular bylaw at issue.  *Id.* at 330.  Although the Fifth Circuit assumed AQHA was legally capable of conspiring with its members, the court found insufficient evidence of conspiracy; because only a minority of committee members stood to gain financially from the bylaw, and there was no evidence regarding other members'

---

[53] Stressman Testimony, Hr'g Tr. Dec. 29, 2015, at 202–03; Stressman Decl., Def. App. [Docket Entry #20] at ¶5.

[54] The testimony was that board member Bret Tonozzi "ropes a little bit but . . . certainly doesn't go full time," and board member Fred Boettcher is a retired bull rider.  Stressman Testimony, Hr'g Tr. Dec. 29, 2015, at 202–03.

motivations, the evidence did not show a "common design and understanding, or a meeting of the minds," as required.  *Id.* at 330–33.

Similarly, here, the Court will assume concerted action could legally have occurred, but the evidence Plaintiffs presented does not make a "clear showing" of a conspiracy or concerted action.  Plaintiffs claim that, through the bylaws, rodeo committees agreed with each other and the PRCA not to compete to recruit ERA members for their rodeos, and to limit the ERA, a competitor of the PRCA, from access to contractors, venues, and suppliers, completely for seventy-two hours before and after PRCA events.[55]  Plaintiffs also claim that when Stressman met with rodeo committees and discussed granting exemptions to that time-related bylaw, it was de facto agreement that the ERA would not receive an exemption.

The record was not sufficient regarding who participated in what way in adopting and implementing the questioned bylaws.  As in *Abraham & Veneklasen Joint Venture*, Plaintiffs did not show that a majority of the board members stood to profit from the allegedly anticompetitive bylaws.  The evidence shows only that rodeo committees and active rodeo contestants could arguably benefit financially from the bylaws, and those groups make up a minority of the PRCA board.[56]  The Court cannot infer from the passage of the bylaws and the evidence presented that the allegedly conspiring parties "knew the essential nature and general scope of the joint plan," and had a meeting of the minds to achieve it.  *MM Steel v. JSW Steel*, 806 F.3d 835 (5th Cir. 2015) (internal quotation marks and citation omitted); *Abraham & Veneklasen Joint Venture*, 776 F.3d at

---

[55] Hr'g Tr. Dec. 29, 2015, at 260.
[56] Stressman Testimony, Hr'g Tr. Dec. 29, 2015, at 202–03.

331 ("[M]ore than the existence of the financial interests of a few is required to prove a conspiratorial agreement among them.").  Plaintiffs thus have not made a clear showing of likelihood of success on the merits of their Section 1 claim.

### b.  Plaintiffs' Section 2 Claim

Section 2 of the Sherman Act covers both concerted and independent action, but only if that action "monopolize[s]."  15 U.S.C. § 2; *Am. Needle, Inc.*, 560 U.S. at 190.  A violation of Section 2 occurs when "the asserted violator: 1) possesses monopoly power in the relevant market; and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident."  *Abraham & Veneklasen Joint Venture*, 776 F.3d at 334 (quoting *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999)).

The Court concludes that Plaintiffs have not made a clear showing that the PRCA possesses monopoly power in the relevant market.[57]  An entity has monopoly power if it has the ability "to control prices or exclude competition."  *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1117 (5th Cir. 1984) (quoting *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391 (1956)) (internal quotation marks omitted).  One way to determine whether a defendant can control prices or exclude competition is by

---

[57] As an initial matter, in order to evaluate market power, the relevant market must be defined.  *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir. 1984).  Plaintiffs identify the relevant market as "the market for professional rodeo athletes" and "competition in the sport of rodeo."  Mot. [Docket Entry #14] at 14; Reply [Docket Entry #30] at 7.  Defendant has not argued that the market is inadequately defined.  Def. Br. [Docket Entry #19] at 12–15.  Neither party presented evidence or argument regarding market definition.  The Court thus accepts Plaintiffs' market definition, only for the purpose of resolving the present Motions.

analyzing the defendant's share of the market.  Plaintiffs have not presented expert testimony regarding how to properly calculate PRCA's market share, but by any metric, it appears that the PRCA's share is substantial.  The PRCA is larger, sanctions significantly more rodeos, and awards substantially more money than does any other rodeo sanctioning organization.

However, "high market share, in the absence of significant entry barriers, can 'overestimate . . . market power.'"  *Am. Cent. E. Texas Gas Co. v. Union Pac. Res. Grp., Inc.*, 93 F. App'x 1, 8 (5th Cir. 2004) (citing *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.,* 885 F.2d 683, 695-696 (10th Cir. 1989)); *Indiana Grocery, Inc. v. Super Value Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) (market share "is at best an indicator of market power in certain cases").  Even if a defendant has a large market share, "absent barriers to entry, there is no way to exclude competition[,] thereby controlling prices."  *Big River Indus., Inc. v. Headwaters Res., Inc.*, 971 F. Supp. 2d 609, 617 (M.D. La. 2013) (citing *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1388 (5th Cir. 1994)).

Plaintiffs have not made a clear showing that the PRCA has the power to exclude competition or that other barriers to entry to the relevant market exist.  Instead, the initial success the ERA has experienced so far, despite the PRCA's obvious hostility, indicates that the PRCA does not have the ability to exclude competitors from the market: Plaintiffs have recruited eighty of the top contestants in the sport as its owners and competitors, and secured contracts with the City of Dallas, a high-profile performance venue, and a major television network.

Additionally, the evidence shows that other entities have successfully entered the market for professional rodeo athletes. The American entered the market in 2014 and has attracted top competitors and awarded significant and growing purses.[58] RodeoHouston has operated as a non-PRCA rodeo since 2011, and similarly attracts top athletes and awards large purses.[59] Finally, the highly-successful Professional Bull Riders, which sanctions single-event bull riding competitions, entered the market in 1992 and now allegedly awards top contestants more money than the PRCA awards its top athletes.[60] Thus, Plaintiffs have not made a clear showing that Defendant has monopoly power, and have not established a likelihood of success on their Section 2 claim.

However, the Court will not dismiss Plaintiffs' Section 2 claim. Plaintiffs have sufficiently and plausibly pled the existence of monopoly power. *See In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 382 (E.D. La. 2013); *Volvo N. Am. Corp. v. Men's Intern. Professional Tennis Council*, 857 F.2d 55, 73 (2d Cir. 1988).

IV.    **CONCLUSION**

Because Plaintiffs have not carried their burden of establishing irreparable harm or likelihood of success on the merits, the Motion for a Preliminary Injunction is **DENIED**. However, Defendant's Motion to Dismiss is also **DENIED**.

       **SO ORDERED.**

       February 4, 2016.

                                         (BARBARA M. G. LYNN
                                         UNITED STATES DISTRICT JUDGE
                                         NORTHERN DISTRICT OF TEXAS

---

[58] Randy Bernard Decl., Def. App. [Docket Entry #20] at ¶¶ 6–7; Dick Decl. Def. App. [Docket Entry #20] at ¶20.
[59] Dick Decl. Def. App. [Docket Entry #20] at ¶19.
[60] Dick Decl. Def. App. [Docket Entry #20] at ¶¶17, 26.